# 14-1712

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

WILLIAM I. KOCH,

*Plaintiff-Counter-Defendant-Appellee*,

v.

ERIC GREENBERG,

*Defendant-Counter-Claimant-Appellant.*

ZACHYS WINE & LIQUOR STORE, INC., a New York corporation,
ZACHYS WINE AUCTIONS INC., a New York corporation,

*Defendants*,

MR. JUSTIN CHRISTOPH, MR. JOHN KAPON,

*Intervenors.*

---

On Appeal from the United States District Court
for the Southern District of New York

---

## PAGE-PROOF BRIEF OF APPELLANT ERIC GREENBERG
## AND SPECIAL APPENDIX

---

DAVID C. FREDERICK
DANIEL G. BIRD
W. JOSS NICHOLS
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (facsimile)
*Attorneys for Defendant-Counter-
Claimant-Appellant Eric Greenberg*

November 18, 2014

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..................................................................................iv

INTRODUCTION ...............................................................................................1

JURISDICTIONAL STATEMENT ......................................................................3

ISSUES PRESENTED FOR REVIEW ................................................................4

STATEMENT OF THE CASE..............................................................................4

    I.     FACTUAL BACKGROUND ..................................................................5

          A.    Greenberg's Wine Collection ..................................................5

          B.    Wine Inspection .......................................................................6

          C.    Sotheby's Pursues Greenberg's Collection Despite Questionable Wines .....................................................................6

          D.    Greenberg Investigates His Collection ....................................8

          E.    Greenberg Pursues Auctions With Christie's And Zachys .....................................................................................9

          F.    Greenberg Encounters More Questionable Wine .....................11

          G.    Greenberg Continues Selling Wine .........................................12

          H.    Zachys' December 2004 Auction .............................................14

          I.    Zachys' October 2005 Auction.................................................15

               1.    The Consignment Agreement.........................................15

               2.    Zachys' Inspections ......................................................16

               3.    Lotting.............................................................................19

               4.    Zachys' Catalog .............................................................19

               5.    Koch's Preparations........................................................21

               6.    The Auction ...................................................................22

J.    Koch Questions The Authenticity Of Some Of Greenberg's Wine ..................................................................22

K.    Greenberg Continues Auctioning Wine.................................23

II.    PROCEDURAL BACKGROUND .......................................................24

A.    Pre-Trial .................................................................................24

B.    Trial ........................................................................................25

C.    Verdicts and Post-Trial Motions............................................26

SUMMARY OF ARGUMENT ......................................................................27

STANDARD OF REVIEW ...........................................................................31

ARGUMENT ................................................................................................31

I.    GREENBERG DID NOT COMMIT FRAUD ...............................31

A.    Koch's Reliance Was Unjustified As A Matter Of Law.........................................................................................32

1.    Koch Unjustifiably Relied on Specifically Disclaimed Information.................................................32

2.    Greenberg Did Not Have "Peculiar Knowledge" ..................................................................34

a.    Koch's refusal to inspect precludes "peculiar knowledge" ............................................35

b.    The district court misunderstood "peculiar knowledge" ............................................38

3.    Koch's Reliance Was Unjustified in Light of the Entire Context of the Transaction............................41

B.    Zachys' Independent, Intermediary Role Precludes Fraud By Greenberg As A Matter Of Law ..............................43

1.    Greenberg Did Not Make Actionable Misrepresentations.........................................................43

ii

          a.     Greenberg did not make indirect misrepresentations to Koch ...................43

          b.     Alternatively, Koch has not identified any actionable misrepresentations on which he relied ....................46

      2.     Greenberg Did Not Owe Koch a Duty To Disclose.................................48

II.    GREENBERG DID NOT VIOLATE GBL § 349 AND § 350 .......................................................................52

    A.    The Auction Was Not Materially Misleading...........................52

    B.    Consigning High-End Wine For Auction Is Not Consumer-Oriented Conduct ......................................55

III.   AS A MATTER OF LAW, GREENBERG SHOULD NOT BE LIABLE FOR PUNITIVE DAMAGES ............................58

    A.    Punitive Damages Are Available For Fraud Only When Egregious Misconduct Is Aimed At The General Public.........................................................58

    B.    Greenberg's Conduct Was Not Egregious Or Aimed At The General Public...................................60

CONCLUSION ...........................................................................................63

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

SPECIAL APPENDIX:

    Opinion and Order (Mar. 31, 2014)...........................................SA1

    Judgment (May 9, 2014)..........................................................SA62

STATUTORY ADDENDUM:

    N.Y. Gen. Bus. Law § 349

    N.Y. Gen. Bus. Law § 350

**TABLE OF AUTHORITIES**

Page

**CASES**

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112
(2d Cir. 1984)........................................................................48, 50

*ACA Galleries, Inc. v. Kinney*, 928 F. Supp. 2d 699 (S.D.N.Y. 2013),
*aff'd*, 552 F. App'x 24 (2d Cir. 2014) .......................................35, 38

*Against Gravity Apparel, Inc. v. Quarterdeck Corp.*, 699 N.Y.S.2d
368 (App. Div. 1st Dep't 1999)....................................................54

*Albion Alliance Mezzanine Fund, L.P. v. State Street Bank &
Trust Co.*, 797 N.Y.S.2d 699 (Sup. Ct. N.Y. Cnty.), *aff'd*,
767 N.Y.S.2d 619 (App. Div. 1st Dep't 2003).......................... 48-49

*Amend v. Hurley*, 59 N.E.2d 416 (N.Y. 1944)......................................49

*Andre Strishak & Assocs., P.C. v. Hewlett Packard Co.*, 752 N.Y.S.2d
400 (App. Div. 2d Dep't 2002)....................................................52

*Banque Arabe et Internationale D'Investissement v. Maryland Nat'l
Bank*, 57 F.3d 146 (2d Cir. 1995)....................................31, 34, 39, 48

*Benetech, Inc. v. Omni Fin. Group, Inc.*, 984 N.Y.S.2d 186
(App. Div. 3d Dep't 2014)...........................................................55

*Borkowski v. Borkowski*, 355 N.E.2d 287 (N.Y. 1976)...........................59

*Brass v. American Film Techs., Inc.*, 987 F.2d 142 (2d Cir. 1993)...................49, 50

*Carvel Corp. v. Noonan*, 350 F.3d 6 (2d Cir. 2003)................................59

*Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*,
148 F.3d 194 (2d Cir. 1998) ........................................................47

*Century Pac., Inc. v. Hilton Hotels Corp.*, 354 F. App'x 496
(2d Cir. 2009)............................................................................41

*Cleghorn v. New York Cent. & H.R.R. Co.*, 11 Sickels 44 (N.Y. 1874)..................58

*Cristallina S.A. v. Christie, Manson & Woods Int'l, Inc.*,
502 N.Y.S.2d 165 (App. Div. 1st Dep't 1986)...............................45

*Cruz v. NYNEX Info. Res.*, 703 N.Y.S.2d 103 (App. Div. 1st Dep't 2000) ..........................................................................................46

*Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775 (2d Cir. 2003) ..........31, 32, 34, 36, 38, 39

*Danann Realty Corp. v. Harris*, 157 N.E.2d 597 (N.Y. 1959).....................32, 34, 39

*Denenberg v. Rosen*, 897 N.Y.S.2d 391 (App. Div. 1st Dep't 2010)................56, 57

*Donovan v. Aeolian Co.*, 200 N.E. 815 (N.Y. 1936) ...............................................51

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) .....................................................................40, 41

*Fioramonti v. McGrath*, 919 N.Y.S.2d 907 (App. Div. 2d Dep't 2011)................59

*Foxley v. Sotheby's Inc.*, 893 F. Supp. 1224 (S.D.N.Y. 1995) .......................... 35-36

*Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275 (2d Cir. 1975)....................................................................................48

*Gomez-Jimenez v. New York Law Sch.*, 956 N.Y.S.2d 54 (App. Div. 1st Dep't 2012)....................................................................52, 53

*Green v. Leibowitz*, 500 N.Y.S.2d 146 (App. Div. 2d Dep't 1986) .......................59

*Greiss v. Royal Nat'l Bank*, 293 N.E.2d 827 (N.Y. 1973)......................................59

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729 (2d Cir. 1984)...................................................................32, 33, 34, 36, 42

*Highland Capital Mgmt. LP v. Schneider*, 607 F.3d 322 (2d Cir. 2010) ................31

*Industrial Risk Insurers v. Ernst*, 638 N.Y.S.2d 109 (App. Div. 2d Dep't 1996)....................................................................................50

*James v. Powell*, 225 N.E.2d 741 (N.Y. 1967).......................................................58

*Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011)..................................................................................................44

*Julie Research Labs., Inc. v. General Resistance, Inc.*, 268 N.Y.S.2d 187 (App. Div. 1st Dep't 1966), *aff'd*, 227 N.E.2d 892 (N.Y. 1967) ..................46

*Junius Constr. Co. v. Cohen*, 178 N.E. 672 (N.Y. 1931) ...................................50, 51

*Kelly v. Defoe Corp.*, 636 N.Y.S.2d 123 (App. Div. 2d Dep't 1996).......... 58, 59-60

*Kim v. Hurston*, 182 F.3d 113 (2d Cir. 1999) .......................................................31

*Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675 (N.Y. 2012)......................54

*Koufakis v. Carvel*, 425 F.2d 892 (2d Cir. 1970) ....................................................59

*Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531
    (2d Cir. 1997).................................................................................34, 40, 41

*Lebowitz v. Dow Jones & Co.*, 847 F. Supp. 2d 599 (S.D.N.Y. 2012),
    *aff'd*, 508 F. App'x 83 (2d Cir. 2013) ...........................................................53

*Long v. Fitzgerald*, 659 N.Y.S.2d 544 (App. Div. 3d Dep't 1997)...................32, 38

*Macullar v. McKinley*, 2 N.E. 9 (N.Y. 1885) ..........................................................43

*Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104 (N.Y. 2011).............46, 49

*Maurizio v. Goldsmith*, 230 F.3d 518 (2d Cir. 2000) ..............................................52

*McPherson v. Husbands*, 864 N.Y.S.2d 444 (App. Div. 2d Dep't
    2008) ..........................................................................................................35, 39

*Mom's Bagels of New York, Inc. v. Sig Greenebaum, Inc.*,
    559 N.Y.S.2d 883 (App. Div. 1st Dep't 1990)...............................................58

*Moore v. Microsoft Corp.*, 741 N.Y.S.2d 91 (App. Div. 2d Dep't
    2002) ................................................................................................................54

*Most v. Monti*, 456 N.Y.S.2d 427 (App. Div. 2d Dep't 1982) ...............................35

*Moustakis v. Christie's, Inc.*, 892 N.Y.S.2d 83 (App. Div. 1st Dep't
    2009)...........................................................................................................56, 62

*MTBE Prods. Liab. Litig., In re*, 725 F.3d 65 (2d Cir. 2013),
    *cert. denied*, 134 S. Ct. 1877 (2014).................................................58, 60, 61

*New York Univ. v. Continental Ins. Co.*, 662 N.E.2d 763 (N.Y. 1995).......55, 58, 59

*Nigro v. Lee*, 882 N.Y.S.2d 346 (App. Div. 3d Dep't 2009)..............................35, 38

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland, N.A.*,
647 N.E.2d 741 (N.Y. 1995) ...............................................................54, 55, 57

*Pinney v. Beckwith*, 608 N.Y.S.2d 738 (App. Div. 3d Dep't 1994) .........................38

*Pitt Street, LLC v. 85-87 Pitt Street Realty Corp.*, 921 N.Y.S.2d 40
(App. Div. 1st Dep't 2011) ...............................................................................37

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,
813 F. Supp. 2d 489 (S.D.N.Y. 2011) ............................................................59

*Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*,
68 F.3d 1478 (2d Cir. 1995) ......................................................................48, 49

*Rocanova v. Equitable Life Assur. Soc'y*, 634 N.E.2d 940 (N.Y. 1994)...........58, 59

*Ross v. Louise Wise Servs., Inc.*, 868 N.E.2d 189 (N.Y. 2007) .........................60, 61

*Roy Export Co. v. CBS, Inc.*, 672 F.2d 1095 (2d Cir. 1982)....................................59

*Rudnick v. Glendale Sys., Inc.*, 635 N.Y.S.2d 657 (App. Div. 2d Dep't
1995) ................................................................................................................32

*Sheth v. New York Life Ins. Co.*, 709 N.Y.S.2d 74 (App. Div. 1st Dep't
2000) ................................................................................................................56

*SIPC v. BDO Seidman, LLP*, 222 F.3d 63 (2d Cir. 2000) ......................................47

*SIPC v. BDO Seidman, LLP*, 746 N.E.2d 1042 (N.Y. 2001) ................43, 44, 45, 46

*Smith v. Triad Mfg. Group, Inc.*, 681 N.Y.S.2d 710 (App. Div.
4th Dep't 1998)................................................................................................56

*S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629
(2d Cir. 1996)..............................................................................52, 53, 54, 55

*St. Patrick's Home for Aged & Infirm v. Laticrete Int'l, Inc.*,
696 N.Y.S.2d 117 (App. Div. 1st Dep't 1999)........................................56, 57

*Steinberg v. Guild*, 258 N.Y.S.2d 670 (App. Div. 1st Dep't 1965)........................49

*Stutman v. Chemical Bank*, 731 N.E.2d 608 (N.Y. 2000) .....................................52

*Tasini v. AOL, Inc.*:

    851 F. Supp. 2d 734 (S.D.N.Y.), *aff'd*, 505 F. App'x 45
    (2d Cir. 2012) ..................................................................53, 54, 55

    505 F. App'x 45 (2d Cir. 2012) ....................................................55

*Teller v. Bill Hayes, Ltd.*, 630 N.Y.S.2d 769 (App. Div. 2d Dep't
    1995) ...............................................................................55, 56, 57

*Torrington Indus., Inc. v. Southworth-Milton, Inc.*, 793 N.Y.S.2d 613
    (App. Div. 3d Dep't 2005) ..............................................................32

*UST Private Equity Investors Fund, Inc. v. Salomon Smith Barney*,
    733 N.Y.S.2d 385 (App. Div. 1st Dep't 2001) ...............................35

*Warner Theatre Assocs. L.P. v. Metropolitan Life Ins. Co.*,
    149 F.3d 134 (2d Cir. 1998) ............................................34, 39, 40

*Weiss v. Polymer Plastics Corp.*, 802 N.Y.S.2d 174 (App. Div.
    2d Dep't 2005) ....................................................................56, 57

*Wright v. Selle*, 811 N.Y.S.2d 525 (App. Div. 4th Dep't 2006) ...........................62

*Yuzwak v. Dygert*, 534 N.Y.S.2d 35 (App. Div. 4th Dep't 1988) ...........................61

## STATUTES, REGULATIONS, AND RULES

28 U.S.C. § 1291 ..........................................................................................3

28 U.S.C. § 1332(a) ......................................................................................3

N.Y. Gen. Bus. Law:

    § 349 ...........................................................................2, 4, 26, 52, 55

    § 350 ...........................................................................2, 4, 26, 52, 55

17 C.F.R. § 240.10b-5 (SEC Rule 10b-5) ..........................................................44

Fed. R. App. P.:

    Rule 3(a) ................................................................................3

    Rule 4(a)(1)(A) ......................................................................3

Fed. R. Civ. P. 50(a)(1).....................................................................31

## INTRODUCTION

This case concerns a high-end auction in fine and rare wine. In 2005, defendant and California resident Eric Greenberg hired New York-based Zachys Wine Auctions, Inc. ("Zachys") to auction 17,000 bottles of wine "as is" from among his roughly 70,000-bottle collection. A distinctive feature of the antique wine market is that the contents of a bottle are unknown; opinions regarding authenticity rest on externally observable indicia of the bottle, label, cork, and the wine's color and clarity. Zachys spent weeks in Greenberg's cellar and again in New York inspecting and selecting the bottles for auction and then describing them in the auction catalog. Bidders had the right to inspect and inquire about the wines before the auction, and to obtain a refund on any problematic wines afterward. The only bidder to sue was billionaire plaintiff William Koch.

No stranger to auctions, high-end collectibles, or contractual disclaimers, Koch spent $3.7 million at the auction on 2,700 bottles of wine. To participate in the auction, Koch signed a contract agreeing to purchase wine "as is" without any warranties of authenticity, merchantability, or provenance, with a refund as his only remedy. Ignoring what he called meaningless fine print, and erroneously assuming that authenticity was guaranteed, Koch declined to inspect any of the bottles before bidding. But he had an expert inspect them afterward, and concluded that 24 were questionable. Koch sued Greenberg on a theory of indirect

liability unprecedented under New York law.  Despite Greenberg's reliance on Zachys, his fiduciary, to inspect and market the wine appropriately, and the absence of any misrepresentations by Greenberg on which Koch could justifiably rely, the jury held Greenberg liable for fraud and violations of N.Y. Gen. Bus. Law ("GBL") § 349 and § 350, and awarded punitive damages.

The district court committed several serious legal errors in upholding that verdict.  First, under well-settled New York law, a plaintiff does not justifiably rely on an auction catalog, when the plaintiff agrees by contract that the wine is sold "as is," subject to a disclaimer of authenticity, and fails to exercise pre-auction inspection rights that would have revealed all of the bottles' externally verifiable indicia of authenticity.  Nor is a consignor liable for statements and omissions made independently by his expert fiduciary upon whom he reasonably relied to make wine-selection decisions and disclosures to bidders.

Second, liability under New York's consumer fraud statutes is unsustainable. The auction of high-end collectibles to wealthy, sophisticated purchasers is not subject to GBL § 349 and § 350, which protect ordinary consumers making direct purchases of inexpensive household goods.  Reasonable consumers who bid on collectible, "as is" wine made available for pre-purchase inspection abide by their contracts and accept that authenticity is not guaranteed.

In all events, punitive damages were inappropriate. Greenberg's reliance on his fiduciary to make appropriate disclosures at a high-end auction was not the sort of publicly directed reprehensible behavior punishable through punitive damages.

If affirmed, the judgment below will have profoundly negative consequences for auction markets and consignors that will reverberate through high-end collectibles and ordinary estate sales alike. Affirming the verdict would erode the legal validity of disclaimers in auction contracts and the longstanding principle that consignors are entitled to rely on the judgment and integrity of auction houses as fiduciaries.

### JURISDICTIONAL STATEMENT

The district court had diversity jurisdiction under 28 U.S.C. § 1332(a). On May 9, 2014, after a jury trial, the court entered final judgment. SA62-63.[1] On May 22, 2014, Greenberg filed a notice of appeal. Fed. R. App. P. 3(a), 4(a)(1)(A). This Court's jurisdiction rests on 28 U.S.C. § 1291.

---

[1] "SA" refers to the Special Appendix at the end of this brief.

## ISSUES PRESENTED FOR REVIEW

1.      Does New York fraud law allow recovery for 24 bottles of questionable wine purchased at auction by a sophisticated plaintiff who bought the wine "as is," ignored a disclaimer that the wine was not guaranteed to be authentic, and knowingly refused to inspect the wine before bidding?

2.      Do GBL § 349 and § 350 allow sophisticated buyers of high-end collectibles to recover for questionable wine sold "as is" at auction, subject to a disclaimer of authenticity and to pre-sale inspection?

3.      May a plaintiff recover punitive damages from a defendant who relied on an expert fiduciary to identify, select, market, and sell high-end collectibles at an exclusive New York auction?

## STATEMENT OF THE CASE

Koch sued Greenberg and Zachys for fraud and GBL violations, alleging he purchased inauthentic bottles marketed deceptively.  After the fraud claims against Zachys were dismissed because of Koch's unjustifiable reliance, Koch settled his GBL claims with Zachys and proceeded to trial against Greenberg over 24 bottles. The jury found for Koch on all counts and awarded him compensatory, statutory, and punitive damages.  Greenberg appeals Judge Oetken's partial denial of JMOL. *See Koch v. Greenberg*, 14 F. Supp. 3d 247 (S.D.N.Y. 2014) (SA1-61).  This Statement takes the evidence in the light most favorable to the verdict (*see infra* p. 31).

## I. FACTUAL BACKGROUND

### A. Greenberg's Wine Collection

Eric Greenberg is a successful entrepreneur who spent years building his reputation and business interests. In 1995, he started a wine collection that became one of the world's largest, eventually reaching between 50,000 and 80,000 bottles.[2] Tr. 315-16, 496; TX435. Top collectors and auction houses alike – including Sotheby's, Christie's, and Zachys – considered Greenberg's collection superlative: "stupendous" and "stunning," achieving "perfection." Tr. 498, 619, 1444; TX1008; TX1070.0004.

Greenberg did not inventory his wines by source. He kept invoices and maintained a list of wines he purchased from some 60 different sellers. Tr. 497, 504, 746-47. But because he acquired wines of the same type and vintage from multiple sellers, Greenberg, like many collectors, could not trace most bottles to specific sellers. Tr. 177, 184, 505, 796-97, 1624-26; TX1102. In 2002, Greenberg decided to auction some of his wines to reduce his inventory and raise money for a new company. Tr. 763.

---

[2] For simplicity, "bottles" herein refers to traditional (750 milliliter) bottles, (1.5 liter) magnums, and (3 liter) double magnums.

## B. Wine Inspection

Auction houses visually inspect wines for authenticity before auction. Tr. 185, 1282. Because wine generally cannot be auctioned once opened, authenticity is evaluated solely by visual inspection of external features – the label, cork, bottle, capsule, and visual characteristics of the wine. Tr. 1303, 1608-12. By industry practice, a bidder may rely on an auction house to examine a collection's authenticity, and a consignor may rely on the auction house to remove questionable bottles before the auction and include only those wines that are, in the auction house's professional judgment, suitable for sale. Tr. 1440-41, 1605. When questionable bottles are rejected, the auction house does not inform bidders. Tr. 884-85, 1971. Before an auction, potential bidders may inspect and ask questions about the wine. Tr. 701, 1071-72, 1445-46, 1504, 1972-75.

## C. Sotheby's Pursues Greenberg's Collection Despite Questionable Wines

In April 2002, two individuals from Sotheby's, Serena Sutcliffe and Jamie Ritchie, evaluated Greenberg's collection for potential consignment. Tr. 152-53. Greenberg's collection amazed them, TX1008, though they spotted some trophy wines, possibly no more than five bottles, with appearances suggesting inauthenticity (*e.g.*, photocopied labels), Tr. 152-59, 186, 522-24.

Greenberg was surprised to learn he might have fake wine. Tr. 292, 792-93. He told Sutcliffe he could not trace individual bottles by source, but that Royal

6

Wine Merchants ("Royal") was one retailer he used. Tr. 177, 523. Though Sutcliffe expressed suspicions to Greenberg about Royal, she would not refuse to sell a bottle simply because it came from Royal; all bottles must be inspected for authenticity before an auction. Tr. 159, 524; Sutcliffe Trial Dep. 22-23, 28.

Sotheby's sought to auction Greenberg's wines. Sutcliffe and Ritchie "were deeply impressed" with Greenberg's collection, calling it "breathtaking" and "one of the greatest" Sutcliffe had "ever seen." TX1008. Sutcliffe "would consider it an honour to be associated with such a unique collection," wanted "to do a great sale" for Greenberg, *id.*, and proposed describing his collection as "one of the great cellars of the world," TX1070.0008. Even though Sotheby's believed some of Greenberg's wine could be inauthentic, Sotheby's would not have disclosed that information – or any negative information about Greenberg – to bidders. Tr. 189, 201, 207.

Sotheby's proposed consignment agreement, however, concerned Greenberg. TX293. It gave Sotheby's too much discretion and required him to make warranties he could not confirm, TX296, including that he had "no reason" to think he was consigning inauthentic wine, TX293. Having just learned from Sutcliffe that he possessed questionable wines, Greenberg suggested revising the warranty to say he had "no reasonable reason" to disbelieve authenticity. TX293.0003; Tr. 305-06, 533. They were unable to reach agreement. TX304.

7

## D.    Greenberg Investigates His Collection

Sutcliffe's revelation that he might have questionable wines upset Greenberg, who began investigating the authenticity of wines possibly obtained from Royal.  He used his invoices to identify the types of wine he had purchased from Royal and inspected those bottles.  Tr. 752-56.  Any questionable wine was put aside or turned backwards in the cellar.  Tr. 569.  Greenberg created "Royal Wine Fake Summary Notes" that detailed wines of the same types as bottles he purchased from Royal and that he thought could be inauthentic.  Tr. 329-41; TX107.

Greenberg also confronted Royal's owner, Jeff Sokolin, demanding "all my money back for every bit of wine that I bought from [Royal]."  Tr. 343.  Letters from Greenberg's lawyer followed.  Greenberg requested a $2 million refund, claiming Royal had misrepresented the provenance and quality of bottles it sold him.  Tr. 343-57; TX266; TX267; TX283; TX291.  Greenberg later informed Royal he had "determined that approximately $912,301 of wine he received [was] fake, and his review [was] continuing."  TX291.  Greenberg submitted claims to two insurance companies regarding those wines; neither was granted.  TX300; Tr. 433-35.

Greenberg also hired a wine appraiser, William Edgerton, to inspect 108 bottles, some of which Greenberg thought were questionable and may have come

from Royal.  Tr. 385-91, 1788-89.  Based on the external features of those bottles, Edgerton concluded that 60 were "definitely counterfeit" and nine others could be. TX73.  Edgerton put a numbered sticker on each bottle he reviewed, including a bottle of 1928 Chateau Latour later purchased by Koch, which Edgerton numbered "41" and deemed "definitely counterfeit" because of a "clearly" photocopied label that had abnormal size and positioning.  *Id.* at 32-33.

### E.  Greenberg Pursues Auctions With Christie's And Zachys

Greenberg explored other auction options in 2002.  Richard Brierley of Christie's visited Greenberg's cellar and offered an assessment and promotional plan hoping to enter a consignment agreement.  TX66; TX69; Tr. 299, 568. Greenberg reportedly told Sotheby's that he might consign wines to Christie's because it was less concerned about provenance.  TX304; Tr. 158.  In fact, Christie's assessment highlighted the "strength of [Greenberg's] collection" and did not suggest that Christie's would need to disclose anything negative to bidders. TX66.  Nevertheless, Greenberg and Christie's failed to reach an agreement. Tr. 574-75.

Zachys also visited Greenberg's cellar.  Tr. 1612-13.  Zachys is renowned for its wine-auction specialists.  Tr. 341, 1444, 1603.  During Zachys' 2002 visit, Greenberg told president Jeff Zacharia about his dealings with Royal and showed

him boxes of ostensibly fake wine. Tr. 342, 1613-14. Zachys agreed to auction some of Greenberg's wines. TX325.085.

Maureen Downey, a Zachys authentication specialist, inspected Greenberg's wines for a 2003 auction. Tr. 835. Downey rejected some (not at issue here) because the corks did not correspond to the bottles' labels, but Zachys did not disclose that rejection to bidders. Tr. 843-45, 884-85.[3] Weeks later, Downey was alarmed to see what she thought were the exact bottles she rejected on the cover of a catalog for another auction house and chronicled her purported discovery in an Internet blog. Tr. 847-49, 892-93. At trial, however, she admitted the bottles were not the same and the blog post was "embellished." Tr. 893, 897-98.

Sotheby's soon learned that Zachys secured a consignment from Greenberg. Ritchie and Sutcliffe commiserated that they "would have required full provenance and authentication by the chateau" for some of Greenberg's Bordeaux wines, and that, although "most" of his "Burgundian wines" were "OK," other wines "were not," including some "trophies[] that [were] a dog's dinner." TX324. Although Ritchie testified he was concerned that some of the wines were being sold, Tr. 173, no one shared his or Sutcliffe's views with Greenberg, Sutcliffe Trial Dep. 92.

---

[3] Greenberg allegedly told Downey he had become an expert in identifying photocopied labels of Chateau Lafleur because he had been sold so many bad bottles. Tr. 836.

**F.      Greenberg Encounters More Questionable Wine**

In May 2003, Greenberg's attorney sent a draft complaint to Royal.  The draft alleged that Royal "knowingly sold [Greenberg] more than $2 million of wine, of which all or substantially all is counterfeit or fake."  TX332.0002 ¶ 1. Greenberg's attorney described the complaint as "along the lines of what Mr. Greenberg will file in court," TX332.0001, although Greenberg never filed it.

Because of his dispute with Royal, Greenberg grew skeptical and frustrated about his wine purchases.  In late 2003, Greenberg complained to WineBids.com about wines he bought at auction that had been consigned by Rudy Kurniawan[4]: "these [wines] are so fake, you have no idea"; "I am livid about fakes; I have seen too many, and ignorant kids cannot make bad buys and think they are going to pawn their mistakes off on unsuspecting others."  TX78.0003.  Greenberg threatened to sue WineBids.com and Kurniawan.  TX78.0002.

Greenberg also complained about wines he purchased from Atherton Wine Imports that he feared may have come from Hardy Rodenstock.  TX353.[5]  Days later, Greenberg told Atherton he also would be returning wines that had a

---

[4] Kurniawan was a world-renowned collector recently convicted for selling counterfeit wine.

[5] Koch obtained a default judgment against Rodenstock in 2010 for the sale of counterfeit wine.  Greenberg previously told The Wine Club:  "if the bottle came from [H]ardy [R]odenstock in [G]ermany no matter what it says, I believe it is counterfeit."  TX310.0002.

different cork-branding orientation than wines of the same vintage in his cellar from three different sources.  TX354.[6]

In February 2004, Greenberg settled with Royal for $362,937.  TX80.  As part of the settlement, Greenberg returned approximately 200 bottles, a subset of the wine he had identified as questionable.  *Id.*  Greenberg kept the remaining wine he had identified (approximately 250 bottles), but had wines he thought were questionable segregated or turned backward.  Tr. 401, 569.  Nevertheless, the 1928 Latour with Edgerton's "41" sticker was accidentally put back on the main racks, ultimately making its way inadvertently into the consignment for Zachys' 2005 auction.  Tr. 613, 2454.

In November 2004, Greenberg returned a 1949 Latour to D. Sokolin Company for a refund because it had what he considered to be "obvious" problems with the cork and label, making "the condition alone . . . doubly unacceptable." TX388.  The wine was imported by Bordeaux Wine Locators, and Greenberg sarcastically quipped it "is the worst counterfeiting operation in the world.  Have a great thanksgiving."  *Id.*; Tr. 279.

### G.    Greenberg Continues Selling Wine

Greenberg auctioned wine with Acker Merrall in December 2004.  As the auction neared, John Kapon, President of Acker Merrall, told Greenberg he could

---

[6] A cork may be stamped with the wine's brand or vintage, or both, and the stamp might be vertically or horizontally oriented on the cork.  Tr. 181-83, 483.

not auction certain magnums because he "had some doubts" about them. TX386.

Kapon planned to examine the magnums with Kurniawan, but suggested that he

could sell all of them if Greenberg personally guaranteed them. *Id.*

Kapon's proposal upset Greenberg. He responded that, if Kapon intended

to keep the magnums out of the sale, then "none of the wine is in the sale. The

entire consignment is pulled, and I want it back this week. I am fucking pissed,

as shipping old wine degrades it, and I am not going to have the integrity of my

collection questioned and then verified by another collector. . . . If my mag[num]s

are good enough for Zachys, they are good enough for anyone else." *Id.*

Kapon then explained his concerns in more detail, including that "the

Lafleurs" dated before 1966 had a "fundamental problem: the corks all have the

vertically, ovally chateau lafleur brand on the cork, which they only start using

post '66," and so he could not offer them "in good conscience." TX389. But

Kapon assured Greenberg that he should auction the remaining wines:

> Your name comes up and not everyone has the best things to say
> about your cellar, and I have always defended it and talked about how
> much great stuff you have and even if you did get burnt, you had
> worked hard on getting these wines identified and isolated, and even
> if you had some bad wines it was a tiny portion of your overall
> collection . . . . So please do not bully me into offering these wines.

*Id.* Greenberg agreed to take back the questionable wines and to go forward with

the auction. *Id.* No evidence suggests that Acker Merrall disclosed that exchange

to bidders. The following day, Greenberg responded to Kapon's same e-mail by

asking, "Petrus changed cork in 66; you are saying that [L]afleur did as well?" TX390. Whether the Petrus and Lafleur chateaux branded their corks in a particular way prior to 1966, or the authenticity of the particular magnums Kapon rejected, both became disputed issues at trial.

Greenberg also sold wine through retailer Chicago Wine Company. In February 2005, following the sale of certain Petrus magnums, a customer complained about cork irregularities. Greenberg agreed to take back the wines and refund the customer. TX413. Greenberg's belief in the authenticity of the Petrus magnums returned by Chicago Wine was disputed at trial.

### H. Zachys' December 2004 Auction

In December 2004, Zachys conducted a "Holiday Auction" that included Greenberg-consigned wines. TX92.001; Answer to Am. Compl. ¶ 5 (DN226). William Koch was a buyer.

Koch is a billionaire businessman and Ph.D. (Tr. 914-15) who is a prominent collector of fine art, antiques, and other rarities. A self-proclaimed "obsessive collector" of wine, which he began collecting in 1970, at the time of trial Koch owned approximately 43,000 bottles. Tr. 933, 1006-08, 1018. By the end of 2004, Koch had sold wine at auction, owned 50% of a wine auction house, and had identified suspicious wine in his own collection. Tr. 990-91, 1008-11, 1135-36. Koch purchased approximately $350,000 of wine at the Holiday Auction. TX91.

## I. Zachys' October 2005 Auction

By 2005, Zachys had conducted six auctions for Greenberg and already knew much about his collection, including that he had questionable wine. Tr. 324, 843-44, 1614, 1695. Zachys also knew: Zachys previously had rejected some of Greenberg's wines as potentially inauthentic, Tr. 1663; some of Greenberg's wine came from Royal, with whom Greenberg had a dispute for selling fake wine, Tr. 1613-14, 1677; Zacharia was concerned with Royal as a vendor in light of "industry chatter" about fakes from Royal, Tr. 1720; and Greenberg could not tie individual bottles back to particular sellers, Tr. 1624. Zachys nevertheless pursued the additional consignment from Greenberg and did not disclose to bidders all that it knew about his collection. Zachys marketed its October 2005 auction as "The Fall Auction: Over 17,000 Bottles of Greatness." TX101 ("Catalog"). The consignment was Greenberg's exclusively, although, as is common, he remained anonymous to bidders. Tr. 1000.

### 1. The Consignment Agreement

Greenberg and Zachys entered a consignment contract that gave Zachys control over the auction and its marketing. TX96. Zachys had the right to perform "physical inspection of inventory" months before the auction. *Id.* ¶¶ 3, 5. After shipment, Greenberg forfeited any right to "withdraw[]" wines from the auction, whereas Zachys had "the right to withdraw any [wine] at any time before actual

sale if in [Zachys'] sole judgment" there was "just cause" to do so. *Id.* ¶ 8. Greenberg also authorized Zachys to rescind sales if genuine issues arose regarding authenticity of any wines. *Id.* ¶ 12. The contract did not ask Greenberg to guarantee authenticity.

Zachys controlled marketing for the auction, including the Catalog. *Id.* at 64. Zachys promised Greenberg that its Catalog would include a "two-page introduction," as well as "many descriptions and explanations." *Id.* Although Greenberg proposed edits to a draft of the Catalog introduction, *see infra* pp. 19-20, he relinquished control over the images and descriptions of his wines. TX96 ¶ 15. He also gave Zachys "sole and absolute discretion" to rescind sales if a buyer complained that "any statement of opinion in the catalogue is not well-founded." *Id.* ¶ 13.

Unlike marketing, the contract gave Greenberg some control over lotting, which is the order and grouping of wine presented at auction. Tr. 710, 831. The parties agreed they would "cooperate in establishing lotting" and that Zachys would not "set the final lotting until it has [Greenberg's] written approval." TX96 ¶ 5(b).

### 2. *Zachys' Inspections*

Shortly after signing the consignment contract, Zacharia and Fritz Hatton, Zachys' chief auctioneer, made plans to spend one day "look[ing] at the real

16

high-valued wines, the wines that needed the most amount of due diligence" for the auction. Tr. 1626, 1630. Zachys treats visual inspection as its most important task; it does not offer for auction any wine it believes may be counterfeit. Tr. 1712, 1721.

Just before their visit, Hatton e-mailed Zacharia to highlight the need to obtain adequate provenance for expensive bottles. TX95. Hatton identified specific bottles "to be reviewed for appearance and provenance prior to shipment," including 23 of the 24 wines at issue in this case. *Id.* Of those, Hatton warned he was "[m]ost concerned with 19[th] C[entury] wines 1870 and back [and] Right Bank [Bordeaux] mag[num]s 1900-1961," among others. *Id.* Greenberg was not shown that e-mail.

During Zachys' day-long visit, Greenberg's cellar master brought trophy wines to Zacharia and Hatton to inspect and select for auction. Tr. 611, 1626, 1630-31. After Zacharia and Hatton left, six other Zachys' personnel spent two weeks inspecting and selecting additional wines. Tr. 611-13.

Zachys inspected the bottles again in New York. Tr. 1631-49; TX99. Zacharia asked for more information about the history of Greenberg's "older bottles," noting "[w]ines from the nineteenth century will not fetch top dollar, in fact they will be much harder to sell without provenance." TX97.0002. Zacharia told Greenberg that the "provenance" information Greenberg typically received

when he purchased wine – that it came from a "European Private Collection" or "European Trade" – was "not enough for many of our buyers at this point." *Id.*; Tr. 592-93. Greenberg responded: "I cannot provide this. I had many sources and can not tie them to bottles." TX97.0001. Minutes later, Greenberg appended his response: "The only thing I can tell [you] about the older Bordeaux is that they were purchased from [E]ddie [G]elsman at [W]ine [L]ibrary or [D]ave Sokolin at [D.] Sokolin in [S]outhhampten [sic]," two U.S. retailers. TX98. Greenberg did not mention that he had bought some nineteenth-century wines from Christie's, Sotheby's, and Royal. Tr. 415-16.

Zacharia acknowledged he would have liked to have known "if" Greenberg consigned wines that he previously had claimed were counterfeit in his Royal lawsuit or his insurance claims, Tr. 1724, but Koch never proved that any of the bottles at issue came from Royal, Tr. 1736. The evidence showed only that Greenberg consigned some wines of the same vintage and producer as wines he bought from Royal, TX1102, and that Greenberg had taken pains to segregate any questionable wines that might have come from Royal, *supra* p. 12.

No one at Zachys gave Greenberg reason to believe that Zachys needed his help authenticating wines. Tr. 1748-49. Greenberg relied on Zachys and testified that he did not intend to auction counterfeit wine, did not intend to mislead bidders, and believed Zachys would not sell any wine that could be inauthentic. Tr. 629-30.

After its inspection, Zachys determined that, in its professional judgment, all the wines at issue in this case were suitable for sale.  Tr. 1661.

### 3. *Lotting*

Zachys and Greenberg worked together on lotting.  Greenberg felt strongly that the "flow" of the wines could dictate the progression of bidding and wanted to be sure the correct number and types of wines in the auction were set "before we go to press with the catalogue."  TX439; TX528.

### 4. *Zachys' Catalog*

Zachys' Catalog greeted readers with a picture of Jeff Zacharia and the introduction he wrote personally.  TX101.0006; Tr. 1662.  The introduction contained Zacharia's "honest opinions and impressions," as well as "marketing" statements, Tr. 1662-63, 1667 – like comparing the unnamed consignor (Greenberg) to other "Alexander the Greats of the collecting world," TX101.0006.  Zacharia shared an early draft of the introduction with Greenberg and asked for his "thoughts or an okay."  TX524.  Greenberg provided comments, including that his collection be called a "best of the best collection"; asking Zacharia not to state the original size of his collection, "as it shows heavy selling"; and requesting that Zacharia not include the statement "[d]oubters may be reassured" about one bottle (not in the auction) because, in Greenberg's view, there was no reason to "beg the question of doubters."  TX435 (capitalization omitted).  Zacharia accepted some

but not all of Greenberg's comments.  Although Greenberg wanted to review the next draft, *id.*, the parties disputed at trial whether Greenberg approved the final draft, Tr. 453-54; TX527.

Zachys devoted more than 200 pages to individual descriptions and pictures of Greenberg's wine.  TX101.0014-.0232.  For many of the bottles, Zachys' specialists drafted condition notes based on their inspection.  TX99; Tr. 1645-51.  Greenberg had no role in that process, Tr. 1651, nor did he review the descriptions before the auction, Tr. 465.  The lots included estimated values, which ranged from $140 to $45,000.  TX101.0066, .0101.  Zachys invited prospective bidders "to examine any lots prior to the auction" and provided a phone number to call with any questions.  TX101.0235, .0237, .0240.

To participate, prospective bidders signed a contract agreeing to "bid subject to, and hereby agree to be bound by, the Conditions of Sale," which constituted the "entire agreement" between the parties.  *Id.* at 240, 247.  The Conditions made clear, as Zacharia testified, that authenticity was not guaranteed, Tr. 1667-68, as all wine was "sold 'AS IS,'" TX101.0240.  The Conditions then disclaimed "any representations" regarding "merchantability," "correctness of catalog, description," "provenance," and other features.  *Id.*  Bidders agreed their "sole and exclusive remedy" was rescission and a refund.  *Id.* at 241.

### 5. *Koch's Preparations*

Zachys distributed its Catalog to top collectors two weeks before the auction. TX96.0064. Koch reviewed it with Brian Orcutt, a former wine cataloger for Christie's, who was knowledgeable about Bordeaux. Tr. 961, 1892-93. While at Christie's, Orcutt's policy was to inspect bottles to ensure Christie's refrained from selling counterfeit wine. Tr. 1892-93. Koch paid Orcutt more than $150,000 to "advise [him] on what vintages were good and what were bad and what [Orcutt] thought the great wines were" and to bid for him at the auction. Tr. 960-61; TX1024. By that time, Koch's investigation into his own collection had led him to a "high probability conclusion" that he had fake wine. Tr. 995-96, 1061-62. Nevertheless, Koch did not ask Orcutt to advise him about the authenticity of the wines in Zachys' auction. Tr. 1901-03.

To Koch, Zacharia's introductory letter "was critical" because it "gave [him] a lot of confidence that [the wines] had been thoroughly vetted and checked and [the auction] had absolutely great wines in it . . . that were authentic." Tr. 927, 941. Koch also reviewed the specific wine descriptions for each lot. Tr. 941-42. He "relied upon what was said in the catalog" and "that this was the best of the best." Tr. 1040. He believed Zachys and the consignor were "representing that these wines are true and real and as described in the catalog." Tr. 964.

21

Koch knew the Catalog contained conditions of sale, but he chose not to read them. Tr. 964-66. He knew all auction houses have such provisions, and even "assumed" that Greenberg's wines were being sold "as is." Tr. 1026. But Koch has the "very strong opinion" that such provisions are "BS," "a license to steal." Tr. 966-67, 1026. So he ignored them.

Koch also chose not to inspect any wine before bidding. Tr. 951, 1073. He was "sure" Zacharia would have allowed him to inspect, but Koch "didn't think it was worth-while" to do so. Tr. 1072, 1073. Zacharia's "letter was so glowing, so overwhelming, I said, what's the need to do it?" Tr. 951, 1071.

### 6. The Auction

Approximately 60-80 people attended the October 2005 auction. Tr. 1900-01. Koch spent $3.7 million on 2,700 bottles of wine, paying prices that ranged from $649 to $44,840,[7] averaging nearly $1,400 apiece. TX100; Tr. 961.

### J. Koch Questions The Authenticity Of Some Of Greenberg's Wine

Four months after the auction, Zacharia forwarded Greenberg a question from Koch regarding the source of a 1921 Chateau Petrus magnum. TX530. Greenberg responded: "I am not sure which mag[num] this is. A lot cam[e] from a collector in Toronto, and many came out of Europe, in many cases from English royalty." *Id.* Despite Greenberg's uncertainty, Zacharia's response to Koch was

---

[7] Koch never challenged the authenticity of the two bottles he purchased for $44,840 each.

unequivocal: the consignor "bought the wines from two different sources: The wine either came from a top collector in Toronto or out of Europe from English royalty." TX461. Zachys never gave Koch Greenberg's actual response. Tr. 981, 1190.

Greenberg subsequently gave Zachys permission to reveal his identity to Koch, and the two spoke by phone. Tr. 979. Greenberg told Koch that the 1921 Petrus might have come from Royal, but that he could not trace specific bottles to specific sources. *Id.* Greenberg also told Koch about his dispute with Royal and their settlement, though Greenberg purportedly said he settled because Royal had ties to the Russian mafia – a reference Koch took as intimidation not to investigate questionable wines. Tr. 979-80, 982. Greenberg also purportedly told Koch that Bordeaux Wine Locators, whose import labels appeared on some of the bottles Koch bought, sold a lot of fake wine. Tr. 980.

### K.    Greenberg Continues Auctioning Wine

Greenberg continued auctioning wine. In 2006, discussing a potential consignment to Christie's, Greenberg said he would not allow Christie's to cherry pick his wine, but that, "[t]he good news is that there is no garbage. That has been sold." TX476.[8] Greenberg went on to sell more than 11,000 bottles through Acker

---

[8] Greenberg testified that his reference to selling "garbage" wines meant he had culled his less impressive wines. Tr. 598-99.

Merrall in 2007, and another 19,000 in 2010.  Tr. 322-24.  There is no evidence anyone has complained about the wines sold at these later auctions.

## II.    PROCEDURAL BACKGROUND

In October 2007, Koch brought state-law claims against Zachys and Greenberg over 11 bottles of wine.  In November, Greenberg, in accordance with the Zachys' auction-participation contract, sent Koch a $273,000 refund for the bottles.  TX1036.  Koch refused.

### A.    Pre-Trial

Both defendants moved to dismiss.  The court dismissed Koch's fraud claim against Zachys because the Catalog expressly disclaimed authenticity, and Koch "made no effort to access information regarding the authenticity" before the auction, rendering his reliance unjustifiable.  DN33,[9] at 8-9.  Greenberg made the same argument, but the court held that Greenberg's peculiar knowledge justified Koch's reliance.  DN37, at 15.  Specifically, the court opined that Koch's complaint alleged that Greenberg had been told by Sutcliffe and Edgerton that the wines at issue were inauthentic.  *Id.* at 7-8, 15.  Koch, however, did not pursue that factual claim at trial (and it would have been neither supported by the evidence nor relevant under a proper application of the peculiar knowledge doctrine).[10]

---

[9] "DN" refers to the district court docket entry.

[10] Although Edgerton had inspected one of the bottles at issue (the 1928 Latour with the "41" sticker), it was undisputed that Greenberg did not intend to

Koch amended his complaint in 2010. He alleged Greenberg consigned 36 bottles of fake wine that Koch purchased at the 2004 and 2005 Zachys auctions. One month later, Greenberg sent Koch another refund – this time for $688,000, which included fees, costs, and interest for all 36 bottles. TX1052. Because Greenberg did not "admit" fraud, Koch again refused his tender. Tr. 2429.

## B. Trial

After settling his GBL claims with Zachys, Koch proceeded to trial against Greenberg on 24 bottles of Bordeaux from the 2005 auction.

### 1. Testimony Regarding Greenberg's Character and State of Mind

Much of Koch's evidence – which Greenberg disputed – concerned Greenberg's general character and mental state, rather than specific statements or specific intent regarding Koch's 24 bottles. For example:

- Ritchie testified that, when Sotheby's identified suspicious wines to Greenberg, he said he "could always sell them through Acker Merrall" because John Kapon "would take anything." Tr. 175. Greenberg denied making that statement. Tr. 526.

- Koch's counsel played third-party deposition testimony suggesting that, after discovering potentially inauthentic wine, Greenberg threatened the life of Sokolin, Royal's owner. Greenberg denied doing so. Tr. 343-44.

- Downey said she did not confront Greenberg about auctioning bottles she rejected as counterfeit because someone said he would "break [her] legs." Tr. 901; *see supra* p. 10.

---

include that particular bottle in the auction. Tr. 613, 2454. No evidence suggests Sutcliffe looked at any of the bottles at issue. Tr. 186.

- Greenberg's former employee, Jamie Cortes, testified that Greenberg once beat up a wine deliveryman. Tr. 802-03. Cortes also testified that, after the Royal settlement, Greenberg said: "what [Royal] did to me I'll do to them; what they did to me, I'll do to someone else." Tr. 757. Greenberg denied all this. Tr. 608.

- Koch's counsel presented an ambiguous e-mail exchange between Greenberg and Kurniawan that allegedly included an assertion by Greenberg that he was "putting . . . on auction" what Kurniawan called "'suspects' [B]ordeaux." TX380. Greenberg disputed Koch's interpretation of the e-mail. Tr. 255-59.

### 2. Testimony Regarding the Wines' Authenticity

The parties presented expert testimony concerning the indicia of authenticity for the 24 bottles Koch pursued at trial. All such indicia were external; no one opened the bottles to test the liquid. One of Koch's experts admitted that, even "if the source is suspect, you obviously have to arrive at your own conclusions once you've looked at the bottles because it may be that the bottles [from a suspicious source] are perfectly okay." Tr. 1490-91.

### C. Verdicts and Post-Trial Motions

The jury held Greenberg liable for fraud and violating GBL § 349 and § 350; it found Greenberg fully at fault under § 349, but held Zachys 25% responsible for violating § 350. DN451. The jury awarded compensatory damages of $355,811; $24,000 in statutory treble damages; and $12 million in punitive damages, which the court remitted to $711,622. DN452; SA1-2.

26

Greenberg moved for JMOL, which the court denied in relevant part. Koch moved for interest, injunctive relief, and $7.9 million in attorney's fees. The court awarded interest but nothing else. SA58-59.

## SUMMARY OF ARGUMENT

**I.A.** The fraud verdict should be reversed because Koch's reliance was unjustified as a matter of law.

**1.** A plaintiff cannot justifiably rely on matters specifically disclaimed by contract. Koch claims he relied on the Catalog and believed he was buying authentic wines, but the Catalog sold the wine "As Is," specifically disclaiming authenticity.

**2.** In the face of such a disclaimer, a plaintiff's reliance could be justified only if the defendant had "peculiar knowledge" of the truth. But "peculiar knowledge" does not exist where a sophisticated plaintiff, like Koch, can learn any relevant facts through visual inspection. Koch could have inspected the wines before bidding, which would have revealed the same signs of inauthenticity that Koch questioned through expert assistance *after* the auction. Koch's decision to purchase first and ask questions later was unjustified.

The court below erroneously held it would be unreasonable for Koch to inspect 2,700 bottles before bidding. That conclusion cannot be legally correct. The pertinent issue is whether Koch acted reasonably in *purchasing* wine without

27

inspecting it when he had an undisputed right to inspect. Inspecting a single bottle is not burdensome; Koch's independent choice to multiply that burden by 2,700 times does not turn Greenberg's conduct into fraud.

3. In all events, the entire context of the transaction establishes Koch's reliance was unjustified. A wealthy plaintiff cannot prove fraud by buying so much wine that he increases his own burden of acting reasonably as to each. That would render the parties' contract meaningless and allow auction-goers to buy their way out of proving every element of fraud.

B. The fraud verdict also should be reversed because Greenberg neither misrepresented nor concealed material facts on which Koch relied.

1. Greenberg said nothing to Koch before the auction; the only representations on which Koch relied were Zachys' statements in the Catalog. The district court erroneously held that the Catalog contained indirect misrepresentations from Greenberg. When an intermediary exercises independent judgment to filter what information is worthy of communicating, the intermediary's statements are its own. Greenberg relied on Zachys as an expert and fiduciary to exercise professional judgment to select wines suitable for sale and describe them in the Catalog appropriately. Any statements in the Catalog about authenticity, therefore, cannot be attributed to Greenberg.

The court below failed to identify any actionable misrepresentations supporting the verdict. Statements from the Catalog's introduction – like "best of the best," and "17,000 bottles of greatness" – are classic puffery, not actionable as a matter of law. Beyond that, neither the court nor Koch has identified any actionable statement in the Catalog.

**2.** Nor did Greenberg owe Koch a duty to disclose. The district court held that a duty arose from Greenberg's superior knowledge about his wine collection that was unavailable to Koch. But the court ignored binding precedent requiring such a defendant to know the plaintiff is making a mistake before any duty to disclose arises. Greenberg indisputably knew nothing about Koch (or any other bidder) before the auction. What Greenberg knew is that bidders could inspect the wine and signed an agreement acknowledging the disclaimers before bidding.

**II.** The GBL verdict also should be reversed because Greenberg's conduct was neither materially misleading nor consumer-oriented.

**A.** Conduct is not materially misleading unless it is likely to mislead a reasonable consumer acting reasonably under the circumstances. Reasonable consumers are unlikely to be misled by conduct that conveys accurate information, discloses risks, and gives access to relevant information. The Catalog complied with those requisites, providing expert descriptions and specific disclaimers, and

29

encouraging bidders to inspect and ask questions.  Under those circumstances, reasonable bidders were unlikely to be misled.

**B.**     Greenberg's conduct also did not have a broad impact on consumers. Rather than selling inexpensive household goods directly to average consumers, Greenberg consigned expensive, high-end collectibles for sale to wealthy and sophisticated purchasers in mediated transactions.  The GBL does not address that conduct.

**III.**   Even if the Court sustains liability, it should reverse the punitive damages award.  Such damages are available for fraud only when criminal-like misconduct is aimed at the general public.  New York courts have rejected punitive damages when a fraud is based on misguided expert advice, and even when an auction consignor's fraud causes severe physical harm to a child.  Greenberg relied on his expert fiduciary Zachys to inspect, authenticate, and market wines – only a tiny fraction of which were assertedly inauthentic – to a select group of wealthy and sophisticated collectors.  Koch had no basis for recovering punitive damages.

JMOL is appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party." Fed. R. Civ. P. 50(a)(1). This Court "review[s] a denial of JMOL de novo," drawing " 'all reasonable inferences regarding the weight of the evidence and the credibility of witnesses in favor of the non-movant.' " *Highland Capital Mgmt. LP v. Schneider*, 607 F.3d 322, 326 (2d Cir. 2010) (quoting *Kim v. Hurston*, 182 F.3d 113, 117 (2d Cir. 1999)).

**ARGUMENT**

## I. GREENBERG DID NOT COMMIT FRAUD

Fraudulent misrepresentation consists of a material false statement made to and intended to deceive the plaintiff, who justifiably relied on the misrepresentation and suffered resulting injury. *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 784-85 (2d Cir. 2003). Fraudulent concealment is the same, except that the defendant must conceal material information that the defendant had a duty to disclose to the plaintiff. *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995). A plaintiff must prove every element clearly and convincingly. *Dallas*, 352 F.3d at 784-85.

The fraud judgment against Greenberg cannot stand for two independent reasons: (A) Koch's reliance was unjustified, and (B) because of Zachys'

intermediary role, Greenberg neither made false statements on which Koch relied nor owed Koch a duty of disclosure.

**A.  Koch's Reliance Was Unjustified As A Matter Of Law**

Koch's reliance fails because he relied on specifically disclaimed representations, *see infra* Part I.A.1; had the ability to learn the truth for himself, *see infra* Part I.A.2; and acted unreasonably under all the circumstances, *see infra* Part I.A.3.

1.  *Koch Unjustifiably Relied on Specifically Disclaimed Information*

Under New York law, "a party cannot justifiably rely on a representation that is specifically disclaimed in an agreement."  *Dallas*, 352 F.3d at 785; *see Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 735, 738 (2d Cir. 1984).  The New York Court of Appeals established that rule long ago, *see Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 599 (N.Y. 1959), and it remains bedrock law today, *see*, *e.g.*, *Rudnick v. Glendale Sys., Inc.*, 635 N.Y.S.2d 657, 658 (App. Div. 2d Dep't 1995) (reliance unjustified where parties' "as is" contract "contained a provision that the sellers made no representations as to the property's physical condition or the bakery's income, expenses, and operation"); *Torrington Indus., Inc. v. Southworth-Milton, Inc.*, 793 N.Y.S.2d 613, 614 (App. Div. 3d Dep't 2005) (similar); *Long v. Fitzgerald*, 659 N.Y.S.2d 544, 546 (App. Div. 3d Dep't 1997) (similar).  Under *Danann*, the question is whether "the substance of the

disclaimer provisions tracks the substance of the alleged misrepresentations."
*Grumman*, 748 F.2d at 735.

Here, the substance of the disclaimer tracks the substance of the representations and concealments on which Koch relied.  Koch claims he relied on the authenticity and provenance of Greenberg's wine.  *See* Tr. 964.  The Catalog, however, expressly states that the wine is sold "'AS IS' without any representations or warranties" of "merchantability," "provenance," and other matters.  TX101.0240. As the district court recognized, that statement disclaimed "authenticity, provenance, and merchantability of the wine."  SA11.  The court instructed the jury accordingly. Tr. 2314:12-15.

Koch argued at trial that the disclaimer actually "affirms" the "authenticity of property" and that, if Zachys intended to disclaim "authenticity," it could have done so explicitly.[11]  The parties' contract, however, states that "authenticity . . . is guaranteed *only as stated herein* and otherwise all property is sold 'AS IS.'" TX101.0240 (emphasis added).  As the district court held, "*herein*" refers to the Conditions of Sale, which contain no guarantee of authenticity.  DN33, at 7 & n.3. Thus, the "As Is" clause disclaimed any authenticity guarantee.  Koch's contrary

---

[11] Letter from M. Kaba to Hon. J. Paul Oetken 1-2 & n.1 (Mar. 22, 2013) (DN445); Pl.'s Pretrial Mem. of Law 16 n.6 (DN352); Pl.'s Opp. to Def.'s Pretrial Mem. of Law 3 n.1 (DN382).

argument focuses on "semantical discrepancies" and elevates form over substance in precisely the way this Court has rejected.  *Grumman*, 748 F.2d at 735.

### 2.    *Greenberg Did Not Have "Peculiar Knowledge"*

If something is " 'peculiarly within the misrepresenting party's knowledge,' " a disclaimer does not automatically render reliance unjustified.  *Dallas*, 352 F.3d at 785 (quoting *Warner Theatre Assocs. L.P. v. Metropolitan Life Ins. Co.*, 149 F.3d 134, 136 (2d Cir. 1998)).  Peculiar knowledge is about a plaintiff's access to the truth; it is not simply a matter of whether the defendant knows specific facts the plaintiff does not.  *See Banque Arabe*, 57 F.3d at 157 (assessing whether information "was readily available"); *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1542 (2d Cir. 1997) (assessing "independent means of ascertaining the truth") (internal quotations omitted).  The operative question is whether the plaintiff "has the means available to him of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation," and "make[s] use of those means."  *Danann*, 157 N.E.2d at 600 (internal quotations omitted).  Not only did Koch fail to use the means available to him, he offered no evidence that Greenberg had any peculiar knowledge of the bottles, labels, corks, or other visual indicia that Koch could not have accessed himself through inspection.

a. Koch's refusal to inspect precludes "peculiar knowledge"

New York courts repeatedly have rejected "peculiar knowledge" arguments when a sophisticated plaintiff failed "to make use of" available means of learning the truth. *McPherson v. Husbands*, 864 N.Y.S.2d 444, 445-46 (App. Div. 2d Dep't 2008); *UST Private Equity Investors Fund, Inc. v. Salomon Smith Barney*, 733 N.Y.S.2d 385, 386 (App. Div. 1st Dep't 2001); *Most v. Monti*, 456 N.Y.S.2d 427, 428 (App. Div. 2d Dep't 1982).

That rule applies to auctions. In *Nigro v. Lee*, 882 N.Y.S.2d 346 (App. Div. 3d Dep't 2009), a New York resident sued a Nevada resident for misrepresenting the condition of his car, sold in an online auction. The court held the defendant did not have "peculiar knowledge" because the plaintiff had the ability to discover the car's true condition before buying it, but chose not to do so until afterwards. *See id.* at 348 (plaintiff "could have contacted defendants to inquire about the vehicle or its history," "procured a vehicle history report," or "hired a mechanic in Nevada to inspect and/or examine the car before purchasing it"); *see also ACA Galleries, Inc. v. Kinney*, 928 F. Supp. 2d 699, 703 (S.D.N.Y. 2013) (rejecting "peculiar knowledge" regarding forged painting because plaintiff gallery "had the opportunity to fully investigate the authenticity of the paining but failed to do so"), *aff'd*, 552 F. App'x 24 (2d Cir. 2014); *Foxley v. Sotheby's Inc.*, 893 F. Supp. 1224, 1229

(S.D.N.Y. 1995) (ability to request letter discussing painting's authenticity precluded justifiable reliance).

Because a sophisticated party's access *alone* is sufficient to defeat "peculiar knowledge" and render reliance unjustified, such reliance is necessarily unjustified as a matter of law when coupled with a contractual disclaimer, as it was here. In *Dallas*, for example, plaintiff Dallas Aerospace sued defendant CIS for misrepresenting as "airworthy" an inadequately rebuilt airplane engine. 352 F.3d at 779. The parties' contract "specifically disclaimed" representations of "airworthiness" and sold the engine "as-is." *Id.* Although a report available from the engine's manufacturer would have disclosed the engine's accident history, Dallas argued that CIS had "peculiar knowledge" of the history because the report was "exclusively accessible only to [engine] owners." *Id.* at 786. This Court disagreed. Even assuming Dallas could not order the report, the "peculiar knowledge" exception did not apply because "Dallas had independent means of learning about the engine's history," including asking CIS to obtain the report. *Id.* Thus, Dallas could not "demonstrate justifiable reliance on the misrepresentation given [1] the Agreement's explicit disclaimers and [2] Dallas's ability to discover the truth about the misrepresentation." *Id.* at 785; *see Grumman*, 748 F.2d at 730, 736-38 (no reasonable reliance or "peculiar knowledge" because plaintiff "[1] contractually disclaimed reliance upon the representations at issue and

36

[2] enjoyed absolute access to all relevant information necessary to confirm the validity of those representations"); *accord Pitt Street, LLC v. 85-87 Pitt Street Realty Corp.*, 921 N.Y.S.2d 40, 41 (App. Div. 1st Dep't 2011) (no reasonable reliance or peculiar knowledge regarding bug infestation because (1) building was sold "as is" and the contract "specifically disclaimed reliance on any representations" regarding physical condition, and (2) the plaintiff "had an opportunity to inspect" the building).

The same holds true here: Greenberg did not have peculiar knowledge because Koch, a sophisticated purchaser, had an opportunity to inspect wines that he purchased "as is" with representations of authenticity specifically disclaimed. Koch (who disclaims merchantability in his own contracts, Tr. 1034) indisputably was a sophisticated purchaser who owned one-half of an auction house and had an extensive collection of fine wine and other collectibles, amassed over decades, often through auction purchases. Tr. 914-15, 1007, 1018; *see also* DN33, at 8 (Koch "is a self-proclaimed 'serious' collector and purchaser of rare wines"); DN285 (Am. Compl.) ¶ 53. Indeed, he had so much experience purchasing wine at auctions that he "assumed" – correctly – the terms of Greenberg's auction contract without even reading it, Tr. 1026, and regularly employed a former Christie's cataloguer to bid for him, TX1024.

Koch also undisputedly had access to all the necessary and existing indicia of authenticity that existed for Greenberg's wines. The Catalog invited questions and pre-auction inspection, and Koch concluded his purchases were questionable only after visually inspecting them after the auction. TX101.0235, .0240. In analogous circumstances, a plaintiff's failure to ask questions or employ experts to inspect property before purchase defeats peculiar knowledge. *See*, *e.g.*, *Dallas*, 352 F.3d at 786; *Nigro*, 882 N.Y.S.2d at 348; *Long*, 659 N.Y.S.2d at 546-47; *Pinney v. Beckwith*, 608 N.Y.S.2d 738, 739 (App. Div. 3d Dep't 1994). Koch acknowledged that a wine's "package is critical" because "that's really what you pay for," Tr. 1159, yet he rejected his opportunity to have the bottles, labels, and corks inspected. An expert inspection is *exactly* what Koch did *after* the auction. DN285 ¶ 36. As numerous courts recognize, "[t]he very fact that [plaintiff] felt the need to seek authentication by [experts] after the purchase indicates that it knew how to do so prior to the purchase." *ACA Galleries*, 928 F. Supp. 2d at 704; *see Nigro*, 882 N.Y.S.2d at 348. As a matter of law, therefore, Greenberg's knowledge was not "peculiar."

> b.     The district court misunderstood "peculiar knowledge"

*First*, the court erroneously held that Koch had no way of knowing "what Greenberg knew" about the authenticity of his wine. SA12. That misapprehends the law. The question is whether Koch had *access* to learn *the truth* about the

external indicia of the wine's authenticity, not whether Greenberg knew particular facts that Koch did not. *See Banque Arabe*, 57 F.3d at 157; *accord Danann*, 157 N.E.2d at 600; *McPherson*, 864 N.Y.S.2d at 445; *see also Warner Theatre*, 149 F.3d at 136 (evaluating plaintiff's access to "the subject of the alleged misrepresentation"). Here, Koch never contended that evaluating authenticity involved anything other than visual inspection of external characteristics. All the necessary external features were as available to Koch and other bidders as they were to Greenberg and Zachys. Thus, regardless of specific facts Greenberg knew about his wine collection (most of which Zachys also knew, *see supra* p. 15), Koch "had independent means of learning about" the authenticity of the specific bottles he purchased, and his failure to take advantage of those means was unjustified. *Dallas*, 352 F.2d at 786.

Underscoring this error was the district court's inconsistent holdings that Koch's reliance was justified as to Greenberg but not Zachys. As to both, Koch's reliance was the same – he relied on the Catalog. Tr. 1040; DN285 ¶¶ 52-55. But, according to the district court, the *reasonableness* of Koch's reliance on the Catalog depends on the defendant's identity. *Compare* DN33, at 8-10 (finding unjustified reliance as to Zachys) *with* DN37, at 7-8 (finding justified reliance as to Greenberg) *and* SA12-13 (same). Those contradictory holdings are irreconcilable. The same conduct cannot be both reasonable and unreasonable; the objective

reasonableness of Koch's reliance on the Catalog alone does not change depending on the defendant's identity.

*Second*, the court held that, even though the jury evaluated Greenberg's wine based on visible "indicia of inauthenticity," Koch's decision to purchase "'thousands of expensive bottles'" meant that he could not "reasonably be[] expected (1) to recognize those signs for what they were or (2) to employ an expert to spend 25 minutes per bottle on inspection at the time of purchase." SA12-13 & n.4 (quoting Tr. 2286). At issue, however, is the reasonableness of Koch's *purchase* based only on the Catalog's statements. To excuse Koch's decision to forgo inspection because he purchased more than he could inspect gets the relevant reliance inquiry backwards. Koch created his own inspection burden and therefore cannot use it to prove "peculiar knowledge." To be sure, this Court has observed in dicta that "the peculiar-knowledge exception" is designed for cases where the "costs in determining the truth or falsity of an oral representation" are so great that reliance is deemed justified. *Warner Theatre*, 149 F.3d at 136. But that does not hold where the plaintiff's "own evident lack of due care . . . is responsible for his predicament." *Lazard*, 108 F.3d at 1543 (internal quotations omitted); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 196 (2d Cir. 2003) (reliance unjustified where sophisticated plaintiff failed to "protect[] itself"). Koch's reliance on the Catalog alone in deciding to purchase 2,700 bottles of rare

wine for $3.7 million "as is" without inspecting a single bottle is per se unreasonable and cannot support fraud liability against Greenberg.

### 3. *Koch's Reliance Was Unjustified in Light of the Entire Context of the Transaction*

This Court assesses justifiable reliance by evaluating "the entire context of the transaction." *Emergent Capital*, 343 F.3d at 195. Indeed, reliance may be unjustified notwithstanding a defendant's "peculiar knowledge." *E.g.*, *Lazard*, 108 F.3d at 1542-43; *Century Pac., Inc. v. Hilton Hotels Corp.*, 354 F. App'x 496, 498-99 (2d Cir. 2009). In this three-party transaction, Koch's reliance was unjustified regardless of what Greenberg knew.

The rule applied by the district court will upset settled auction practice. *First*, wealthy plaintiffs will now be able to prove fraud without proving justifiable reliance. If Koch's reliance is justified because of "what Greenberg knew," SA12, that will be true of most consignors, who, whether selling parents' estate items or high-end collectibles, typically know more about the circumstances surrounding their auctioned items than bidders do. To avoid liability under the district court's rule, consigners must now disclose all facts related to an item, whether or not an auction house would disclose those facts or a bidder who examined the item would reasonably care about them. Alternatively, if Koch's reliance is justified because he bought so much wine that the burden of inspecting it became unreasonable, then

41

wealthy bidders need only spend more money to inoculate otherwise unjustified conduct.

*Second*, where, as here, authenticity of an auction item is based solely on visual inspection, the expert auction house – not the consignor – can best determine authenticity. Both industry practice and consignment contracts expect as much. Tr. 1440-41; TX96. Contractual disclaimers and inspection rights protect auction houses from fraud liability. Those safeguards must do the same for consignors, who give their collectibles (often irrevocably, *see* TX96 ¶ 8) to auction houses and rely on them to market items appropriately. *See infra* pp. 44-45.

*Third*, the district court's contradictory holdings render the parties' contract meaningless. The auction contract allocated the risk of inauthentic wine equally among consignor, auction house, and bidder with an exclusive remedy – a refund, which Greenberg provided here – that returns parties to the status quo. The district court, however, improperly shifted to Greenberg alone all the risks for Zachys' negligence, Koch's deliberate decision to buy wine "as is" without inspecting it, and Koch's insatiable desire to obtain an "admi[ssion]" from Greenberg for selling questionable wine. Tr. 2429; *see Grumman*, 748 F.2d at 735 ("[W]here the parties to an agreement have expressly allocated risks, the judiciary shall not intrude into their contractual relationship.").

**B.      Zachys' Independent, Intermediary Role Precludes Fraud By Greenberg As A Matter Of Law**

The district court erroneously held that Greenberg, through Zachys, made indirect misrepresentations and owed Koch a duty to disclose.

1.      *Greenberg Did Not Make Actionable Misrepresentations*

A defendant is not liable for a misrepresentation he did not make to the plaintiff. *See Macullar v. McKinley*, 2 N.E. 9, 10-11 (N.Y. 1885). Greenberg said nothing to Koch. Only Zachys, in the Catalog, said anything to Koch. Tr. 968 (Koch explaining he sued Zachys "because I bought some fake wines from their catalog and I believe they were responsible for it"). Zachys, not Greenberg, made any misrepresentations on which Koch could have relied.

The district court's indirect misrepresentation theory erred for two reasons: (a) the court misapprehended the law, and (b) even if indirect, the representations were not actionable.

a.      Greenberg did not make indirect misrepresentations to Koch

Where an intermediary stands between the parties as a "filter[]," exercising its independent judgment to decide what information is "worthy of communicating," the intermediary's statements cannot be attributed to the defendant as a matter of law. *SIPC v. BDO Seidman, LLP*, 746 N.E.2d 1042, 1047-48 (N.Y. 2001).

In *BDO Seidman*, the Securities Investor Protection Corporation ("SIPC") claimed that BDO Seidman indirectly misrepresented – through the National Association of Securities Dealers' ("NASD") regulatory reporting process – the "precarious financial condition" of a client and that, if BDO had "accurately informed" NASD of the client's condition, SIPC could have "avoid[ed]" millions in losses. *Id.* at 1046-47. The Court of Appeals rejected the claim. Because "BDO's reports were filtered through the NASD's own process of evaluation," whatever NASD said did not "represent[] either the sum or substance of BDO's representations." *Id.* at 1047-48. NASD's "evaluative role" created an "insurmountable disconnect between BDO's representations and SIPC's purported reliance on those representations." *Id.* NASD had "too much discretion . . . for SIPC to be able to claim any significant direct reliance on BDO." *Id.* at 1047; *cf. Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011) ("the maker of a statement" for purposes of Rule 10b-5 "is the person or entity with ultimate authority over the statement").

Here, Zachys served as the expert exercising independent and final judgment regarding which of Greenberg's wines to auction and how to market them. Zachys indisputably has expertise in authenticating, marketing, and selling wine. Koch conceded that Zachys had a "specialized ability to ascertain, and investigate, the

44

history and authenticity of the wine and overall knowledge of wine."  Compl. ¶ 68 (DN1); *see also* Pl.'s Opp. to Zachys' MTD 21 (DN25).

Once Greenberg hired Zachys, it owed him a fiduciary duty.  Under New York law, an auction house "is the agent of the consignor" and "ha[s] a fiduciary duty to act in the utmost good faith" of the consignor, who is "entitled to rely" on the auction house's "judgment and integrity."  *Cristallina S.A. v. Christie, Manson & Woods Int'l, Inc.*, 502 N.Y.S.2d 165, 171-72 (App. Div. 1st Dep't 1986). Greenberg did precisely that:  he relied on Zachys to undertake a "very thorough" "physical inspection of [the] inventory," Tr. 1751; TX96 ¶ 5; exclusively select which of the consigned wines would be auctioned, *id.* ¶ 8; identify to whom to market particular wines, TX444; and choose what to say about the wines in the Catalog, Tr. 1651-52, 1751.  Like an intervening cause that severs the causal chain, Zachys had an "evaluative role" that "insurmountabl[y] disconnect[ed]" Greenberg from Koch.  *BDO Seidman*, 746 N.E.2d at 1048.

The district court held that, "so long as Greenberg reasonably expected auction attendees to rely" on the Catalog, the statements are "actionable representations."  SA9.  That position cannot be correct as to *Greenberg*:  the undisputed evidence was that Zachys, not Greenberg, controlled anything the Catalog said about authenticity.  The court also held "it was reasonable for the jury to find that Greenberg was a driving force behind the catalogue's representations."

*Id.* That standardless "driving force" rule also misstates the law: Zachys acted like NASD in *BDO Seidman* by describing the wines based on its independent inspection of externally verifiable indicators, with no expectation or request that Greenberg ensure the accuracy of those descriptions. *See supra* pp. 16-19.

> b. Alternatively, Koch has not identified any actionable misrepresentations on which he relied

Statements in the Catalog introduction – like "best of the best" – are "marketing," not "facts about Mr. Greenberg's collection." Tr. 1662, 1664-65. Such puffery is not actionable as a matter of law. *See Julie Research Labs., Inc. v. General Resistance, Inc.*, 268 N.Y.S.2d 187, 189 (App. Div. 1st Dep't 1966) (per curiam), *aff'd*, 227 N.E.2d 892 (N.Y. 1967); *see also Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1108 (N.Y. 2011).

The district court assumed the jury did not rest liability on such statements. SA6-7. Yet the court did not identify any other specific misrepresentations supporting liability; it simply cited Koch's post-trial brief. SA7-8. Koch, in turn, identified four "statements" to support the jury's verdict. Pl.'s Opp. to Def.'s JMOL Mot. 4-6 (DN503). Those statements were not fraudulent:

i. *Greenberg misrepresented that his wine was authentic*. The Catalog does not represent that the wines are authentic; it specifically disclaims authenticity. TX101.0240; *supra* Part I.A.1.

ii.  *Greenberg misrepresented the sources of his "older Bordeaux."*[12]

The Catalog contains no such representation; it specifically disclaims representations about "provenance."  TX101.0240.  Greenberg's statement regarding his "older Bordeaux" comes from an e-mail he wrote to Zachys, TX98, which cannot support liability because Zachys did not relay the information to Koch.  *See SIPC v. BDO Seidman, LLP*, 222 F.3d 63, 72 (2d Cir. 2000) (no reliance on misrepresentations that were not received); *Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 148 F.3d 194, 196 (2d Cir. 1998) (no reliance "by showing only that a third party relied on a defendant's false statements").

iii.  *Greenberg misrepresented that his "Right Bank magnums" were "sourced on the Continent," when he knew they came from Royal or Bordeaux Wine Locators*.  This statement from the Catalog's introduction is not fraudulent for numerous reasons:  Zacharia said it, TX435; Tr. 1743; Koch did not rely on it;[13] and Koch did not prove this statement about the wines' origin was false – much less intentionally so, Tr. 1688, 1735-36, 1744.

---

[12] Only one nineteenth-century bottle is at issue.  DN451; *see supra* pp. 17-18.

[13] Koch did not identify this statement as one on which he relied, Tr. 936-40, although he opined at trial that "sourced on the Continent" meant the wines came "directly" from Europe, Tr. 1041.

iv. *Greenberg misrepresented that he was a collector*. This is not a misrepresentation at all. As the Catalog disclosed, Greenberg was a collector, "consignor," and "seller," with "[s]everal" previous sales. TX101.0006-.0007. Those statements are not mutually exclusive; Greenberg was a collector who, like Koch, auctioned some of his wine. Tr. 1008-11.

### 2. *Greenberg Did Not Owe Koch a Duty To Disclose*

**a.** The district court also incorrectly held that Greenberg owed Koch a duty to disclose because "Greenberg had superior knowledge not readily available to Koch concerning the bottles at issue in the case." SA10.

*First*, Greenberg did not know anything about Koch. When a duty to disclose is based on superior knowledge, a plaintiff must prove the defendant "knows that the [plaintiff] is acting on the basis of mistaken knowledge." *Banque Arabe*, 57 F.3d at 155; *see Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1484 (2d Cir. 1995); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 123 (2d Cir. 1984); *Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275, 283 (2d Cir. 1975). The district court inexplicably ignored that element, which is fatal to Koch's concealment claim.

It is undisputed that Greenberg did not know Koch before the auction. The "context" for a duty to disclose based on superior knowledge "has invariably involved direct negotiations between parties to a business transaction." *Albion*

*Alliance Mezzanine Fund, L.P. v. State Street Bank & Trust Co.*, 797 N.Y.S.2d 699, 704 (Sup. Ct. N.Y. Cnty.), *aff'd*, 767 N.Y.S.2d 619 (App. Div. 1st Dep't 2003). Strangers with no direct dealings need not disclose information to each other. *See*, *e.g.*, *Mandarin Trading*, 944 N.E.2d at 1108-09 (absent specific dealings, the fact that "a hypothetical purchaser" might consider facts material does not create a duty to disclose); *Steinberg v. Guild*, 258 N.Y.S.2d 670, 671 (App. Div. 1st Dep't 1965) (per curiam) (no duty to disclose to plaintiffs "who at the time of contract were not limited partners and unknown to said defendants"). Here, Zachys, not Greenberg, knew Koch and communicated with him before the auction.

This Court has previously rejected a fraud verdict on the very same ground. In *Remington Rand*, a jury found that the defendants concealed their relationship with an entity that misappropriated the plaintiff's trade secrets, thereby fraudulently inducing the plaintiff to release its claims against them. This Court reversed, finding no duty to disclose because the plaintiff "failed to show that the [defendants] were aware that it had a false understanding of their role" in the underlying transaction. 68 F.3d at 1484; *see Amend v. Hurley*, 59 N.E.2d 416, 419 (N.Y. 1944) (no duty to disclose where there is "no evidence that [defendant] had any idea or knowledge that [plaintiff] had made a mistake"). The court below mistakenly relied on *Brass v. American Film Technologies, Inc.*, 987 F.2d 142

(2d Cir. 1993), but there the defendant engaged in direct, "continued," and repeated "solicitation" of the plaintiff that consistently omitted material information. *Id.* at 152. Absent any evidence that Greenberg had any direct dealings with Koch, Greenberg owed him no duty to disclose.

*Second*, Greenberg had no duty to disclose because Zachys knew, controlled, and made available to Koch all necessary facts for determining the wine's authenticity. Just as a plaintiff's access defeats peculiar knowledge, *see supra* Part I.A.2, access also obviates any duty to disclose information the plaintiff had access to discover. *See Aaron Ferer*, 731 F.2d at 123 (no duty because information "was either a matter of public record, was not pursued by plaintiffs, or was disclosed, at least in part, by [defendant]"); *Industrial Risk Insurers v. Ernst*, 638 N.Y.S.2d 109, 110 (App. Div. 2d Dep't 1996) (no duty where "parties dealt at arm's length" and information "could have easily been ascertained at all times" by plaintiff or its experts). The bottles themselves revealed all indicia of authenticity that existed, and Koch had access to that information. Greenberg therefore had no duty to disclose additional information to Koch.

**b.** Koch argued below that, under *Junius Construction Co. v. Cohen*, 178 N.E. 672 (N.Y. 1931), Greenberg had a duty to disclose because he made a misleading, partial disclosure *to Zachys* about the source of some of his "older Bordeaux." *Supra* p. 47. In *Junius*, the defendant sold land to the plaintiff and

50

"warned" that certain street openings could "modify" the "exterior boundaries" of the land, but said nothing about another street that could "cut the plot substantially in half." 178 N.E. at 672. The Court of Appeals held that, "having undertaken" to disclose certain risks, the defendant could not omit a similar but "greater risk." *Id.* at 674. Unlike the defendant in *Junius*, however, Greenberg made *no* disclosures to Koch, much less misleading, partial disclosures. Koch cannot identify a single statement by Greenberg to Koch about the authenticity of the bottles Koch purchased. Absent such statements, *Junius* does not create a duty to disclose.

Koch also argued below that, under *Donovan v. Aeolian Co.*, 200 N.E. 815 (N.Y. 1936), Greenberg had a duty to disclose because he implicitly represented the wines' authenticity absent contrary disclosures. In *Donovan*, the plaintiff visited a manufacturer's "salesroom[]" and, "[a]fter hearing the tone of several pianos," purchased a rebuilt piano that she mistakenly thought was new. *Id.* at 816. The defendant said nothing about the newness of the piano during the sale, but the Court of Appeals held that, "[w]hen a manufacturer offers a piano for sale in the ordinary course of business without disclosure of the fact that the piano had been used and then repaired, the *acts* of the manufacturer, coupled with the *words* of the salesman, may be regarded as an affirmation that the piano was taken out of stock and unused." *Id.* at 817. The same is not true here. Goods purchased from a manufacturer may be presumed to be new, especially when a salesman does not

51

say otherwise during the sale; second-hand wine purchased "as is" with an unexercised right to pre-inspect cannot be presumed to be authentic, especially when authenticity is expressly disclaimed.

## II. GREENBERG DID NOT VIOLATE GBL § 349 AND § 350

For § 349 and § 350, Koch had to prove that Greenberg engaged in "consumer-oriented" conduct that was "misleading in a material way." *Stutman v. Chemical Bank*, 731 N.E.2d 608, 611 (N.Y. 2000); *see Maurizio v. Goldsmith*, 230 F.3d 518, 522 (2d Cir. 2000) (per curiam). As a matter of law, Greenberg's conduct was neither.

### A. The Auction Was Not Materially Misleading

Conduct or advertising is not materially misleading unless it is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Stutman*, 731 N.E.2d at 611-12 (internal quotations omitted); *see S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 636 (2d Cir. 1996); *Andre Strishak & Assocs., P.C. v. Hewlett Packard Co.*, 752 N.Y.S.2d 400, 403 (App. Div. 2d Dep't 2002). Section 349 "does not require businesses to ascertain consumers' individual needs and guarantee that each consumer has all relevant information specific to its situation." *Gomez-Jimenez v. New York Law Sch.*, 956 N.Y.S.2d 54, 58 (App. Div. 1st Dep't 2012) (internal quotations omitted). Courts have held that conduct is not materially misleading on many different grounds, including the

absence of false information, *see id.* at 58-59; the presence of "clear disclaimers," *S.Q.K.F.C.*, 84 F.3d at 637; and the plaintiff's ability to obtain relevant information, *see Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 744-45 (S.D.N.Y.), *aff'd*, 505 F. App'x 45 (2d Cir. 2012).  Here, *all three* of those factors are present.

*First*, Greenberg did not make any false or incomplete statements.  A defendant does not engage in materially misleading conduct by "simply publishing truthful information and allowing consumers to make their own assumptions about the nature of the information."  *Gomez-Jimenez*, 956 N.Y.S.2d at 58-59.  That is so even if "there is no question" that the conduct leaves "some consumers with an incomplete, if not false, impression," and even if a court is "troubled by the unquestionably less than candid and incomplete nature of [a] defendant's disclosures."  *Id.*; *see also Lebowitz v. Dow Jones & Co.*, 847 F. Supp. 2d 599, 603-05 (S.D.N.Y. 2012) (not misleading to cancel part of subscription service where severable nature of "service" disclosed), *aff'd*, 508 F. App'x 83 (2d Cir. 2013).  Here, Zachys described the nature of Greenberg's collection and the wines as labeled and provided pre-auction access, but told auction-goers the sales were "as is," without guarantees, with remedies limited to a refund.  That is not misleading.

*Second*, the Catalog included "clear disclaimers" of the very matters about which Koch complains – authenticity, merchantability, and provenance.  *S.Q.K.F.C.*,

53

84 F.3d at 637.  Bidders had to "agree to be bound by" those clear disclaimers to participate in the auction.  TX101.0247; Tr. 1672; *see Moore v. Microsoft Corp.*, 741 N.Y.S.2d 91, 92 (App. Div. 2d Dep't 2002) (barring GBL claim because agreement disclaimed warranties, and user "was required to indicate assent" before using software).  Consequently, those "who can afford" to bid at Zachys' auctions, TX101.0007, were on notice that some of Greenberg's wines could be inauthentic. *See Against Gravity Apparel, Inc. v. Quarterdeck Corp.*, 699 N.Y.S.2d 368, 369 (App. Div. 1st Dep't 1999) (disclaimer that product not "error free," together with expired warranty, defeated GBL claim).[14]

*Third*, bidders' right to inspect the wines and inquire about them, coupled with the general sophistication and wealth of high-end wine purchasers, *see* SA42-45, 49, means they "could reasonably have obtained the relevant information" concerning the wine's authenticity.  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995).  In *Tasini*, for example, freelance writers claimed that a website improperly concealed their works' popularity by withholding precise data showing readership size.  The court dismissed plaintiffs' GBL claims because, although "the exact page-view data

---

[14] Although a disclaimer alone is insufficient to dismiss a GBL claim, *see Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675 (N.Y. 2012), Greenberg's argument is neither based on the disclaimer alone nor made on a motion to dismiss. The totality of evidence presented at trial, including the disclaimer, establishes that the consignment was not materially misleading.

was unavailable to the plaintiffs, they likely could have inferred an approximate level of exposure" from other available sources.  851 F. Supp. 2d at 745.  This Court affirmed.  505 F. App'x at 48; *see also Benetech, Inc. v. Omni Fin. Group, Inc.*, 984 N.Y.S.2d 186, 189 (App. Div. 3d Dep't 2014) (no GBL claim where material accessible "by reviewing the contents of defendant's website").  Likewise here, sufficient information about the potential inauthenticity of Greenberg's wines was available to reasonable auction-goers, all of whom had the right to inspect the wines and ask Zachys questions.

Under those circumstances, a reasonable auction-goer would not be misled about Greenberg's wines.

### B. Consigning High-End Wine For Auction Is Not Consumer-Oriented Conduct

Even materially misleading conduct does not violate GBL § 349 and § 350 unless it is "consumer oriented," which means it "must have a broad impact on consumers at large." *New York Univ. v. Continental Ins. Co.*, 662 N.E.2d 763, 770 (N.Y. 1995); *see S.Q.K.F.C.*, 84 F.3d at 636 ("potentially affect similarly situated consumers") (internal quotations and alteration omitted).  Those statutes are "directed at wrongs against the consuming public" and are "primarily intended to reach" "modest transaction[s]."  *Oswego*, 647 N.E.2d at 744; *New York Univ.*, 662 N.E.2d at 770-71; *Teller v. Bill Hayes, Ltd.*, 630 N.Y.S.2d 769, 774 (App. Div. 2d Dep't 1995).  Violations typically involve individuals who purchase inexpensive

consumer goods from well-heeled businesses. *See Cruz v. NYNEX Info. Res.*, 703 N.Y.S.2d 103, 106-07 (App. Div. 1st Dep't 2000); *Teller*, 630 N.Y.S.2d at 774. By contrast, transactions are *not* "consumer oriented" when, for example, they do not involve goods purchased for personal, family, or household use, *Sheth v. New York Life Ins. Co.*, 709 N.Y.S.2d 74, 75 (App. Div. 1st Dep't 2000); they are high-end, expensive deals, *Denenberg v. Rosen*, 897 N.Y.S.2d 391, 396 (App. Div. 1st Dep't 2010); or a sophisticated intermediary stands between buyer and seller, *Weiss v. Polymer Plastics Corp.*, 802 N.Y.S.2d 174, 176 (App. Div. 2d Dep't 2005). The conduct here – consigning high-end wine for auction – bears the hallmarks of transactions that are *not* consumer-oriented.

*First*, antique wine sold at auction is a collectible, not a consumer good. The auction of Hollywood memorabilia and the sale of investment securities are not consumer-oriented. *See Moustakis v. Christie's, Inc.*, 892 N.Y.S.2d 83, 83-84 (App. Div. 1st Dep't 2009); *Smith v. Triad Mfg. Group, Inc.*, 681 N.Y.S.2d 710, 712 (App. Div. 4th Dep't 1998). The same is true of antique wine. Zachys marketed the auction to "collectors and enthusiasts." TX101.0007. Indeed, "Koch himself characterized the wine at issue as collectible artifacts rather than something that he would actually imbibe." SA42.

*Second*, Zachys' role as an expert intermediary means that Greenberg did not engage in a consumer-oriented transaction with Koch. In *St. Patrick's Home*

*for Aged & Infirm v. Laticrete International, Inc.*, 696 N.Y.S.2d 117 (App. Div. 1st Dep't 1999), a nursing home brought GBL claims against a manufacturer of allegedly defective wall panels, as well as the construction manager and architect responsible for the project. *Id.* at 120. The court held that the manufacturer, "which had no contact with the plaintiff," did not engage in "consumer-oriented conduct" because the manager and architect were "sophisticated business entities [that] acted in an intermediary role in the transaction, thereby reducing any potential that a customer in an inferior bargaining position would be deceived." *Id.* at 122; *see Weiss*, 802 N.Y.S.2d at 176 (same). Likewise, Greenberg had no contact with Koch, who dealt exclusively with Zachys – the expert intermediary responsible for the auction. If anyone engaged in consumer-oriented activity, it was Zachys, not Greenberg.

*Third*, sales of high-end wines to wealthy auction-bidders for hundreds or thousands of dollars apiece are not "modest" transactions that affect the general public. *Denenberg*, 897 N.Y.S.2d at 396; *Oswego*, 647 N.E.2d at 744-45. Recoveries in GBL cases "uniformly involve transactions where the amount in controversy is small." *Teller*, 630 N.Y.S.2d at 773 (internal quotations omitted). As Judge Oetken recognized in rejecting Koch's petition for $7.9 million in attorney's fees, this case concerned "high-end wine auctions where a single bottle may sell for $20,000" to a "rarefied class" of "inevitabl[y]" wealthy connoisseurs,

SA45, not "consumers who are 'vulnerable' or 'disadvantaged'" or "'consumers at large,'" SA49.  That rationale should have negated the GBL liability verdict.

## III.  AS A MATTER OF LAW, GREENBERG SHOULD NOT BE LIABLE FOR PUNITIVE DAMAGES

The jury never should have been given the chance to award punitive damages. Because Greenberg's conduct was neither reprehensible nor aimed at the public, punitive damages were unavailable.[15]

### A.  Punitive Damages Are Available For Fraud Only When Egregious Misconduct Is Aimed At The General Public

New York law is "well settled" that punitive damages "are not available in the ordinary fraud and deceit case."  *Kelly v. Defoe Corp.*, 636 N.Y.S.2d 123, 124 (App. Div. 2d Dep't 1996) (internal quotations omitted); *see Mom's Bagels of New York, Inc. v. Sig Greenebaum, Inc.*, 559 N.Y.S.2d 883, 885 (App. Div. 1st Dep't 1990).  The purpose of punitive damages "is not to remedy private wrongs but to vindicate public rights."  *Rocanova v. Equitable Life Assur. Soc'y*, 634 N.E.2d 940, 943 (N.Y. 1994); *see New York Univ.*, 662 N.E.2d at 767.  A jury may award punitive damages for fraud only when the defendant's conduct is "aimed at the public generally," *James v. Powell*, 225 N.E.2d 741, 747 (N.Y. 1967) (internal

---

[15] New York authority is split on "whether punitive damages must be shown by clear and convincing evidence or a preponderance of the evidence."  *In re MTBE Prods. Liab. Litig.*, 725 F.3d 65, 127 n.49 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 1877 (2014).  The court below decided the case (SA36) under the clear-and-convincing standard, *see Cleghorn v. New York Cent. & H.R.R. Co.*, 11 Sickels 44, 48 (N.Y. 1874) ("clearly established").  Koch can satisfy neither standard.

quotations omitted), and "may be characterized as 'gross' and 'morally reprehensible,' and of 'such wanton dishonesty as to imply a criminal indifference to civil obligations,'" *New York Univ.*, 662 N.E.2d at 767 (quoting *Rocanova*, 634 N.E.2d at 944); *see Greiss v. Royal Nat'l Bank*, 293 N.E.2d 827, 827 (N.Y. 1973); *Koufakis v. Carvel*, 425 F.2d 892, 907-08 (2d Cir. 1970).[16]

The district court erroneously held that a " 'pattern of conduct directed at the public in general' " is " 'not essential' " to recover punitive damages. SA35 (quoting *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 526 (S.D.N.Y. 2011)). *Pure Power* involved a breach of fiduciary duty, and New York courts have recognized an exception to the "public harm" requirement for fiduciaries. *See*, *e.g.*, *Green v. Leibowitz*, 500 N.Y.S.2d 146, 149 (App. Div. 2d Dep't 1986). The prevailing view is that "[p]unitive damages may only be recovered in a fraud action where the fraud is aimed at the public generally, is gross, and involves high moral culpability." *Kelly*, 636 N.Y.S.2d at 124; *see Fioramonti v. McGrath*, 919 N.Y.S.2d 907, 908 (App. Div. 2d Dep't 2011).

---

[16] Although punitive damages can be awarded in some cases "whether or not directed against the public generally," *Roy Export Co. v. CBS, Inc.*, 672 F.2d 1095, 1106 (2d Cir. 1982) (citing *Borkowski v. Borkowski*, 355 N.E.2d 287 (N.Y. 1976) (memorandum)), the "public harm" standard remains good law, especially when, as here, a contractual relationship was "necessary for this dispute to have arisen." *Carvel Corp. v. Noonan*, 350 F.3d 6, 25 (2d Cir. 2003) (emphasis omitted); *see Rocanova*, 634 N.E.2d at 943-44.

**B. Greenberg's Conduct Was Not Egregious Or Aimed At The General Public**

In determining whether a defendant's conduct is sufficiently "close to criminality" to warrant punitive damages, the question is whether it "constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." *MTBE*, 725 F.3d at 127-28 (internal quotations omitted). Greenberg's conduct does not meet that standard.

Greenberg relied on his expert fiduciary to inspect, select, and market wines for a private auction and to provide disclaimers to bidders. Accordingly, his conduct did not reach "the very high threshold of moral culpability" for which punitive damages are appropriate. *Id.* at 128 (internal quotations omitted). In *Ross v. Louise Wise Services, Inc.*, 868 N.E.2d 189 (N.Y. 2007), for example, an adoption agency repeatedly concealed and "intentionally misrepresented" to adoptive parents the troubled mental health of their adoptive child's biological family, despite repeated inquiries over a 30-year period. *Id.* at 191-92, 197. When the child was diagnosed a paranoid schizophrenic, the parents sued for fraud. The Court of Appeals allowed the claim for fraud, but denied punitive damages. During the relevant time period, experts believed that concealment of family medical history was appropriate "if the professionals were unsure whether the factors were hereditary." *Id.* at 197. The Court held that, because the agency complied with the professional judgment of its social workers, its conduct "did

not evince the high degree of moral turpitude required for punitive damages." *Id.* Likewise here, Greenberg relied on his expert fiduciary to inspect and select wines for auction with appropriate disclosures about authenticity and provenance. Moreover, unlike the *Ross* defendant, Greenberg did not repeatedly misrepresent or conceal facts for 30 years in response to multiple inquiries; rather Greenberg knew his wines were available for inspection pursuant to each bidder's contract with Zachys. Greenberg's conduct therefore did not grossly deviate from what a "reasonable person would observe in the situation." *MTBE*, 725 F.3d at 128 (internal quotations omitted).

Even in the specific "situation" of auctions, *id.*, the Appellate Division has rejected punitive damages under more severe circumstances. In *Yuzwak v. Dygert*, 534 N.Y.S.2d 35 (App. Div. 4th Dep't 1988), a family sued for fraud after a 7-year-old girl was kicked in the face by a horse purchased at auction based on defendant's repeated written and oral representations that the horse was " 'easy to handle,' " "quiet with children," and "would make a fine show horse for children." *Id.* at 35-36. The court nevertheless held that the defendant's conduct was "not of the kind that would warrant punitive damages." *Id.* at 36. Certainly here – where Zachys made the representations and disclaimed authenticity and provenance, and no physical harm resulted – Greenberg's reliance on Zachys is not more egregious than the defendant's conduct in *Yuzwak*.

Nor was Greenberg's conduct "directed at the public at large."  *Wright v.*

*Selle*, 811 N.Y.S.2d 525, 527 (App. Div. 4th Dep't 2006) (internal quotations

omitted).  Just as Greenberg's conduct was not "consumer oriented" for purposes

of the GBL, *see supra* pp. 55-58, it also was not aimed at the public.  In *Moustakis*,

for example, the plaintiff brought GBL and common-law claims "aris[ing] out of

an auction of [Hollywood] memorabilia" described in a catalog, sold "as is," and

subject to conditions "which plaintiff accepted in order to be allowed to participate

in the bidding process."  892 N.Y.S.2d at 83-84.  The court rejected the GBL

claims as not having "an impact on the public at large," and likewise denied

punitive damages because the misconduct arose "from a private contract."  *Id.*

at 84.

In ruling to the contrary, the court below erroneously cited "evidence from

which the jury could find that this auction was not the first time Greenberg had

sold counterfeit wine."  SA37 & n.16.  First, there is no evidence that Greenberg

ever intentionally sold inauthentic wine.  At most, the disputed evidence could

be viewed as suggesting a *desire* to sell fake wine in the future.[17]  But there is

*no* evidence that Greenberg intentionally offered inauthentic wine to the general

---

[17] The district court cited testimony that Greenberg said he could sell "anything" through Acker Merrall, Tr. 175, and would sell bad wine to others as Royal had done to him, Tr. 757; and the e-mail in which he said the "garbage" wine "has been sold," TX476.

public. Second, the sale of high-end wine at exclusive auctions is not conduct directed at the general public.

## CONCLUSION

The Court should reverse the district court's judgment and direct entry of judgment for Greenberg.

Respectfully submitted,

/s/ *David C. Frederick*
DAVID C. FREDERICK
DANIEL G. BIRD
W. JOSS NICHOLS
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (facsimile)
*Attorneys for Defendant-Counter-*
*Claimant-Appellant Eric Greenberg*

November 18, 2014

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the applicable type-volume limitations. This brief was prepared using a proportionally spaced type (Times New Roman, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), this brief contains 13,963 words. This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Office Word 2007) used to prepare this brief.

 /s/ *David C. Frederick*
David C. Frederick

November 18, 2014

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 18, 2014, I electronically filed the foregoing Brief of Appellant Eric Greenberg with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *David C. Frederick*
David C. Frederick

# SPECIAL APPENDIX

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
                                                   :
WILLIAM I. KOCH,                                   :
                                Plaintiff,         :
                                                   :              07 Civ. 9600 (JPO)
                    -v-                             :
                                                   :              OPINION AND ORDER
ERIC GREENBERG,                                    :
                                Defendant.         :
                                                   :
---------------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

Plaintiff William I. Koch brought this diversity action against Defendant Eric Greenberg,

asserting claims of fraud and violations of New York's General Business Law ("N.Y. GBL" or

"GBL").  Koch's claims derive from his purchase of rare French wine consigned by Greenberg

through an auction house in October 2005.  Koch purchased over 2,600 bottles of wine from

Greenberg at the auction, and he subsequently claimed that 24 of those bottles were counterfeit.

In March and April 2013, this Court held a three-week jury trial on Koch's claims.  The trial was

bifurcated between an initial phase—covering liability and non-punitive damages—and a

punitive damages phase.  On April 11, 2013, the jury returned a verdict for Koch on all three

claims, awarding compensatory damages of $355,811 (the purchase price for the 24 bottles) and

an additional $24,000 in statutory damages on one of Koch's GBL claims ($1000 per bottle).

(Dkt. No. 451.)  The next day, April 12, 2013, the jury returned a verdict in Koch's favor in the

second phase of the trial, awarding Koch $12 million in punitive damages.  (Dkt. No. 452.)

Presently before the Court are Greenberg's motion for judgment as a matter of law, or, in

the alternative, for a new trial (Dkt. No. 495), and Koch's motion for attorney's fees, injunctive

relief, and interest (Dkt. No. 497.)  For the reasons that follow, the motions are granted in part

1

**SA1**

and denied in part:  (1) Greenberg's motion for judgment or for a new trial is denied, except to the extent that (a) the $355,811 compensatory damages award is reduced to $212,699, pursuant to New York General Obligations Law § 15-108, as a result of Koch's prior settlement with Zachys, and (b) the $12 million punitive damages award is remitted to $711,622; (2) Koch's request for attorney's fees is denied; (3) Koch's request for injunctive relief is denied; and (4) Koch's request for pre- and post-judgment interest is granted.

## I.      Background

Familiarity with the background of this case is presumed, and the Court addresses only those aspects of its factual and procedural background that are relevant to the instant motions.

### A.      Factual Background

This case concerns the sale of 24 bottles of wine by Zachys Wine Auctions, Inc. ("Zachys").  These 24 bottles of wine, which were among a larger set of bottles consigned by Greenberg and purchased by Koch, bore certain indicia of inauthenticity, suggesting that the wine was counterfeit, or not what it was purported to be.  After discovery of this fact, Koch brought suit against Greenberg, alleging common law fraud and claims under N.Y. GBL §§ 349 and 350, which address deceptive business practices.  The trial was bifurcated into two phases, with the first encompassing liability and the second addressing Koch's claim for punitive damages associated with his fraud allegations.  On April 11, 2013, the jury found in favor of Koch on all claims, specifically finding that Greenberg had committed fraud under two theories—affirmative misrepresentation and fraudulent concealment—and that he had engaged in materially deceptive business practices in violation of GBL §§ 349 and 350.  The jury awarded compensatory damages of $355,811—representing the purchase price for the 24 bottles—and an additional $24,000 in statutory damages under GBL § 349, which authorizes

2

"treble damages" up to $1000 per violation.  On April 12, 2013, the jury awarded Koch $12 million in punitive damages.

### B.      Procedural Background

In an opinion and order dated September 30, 2012, the Honorable Barbara S. Jones, to whom this case was previously assigned, denied Greenberg's motion for summary judgment, holding that there were genuine disputes of material fact with respect to the claims at issue here. *Koch v. Greenberg*, No. 07 Civ. 9600 (BSJ), 2012 WL 7997484 (S.D.N.Y. Sept. 30, 2012).  On October 24, 2012, this case was reassigned to the undersigned.

Jury selection for trial began and was completed on March 26, 2013.  The first phase of the trial took place from March 27, 2013 through April 11, 2013.  The punitive damages phase of the trial lasted one day, beginning and ending on April 12, 2013.  At the close of evidence, Defendant's counsel asked the Court that his motion for judgment as a matter of law be "deemed made now with briefing to be filed in due course."  (Tr. 2109.)[1]  The Court reserved on the motion, subject to later briefing.  (*Id.*)

Defendant's motion for judgment as a matter of law, or, in the alternative, for a new trial, was filed on June 21, 2013.  (Dkt. No. 495.)  Plaintiff's opposition was filed on August 2, 2013 (Dkt. No. 503), and Defendant replied on August 23, 2013 (Dkt. No. 505.)  Plaintiff filed his motion for attorney's fees, injunctive relief, and interest on June 24, 2013.  (Dkt. No. 497.) Defendant's opposition was filed on August 9, 2013 (Dkt. No. 504), and Plaintiff replied on September 10, 2013 (Dkt. No. 507).

---

[1] The trial transcript appears on the docket at entry numbers 454, 456, 458, 460, 462, 464, 466, 468, 470, 472, 474, 476, 478.  The pages are numbered continuously from 1-2516.  Accordingly, citations to the trial record are as follows, with the corresponding page number: "Tr. __."

II.     **Legal Standards**

A.      **Motion for Judgment as a Matter of Law Pursuant to Rule 50**

Federal Rule of Civil Procedure 50 provides that a motion for judgment as a matter of law may be made at any time before the case is submitted to the jury, and, in the event of denial, the movant may renew the motion no later than 28 days after trial.  Fed. R. Civ. P. 50(a)(2), (b). "In reviewing a Rule 50 motion, a court may consider all the record evidence, but in doing so it 'must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'"  *Cross v. N.Y.C. Trans. Auth.*, 417 F.3d 241, 247 (2d Cir. 2005) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted)).  The movant's burden on a Rule 50 motion will be "particularly heavy after the jury has deliberated in the case and actually returned its verdict."  *Id.* at 248. Thus, in order to grant such a motion, "there must be 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.'"  *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992) (quoting *Mattivi v. South African Marine Corp.*, 618 F.2d 163, 168 (2d Cir.1980) (citation omitted)).

As this Court has cautioned before, "whenever a court contemplates encroaching on the role of the jury, it should recall that the jury trial is central to the democratic system envisioned by our Founding Fathers."  *Psihoyos v. John Wiley & Sons, Inc.*, No. 11 Civ. 1416 (JPO), 2012 WL 5506121, at *1 (S.D.N.Y. Nov. 7, 2012).  As one such Founder "colorfully noted, trial by jury is a key 'indemnification against being ridden like horses, fleeced like sheep, worked like

cattle, and fed and clothed like swine and hounds.'" *Id.* (quoting The Revolutionary Writings of John Adams 55 (C. Bradley Thompson ed., 2000)).

Accordingly, with both the role of the jury and Rule 50's "stern standard" in mind, the Court must "give deference to all credibility determinations and reasonable inferences of the jury, and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (quotations and citation omitted).

### B. Motion for a New Trial Pursuant to Rule 59

After a jury trial and upon motion, a court may "grant a new trial on all or some of the issues—and to any party . . . ." Fed. R. Civ. Pr. 59(a)(1). "A motion for a new trial should be granted when, in the opinion of the district court, 'the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.'" *Song*, 957 F.2d at 1047 (quoting *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir. 1988) (citations omitted)). Rule 59 motions differ from motions for a new trial pursuant to Rule 50 in two significant respects. First, "[u]nlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998). And second, in considering a Rule 59 motion, "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *Id.* "A new trial may be granted, therefore, when the jury's verdict is against the weight of the evidence." *Id.* at 133 (citations omitted). Despite this, however, a court will grant a Rule 59 motion only when the jury's verdict proves "egregious" in light of the evidence presented at trial. *Id.* at 134 (quotations and citations omitted).

**III.   Defendant's Motion for Judgment as a Matter of Law**

    **A.   Fraud Claim**

Greenberg contends that Koch "failed to present clear and convincing evidence of fraud." (Defendant Eric Greenberg's Memorandum of Law, Dkt. No. 496 ("Def.'s Mem."), at 2.)  Fraud requires the following elements: (1) representation of material fact; (2) falsity; (3) scienter; (4) reasonable reliance; and (5) injury.  *Koch v. Greenberg*, No. 07 Civ. 9600 (BSJ), 2008 WL 4778813, at *6 (S.D.N.Y. Oct. 31, 2008).  The jury was properly instructed as to each of these elements (Court Ex. 7), which were reiterated in the verdict form.  (Dkt. #451.)

As to the first two elements, Greenberg argues that the trial record was devoid of any actionable misstatement made by Greenberg, contending instead that (1) most of the statements in the auction catalogue were non-actionable statements of opinion; and (2) Zachys, rather than Greenberg, made the statements at issue.  First, the jury was instructed that statements of opinion are non-actionable except in the limited circumstance where such a statement of opinion is not sincerely held.  *See, e.g.*, *Union Carbide Corp. v. Montell N.V.*, 9 F. Supp. 2d 405, 409 (S.D.N.Y. 1998) ("However, even an expression of opinion may be actionable if it is not sincerely held.").  Additionally, the jury was instructed, at Greenberg's request, on the non-actionable nature of so-called "puffery" or "trade-talk."  *See Bareham & McFarland, Inc. v. Kane*, 228 A.D. 396, 398 (4th Dep't 1930) ("Neither can the statements complained of be made the basis of an action in fraud, if they are nothing more than a recommendation of the plaintiff's wares.  It is common knowledge that dealers are wont to put the best side out, and extol their goods.  The public is so familiar with 'dealer's talk' that it is generally regarded as a mere expression of opinion, and, where the parties deal on equal terms, is not relied upon to any great extent." (citation omitted)); *accord Serrano v. Cablevision Sys. Corp.*, 863 F. Supp. 2d 157, 167-69 (E.D.N.Y. 2012)

6

**SA6**

("Statements will not form the basis of a fraud claim when they are mere 'puffery' or are opinions as to future events." (citations omitted)).

It is axiomatic that "juries are presumed to follow their instructions." *Zafiro v. United States*, 506 U.S. 534, 540 (1993) (quotations and citations omitted).  Accordingly, it is nothing more than conjecture for Greenberg to assume that the jury's finding of fraud by affirmative misrepresentation was based on vague statements in the auction catalogue such as one that Greenberg's 17,000-bottle collection was the "best-of-the-best."  The jury was explicitly instructed that general statements of puffery concerning the status of a vendor's wares are insufficient, as a matter of law, to give rise to actionable fraud.  (*See, e.g.*, Court Ex. 7, at 7 ("Examples of such [non-actionable] statements are vague claims of superiority over comparable products or exaggerated and boasting statements upon which no reasonable buyer would be justified in relying.").)  Citing the charge conference, Greenberg contends that Koch suggested at trial that such statements were not puffery, but rather, were actionable, insincerely held statements of opinion.  (Tr. 2024.)   Again, in accordance with Greenberg's request, the jury was instructed on the difference between the two, and is presumed to have followed that law.  (*Id.* at 2118:8-22; *see also id.* at 2165:19-2166:16.)[2]  Moreover, aside from such vague superlatives, the

---

[2] In closing argument, Greenberg's counsel stated as follows with regard to puffery:

> He says, look, the ad said terrific house, this house is only 2100 square feet.  You know, a terrific house is 21,000 square feet. That's a terrific house.  I was misled. And it says spacious living room.  This living room is only 20 feet by 20 feet.  What are you talking about?  A spacious living room is a hundred feet long and 50 feet wide.  That's a spacious living room.  You defrauded me.
> And wonderful yard, I got there, I walked out in the yard. No fountains.  Where were the tennis courts, the Olympic size swimming pool?  There was not even a swimming pool.  Not even room to play polo or a putting green.  That was a wonderful yard. You said wonderful yard.

7

record contains several additional potential statements of fact, or potentially insincerely held opinions, that the jury could have reasonably construed as actionable misstatements.  (*See* Plaintiff's Opposition, Dkt. No. 503 ("Pl.'s Opp."), at 4-6.)

Greenberg also argues that none of the possible misstatements alleged as the bases for fraud were "made by Greenberg at all," but rather, "were made by [Jeff] Zacharia in the Zachys auction catalogue."  (Def.'s Mem. at 4.)  First, under New York law, while a plaintiff may not generally claim reliance on statements made by third parties, so long as plaintiff is among the "class of persons" intended to rely on the statement, Rest. (Second) of Torts § 533 (1976), it is unnecessary that such "representations should be made to the plaintiff directly."  *Greene v. Mercantile Trust Co.*, 60 Misc. 189, 193 (N.Y. Sup. Ct. 1908); *accord Ostano Commerzanstalt v.*

---

That was a fraud.  My interpretation of wonderful yard is what I just described to you.  And great location, this is just in New Rochelle.  I thought it was Beverly Hills or Sutton place.

You don't get to do that, and there is a reason you don't get to do that.  *The judge will give you an instruction explaining why you can't do that.  He is going to read to you general assertions or expressions of a seller in praising the product being offered for sale, commonly called dealer's talk, trade talk, or puffery, do not constitute a basis for a fraud claim.  Examples of such statements are vague claims of superiority over comparable products or exaggerated and boasting statements upon which no reasonable buyer would be justified in relying.*

How much testimony did we hear from Mr. Koch about having read Alexander the Great, the Alexander the Greats of the collecting world?  After reading that, he then read all kinds of things.  These wines had to be genuine because Alexander the Great only collected genuine wine.  They had to be stored a certain way because Alexander the Great had a great wine fridge.

All of that is not a representation, and all of the things that Mr. Koch said he thought it meant is not actionable, as we call it in law.  You can't sue somebody over it, because it's dealer's talk or trade talk or puffery.  "Puffery" is a funny word.  But it is sort of puffing.  Great house, great lawn.  People do that.

(Tr. 2165:4-2166:16 (emphasis added).)

8

**SA8**

*Telewide Systems, Inc.*, 794 F.2d 763, 766 (2d Cir. 1986) ("[F]raudulent misrepresentation made with 'notice in the circumstances of its making' that the person to whom it was made would communicate it to third parties subjects the person making the misrepresentation to liability to the third party." (citation omitted)).  Accordingly, even if Greenberg's statements were made to Zachys or its owner, rather than to Koch himself, so long as Greenberg reasonably expected auction attendees to rely on those statements—a conclusion the jury was free to reach in light of the record—they may be actionable representations under New York law.  Greenberg also asserts that Zachys, rather than Greenberg, drafted the entire catalogue, developing its own representations concerning the wine that were separate from any representations made by Greenberg.  (*See* Def.'s Mem. at 5 ("Indeed, Zachys' control over the catalogue extended to every representation therein . . . .").)  However, given the testimony at trial, it was reasonable for the jury to find that Greenberg was a driving force behind the catalogue's representations.  (*See* Pl.'s Opp. at 7-8.)  The jury was free to accept the testimony of Greenberg and his witnesses that the catalogue's representations were those of Zachys and Zachys alone; however, it appears to have rejected this interpretation of the evidence.  (*See, e.g.*, Dkt. No. 451 at 13 (apportioning blame for Koch's GBL claims at 100% for Greenberg and 0% for Zachys with respect to the § 349 claim and at 75% for Greenberg and 25% for Zachys with respect to the § 350 claim).)

As noted above, the jury also found Greenberg liable for fraud on an alternative ground: namely, pursuant to the theory of fraudulent concealment.  The jury was properly instructed that, under New York law, silence or omission with respect to a material fact can serve as the equivalent of an affirmative misrepresentation where either: (1) "one party possesses superior knowledge, not readily available to the other," or (2) "the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other

9

**SA9**

party it cannot give only half of the truth." *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d. Cir. 1993) (citation omitted).  Either theory can give rise to liability for fraudulent concealment, and it was reasonable and permissible for the jury to conclude that Greenberg had superior knowledge not readily available to Koch concerning the bottles at issue in the case. Throughout the trial, Greenberg's counsel emphasized that Koch had the opportunity to inspect the bottles at issue, and, had he done so, he would have *seen* the indicia of inauthenticity that served as readily apparent indicators of their counterfeit status.  The jury was free to credit that argument and chose not to do so—a determination that was within the province of the jury. While the record did indicate surface-level problems with the bottles of wine—aberrational labels or irregular cork striations, for example—the record also included numerous references to information that Greenberg knew about the wine bottles, but chose not to share with Zachys or consumers.  The jury chose to agree with Koch's position that "[n]o amount of inspection would have revealed what Greenberg knew" (Pl.'s Opp. at 10), and the Court concludes that that choice was sufficiently supported by the evidence at trial.  Greenberg's arguments about the reasonableness of inspection in these circumstances are unavailing.  The jury was instructed on the meaning of facts that are "readily available," namely, that they are those facts "discovered through the exercise of ordinary intelligence by the plaintiffs." (Court Ex. 7 at 11.)  The jury was well aware that buyers, especially sophisticated buyers, are required by law to "protect themselves" in business transactions by obtaining relevant information.  (*Id.*)  Nevertheless, all parties agreed that, for example, "a buyer is not required to conduct investigations to unearth facts and defects that are present, but not obvious," meaning that "a buyer is not expected to discover that a house is infested with termites."  (*Id.*; *see* Tr. at 2046:15-2047:12 (neither party objecting to this aspect of the jury charge).)

**SA10**

Closely akin to the issue of Greenberg's duty to disclose is the reasonableness of Koch's reliance—another required element of a common law fraud claim.  Greenberg contends that "[i]n all events, Koch's reliance on the alleged statements or omissions was unreasonable as a matter of law." (Def.'s Mem. at 14.)  At Greenberg's request, the Court instructed the jury that given the most logical interpretation of the "As-Is" clause in the auction catalog, authenticity, provenance, and merchantability of the wine were disclaimed.  (Trial Ex. 7 at 9.)  Additionally, in accordance with New York law, the jury was instructed that specific disclaimers ordinarily "preclude a finding of justifiable reliance," as required for a fraud claim.  (*Id.*)  However, in special circumstances, where the material facts upon which a plaintiff relies are "peculiarly within the [defendant's] knowledge," and not discoverable by the plaintiff through "the exercise of ordinary intelligence," such an "As-Is" clause will not act as a bar to a fraud claim.  *Danam Realty Corp. v. Harris*, 184 N.Y.S.2d 599, 600 (Ct. App. 1959) (quotations and citation omitted).  The jury was also instructed that in determining whether Greenberg possessed the requisite "peculiar knowledge," they were to examine "(1) the sophistication of the buyer and (2) the accessibility of the underlying information."  *See Koch*, 2008 WL 4778813, at *3; (Trial Ex. 7 at 9.)

Both at trial and in his post-trial motion, Greenberg argued that Koch was a sophisticated buyer who had a full and fair opportunity to inspect the wine he purchased.  (*See, e.g.*, Def.'s Mem. at 14-15.)  According to Greenberg, the difficulty of inspecting over two thousand bottles of wine "cannot trump Koch's undisputed inspection right because it is a problem entirely of Koch's own making."  (*Id.* at 15-16.)  It is Greenberg's position that a finding for Koch on this element of fraud represents a reversal of "the traditional understanding that a plaintiff's wealth and sophistication is a factor that weighs *against* a finding of peculiar knowledge."  (*Id.* at 16.)

11

**SA11**

In contrast, Koch notes that the jury, despite hearing Greenberg's position that Koch was a sophisticated buyer who should have inspected his purchases,[3] "found that New York's peculiar knowledge exception applies . . . ."  (Pl.'s Opp. at 13.)  Greenberg argues that a sophisticated buyer with access to inspection cannot, as a matter of law, be deemed to have reasonably relied where there is a specific disclaimer.  (Defendant Eric Greenberg's Reply Memorandum of Law, Dkt. No. 505 ("Def.'s Rep."), at 8.)  This argument simply rehashes Greenberg's argument at trial:  namely, that within the meaning of the peculiar knowledge exception, given the catalogue's right to inspection, the material facts known to Greenberg were "readily available" to Koch.  However, it was reasonable for the jury to conclude that, in light of all the circumstances, and despite Koch's sophistication and his right to inspect the bottles, it was unreasonably difficult or impossible for him to have discovered "what Greenberg knew."  (Pl.'s Opp. at 10.)  For example, while the jury determined that the indicia of inauthenticity from the bottles reflected the reality that they were counterfeit, this fact does not compel the conclusion that

---

[3] During closing argument, Greenberg's counsel noted, of the "peculiar knowledge" exception, as follows:

> I'm going to talk later about a thing called peculiar knowledge. Peculiar knowledge can cause there to be an exception to this in a certain way, and I'm going to discuss it.  But I point it out to you because whether or not there is peculiar knowledge, what Mr. Koch knows is there are no representations being made. There are no guarantees being offered.  There are no promises being made about the wine.  It says that, and it also says, and we're not guaranteeing, warrantying.  But there is nowhere you can read this catalog and imply, other than through Alexander the Great, that there is some kind of promise.
> Inspection.  Couldn't inspect.  First, the reason was, well, I just decided I wouldn't inspect because of Alexander the Great.  If his wines were that good, I didn't have to inspect.  Later in the trial it was, oh, no, actually the reason I didn't inspect was I would have to inspect all 17,000 bottles and that would be really hard, it would be very expensive.

(Tr. 2170:2-19.)

Koch, under the circumstances of the 2005 auction, could have reasonably been expected (1) to recognize those signs for what they were or (2) to employ an expert to spend 25 minutes per bottle on inspection at the time of purchase.[4]  Accordingly, it was reasonable for the jury to conclude that material facts upon which Koch relied were peculiarly within Greenberg's knowledge, thus permitting a finding of fraud notwithstanding the presence of an explicit disclaimer.

Greenberg also contends that Koch did not adequately prove scienter and causation. (Def.'s Mem. at 10-14.) With respect to causation, Greenberg argues that there was no evidence that Zachys would have behaved differently had Greenberg disclosed what he knew about the wine at issue.  (*Id.* at 10.)  This characterization of the evidence, however, overlooks aspects of the record from which the jury could have reasonably concluded that Koch had established causation through clear and convincing evidence.  (*See, e.g.*, Tr. at 1707:12-1709:6 (Zachariah testifying that he would have liked to have known that Bill Edgerton, an expert, had determined that some of Greenberg's bottles were counterfeit); *id.* at 1712:1-12 (Zachariah stating that he would have liked to have known that Chateau Lafleur did not use vertically branded corks until

---

[4] In closing, Koch's counsel highlighted this difficulty, noting:

> [Mr. Greenberg's counsel] says: Oh, well, this isn't that many bottles. I'm sorry. What do you have, some sort of bottle radar? You go into the warehouse and you just magically come to these 24 bottles and then you look at them? There were thousands of expensive bottles. Take a look at Exhibit 100. It's the invoice. Mr. Koch buys expensive bottles of wine. They're all expensive. Where do you start? There are hundreds of bottles in there that are over a thousand, over $2,000, over $3,000. Mr. Egan told you, it would have taken him 25 minutes a bottle to do the work to review.

(Tr. 2286:1-11.)

1966); *id.* at 1714:24-1715:4 (Zachariah stating that he would have liked to have known of Greenberg's belief "that vertical branding in Petrus magnums from before 1966 was not appropriate to the time"); *id.* at 1722:6-1724:19 (Zachariah testifying at his prior deposition that he would have liked to have known if Greenberg had consigned wines to Zachys that Greenberg had previously claimed were counterfeit).) Additionally, at trial, Koch stated that if he himself had known some of this information, he would not have purchased the wine at issue. (*See, e.g.*, *id.* at 971:24-974:8.) The jury was within its rights to credit that testimony and was accordingly reasonable in concluding that the element of causation was met.

With regard to scienter, which may be satisfied by either knowledge or recklessness—the latter of which was defined to the jury as a representation "made without knowledge of or a genuine belief in [its] accuracy" (Trial Ex. 7 at 8)—Greenberg contends that his segregation of suspect wines and firm belief in Zachys' vetting process undercuts any claim of a knowing or reckless violation. (*Id.* at 12.) However, there is sufficient evidence from which the jury could conclude that Greenberg possessed the requisite state of mind. (*See, e.g.*, Pl.'s Opp. at 12-13.) Moreover, Greenberg's arguments concerning the potential bias or credibility of witnesses whose testimony was relevant to Greenberg's scienter are misplaced, as the Court is required to "give deference to all credibility determinations and reasonable inferences of the jury and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 137, 133-34 (2d Cir. 2008) (quotations and citations omitted). Thus, the jury could reasonably have concluded that Koch satisfied his burden with regard to scienter.

Accordingly, the jury's finding of fraud was not unreasonable and was permissible based on the evidence at trial.

14

### B.     GBL Claims

A successful GBL § 349 claim requires that a plaintiff prove, by a preponderance of the evidence, that (1) "the defendant has engaged in an act or practice that is deceptive or misleading in a material way"; (2) the "plaintiff has been injured by reason thereof"; and (3) the deceptive act or practice is "consumer oriented." *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 343-44 (Ct. App. 1999) (quotations and citations omitted).  In contrast to "private contract disputes, unique to the parties," consumer-oriented conduct within the meaning of the statute requires acts or practices that "have a broader impact on consumers at large." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (Ct. App. 1995) (citations omitted).  Importantly, however, "[c]onsumer-oriented conduct does not require a repetition or pattern of deceptive behavior." *Id.*  Accordingly, so long as conduct was aimed at the public at large, it is immaterial that the defendant may not have "committed the complained-of acts repeatedly—either to the same plaintiff or to other consumers." *Id.*  Where the "acts complained of 'potentially affect similarly situated consumers,'" the consumer-oriented prong will be met. *Koch*, 2008 WL 4778813, at *7 (quoting *Oswego*, 85 N.Y.2d at 27).  GBL § 350 prohibits false advertising and has the same elements as § 349, except for the requirement that the Defendant's *advertisement* "(1) had an impact on consumers at large, (2) was deceptive or misleading in a material way, and (3) resulted in injury." *Andre Strishak & Associates, P.C. v. Hewlett Packard Co.*, 300 A.D.2d 608, 609 (2d Dep't 2002) (citations omitted).

Here, Greenberg argues that given Zachys' role as intermediary, and Koch's sophistication as a buyer, the auction and auction catalogue cannot be considered "consumer-oriented." (Def.'s Mem. at 17.)  The Court disagrees.  As the Court has already noted in the course of this litigation:

15

**SA15**

> Given the large number of bottles Greenberg consigned for the October 2005 auction, and the fact that Plaintiff's purchase of a small percentage of those bottles contained counterfeits, it seems possible that other consumers at the auction were impacted by Greenberg's alleged misconduct. Thus, assuming the allegations of the complaint to be true, it is reasonable to conclude that the conduct complained of affected other similarly situated consumers―other purchasers at the October 2005 auction―and, therefore, had a broad impact on consumers at large.

*Koch*, 2008 WL 4778813, at*7 (footnote omitted).

Additionally, the New York Court of Appeals has held that an "as-is" clause does not bar a claim under the GBL.  *See Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (Ct. App. 2012) ("Here, plaintiff sufficiently pleaded such causes of action, and the disclaimers set forth in defendant's catalogs 'do not . . . bar [plaintiff's] claims for deceptive trade practices at this stage of the proceedings, as they do not establish a defense as a matter of law.'" (quoting *Goshen v. Mutual Life Ins. Co. of New York*, 98 N.Y.2d 314, 326 (Ct. App. 2002) (citation omitted)). Moreover, while a plaintiff must have suffered harm to bring a successful GBL §§ 349 or 350 claim, he need not show justifiable reliance such as that which is required for fraud.  *See Koch*, 18 N.Y. 3d at 941-42 ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law §§ 349 and 350 claims, it was error.  Justifiable reliance by the plaintiff is not an element of the statutory claim." (citation omitted)).

For the reasons discussed above, it was permissible for the jury to conclude that Greenberg's representations or the catalogue's advertisements were materially misleading. Again, given the apportionment aspect of the verdict form, as well as the evidence at trial showing Greenberg's involvement with the Zachys auction and catalog, Greenberg's argument that Zachys is to blame is unavailing.

**SA16**

Greenberg also argues that Koch failed to establish entitlement to additional statutory damages under § 349, which allows for treble damages up to $1,000 per violation in the event that a defendant willfully or knowingly violated the provision.  GBL § 349(h).  As discussed, there was sufficient evidence at trial from which the jury could infer that Greenberg made misrepresentations knowingly.  (*See, e.g.*, Tr. at Tr. at 175:22-23.)   Accordingly, the jury's award of additional statutory damages of $24,000 under § 349 was permissible in light of the record.

In sum, Greenberg has not met his heavy burden of demonstrating that "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against him."  *Bucalo*, 691 F.3d at 127-28 (quotation sand citations omitted).

Accordingly, the Court declines to set aside the jury's verdict under Rule 50.

## IV.    Defendant's Motion for a New Trial on Liability

Alternatively, Greenberg moves for a new trial pursuant to Federal Rule 59(a)(1)(A), arguing that (1) Koch presented insufficient evidence to take the case to a jury and (2) given the evidence, the jury erred in deciding in favor of Koch.

### A.    Sufficiency of the Evidence; Clear Weight of the Evidence

Where the jury reaches a "seriously erroneous result" or the verdict constitutes a "miscarriage of justice," it is appropriate for the Court to grant a motion for a new trial.  *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir. 1983).  Here, the evidence is sufficient to support the jury's verdict.  And while it is appropriate for the Court to weigh evidence when analyzing a Rule 59 motion, *Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003), here, the jury

17

**SA17**

was within its rights to credit Koch's witnesses.  While Greenberg's counsel, through vigorous

cross-examination, attempted to discredit Koch and his witnesses, the jury was properly

instructed on the evaluation of credibility, and Koch's witnesses were not so devoid of credibility

as to warrant a new trial.  (*See, e.g.*, Tr. at 2329:16-2333:16 (the Court instructing the jury on the

evaluation of witness testimony); *see also* Tr. at 2203:21-2204:22 (Greenberg's counsel

attacking J.J. Cortes' credibility in closing); 2197:10-2198:6 (Greenberg's counsel attacking

Jamie Ritchie's credibility in closing).)  Courts must be cautious when contemplating the

disturbance of a jury's verdict.  *See Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d

Cir. 2012), *cert. denied*, 133 S. Ct. 789 (2012) ("[O]ur precedent counsels that trial judges must

exercise their ability to weigh credibility with caution and great restraint, as a judge 'should

rarely disturb a jury's evaluation of a witness's credibility,' and may not 'freely substitute his or

her assessment of the credibility of witnesses for that of the jury simply because the judge

disagrees with the jury.'  Indeed, we have stated that '[w]here the resolution of the issues

depended on assessment of the credibility of the witnesses, it is proper for the court to refrain

from setting aside the verdict and granting a new trial.'" (citations omitted)).  Here, nothing in

the record calls such a drastic result.

### B.     Alleged Evidentiary Errors

Greenberg also cites three purported "evidentiary errors" as grounds for a new trial.

(Def.'s Mem. at 21.)  While "substantial errors in the admission or rejection of evidence" can

render a new trial appropriate, 11 Charles Alan Wright et al., Fed. Prac. & Proc. 2805 (3d ed.

1998), the Court's evidentiary determinations were well within its discretion and not so

prejudicial to Greenberg as to warrant a new trial.

18

First, Greenberg cites the exclusion of Greenberg's refund offers during the liability phase as erroneous and highly prejudicial.  (Def.'s Mem. at 21.)  The fact that, on two occasions, Greenberg had offered Koch a full refund for the price of the wine that Koch contended was counterfeit was a hotly contested topic and the subject of multiple motions and applications, both before and during this trial.  While Greenberg contended that these offers were directly relevant to his scienter, Koch's position was that they were settlement offers, falling squarely within the strictures of Federal Rule of Evidence 408, which excludes compromise offers and negotiations from admission at trial.[5]  The Court's determination with regard to this difficult issue was not, as Greenberg contends, erroneous, and instead reflected a careful balancing that minimized prejudice to both parties.

On November 27, 2007, Greenberg sent Koch a letter, together with a check for $272,555.72, offering to buy back eleven bottles of wine that Koch had originally claimed were counterfeit.  (Trial Ex. 1036.)  In this letter, Greenberg stated as follows: "I am perfectly happy to repay your money and take all the bottles back.  Your lawsuit requests rescission and I agree."  Greenberg also included his desire to bring the matter to a conclusion in a "gentlemanly way."  (*Id.*)  On November 29, 2010, Greenberg offered to pay Koch $688,238.47 to compensate Koch for each of the bottles cited in Koch's Amended Complaint (a larger number of bottles than the subset of 24 at issue in the trial).  (Trial Ex. 1052.)  In that letter, Greenberg highlighted that rescission, accompanied by a full refund, is a remedy specifically provided for in the auction

---

[5] (*See* Dkt. No. 361 (Pl.'s Third Motion in Limine, to exclude evidence regarding Greenberg's settlement offers); Dkt. No. 400 (Def.'s Opposition to Pl.'s Third Motion in Limine); Dkt. No. 429 (Def.'s letter requesting reconsideration of Court's exclusion of the refund offers); Dkt. No. 431 (Def.'s letter requesting reconsideration of the Court's decision to permit the refund offers only during the punitive damages phase of the trial); Dkt. No. 447 (Pl.'s response to one of Def.'s request for reconsideration of the Court's decision regarding the refund offers).)

19

catalogue.  (*Id.*)  Koch refused both of these offers.  At the final pretrial conference, held on

March 18, 2013, the Court determined that while the offers were not settlement offers in the

traditional sense, as they did not explicitly call for a release, they were best "read as within the

scope of Rule 408."  (Transcript of Final Pretrial Conference, March 18, 2013 ("FPTC Tr."), at

41:2-3.) Additionally, the Court determined that the refunds' exclusion was compelled by the

risk of prejudice to Koch.  The Court determined that the limited probative value of the

refunds—which provide insight into the practices in the wine industry but not necessarily into

Greenberg's state of mind at the time of the alleged fraud—was outweighed by an attempt to

paint Mr. Koch as unreasonable and litigious in not accepting the money.  (*Id.* at 41:3-17.)[6]

In the wake of the ruling granting Koch's third motion *in limine*, which had requested

exclusion of the offers, the Court reviewed detailed correspondence from the parties, with

Greenberg requesting reconsideration in light of the Court's decision not to bifurcate the trial as

he had requested, in his own motions *in limine*, into a liability and punitive damages phase.  On

March 20, 2013, the Court received a letter from Greenberg's counsel outlining the reasoning

---

[6] In ruling on this motion *in limine*, the Court stated:

> But I think more convincing than [the refunds as within the scope of FRE 408] is the balance under Rule 403 mainly because I think there's limited probative value and I think it's substantially outweighed by the prejudicial effect of attempting to paint Mr. Koch as being unreasonable in not accepting the full refund amount.
>
> You could look at it as prejudicing one side or the other.  It's two sides of the same coin.  But I think what's really at issue in the case is not the reasonable or unreasonable business practices relating to granting or not granting a refund, offering or not offering a refund, but when you look at the claims, specifically the GBL issues, the issue is the conduct, the statements relating to the offers of wine at the auction and not the subsequent refund.  So I conclude that under Rule 403, this evidence will be excluded.

**SA20**

behind Greenberg's position on the refund issue, explaining that in light of the Court's decision not to bifurcate the proceedings, "Greenberg's refund offers [had become] relevant to a single phase trial that includes punitive damages." (Dkt. No. 429.) The letter noted that given that the reprehensibility of the conduct is relevant to a jury's punitive damages calculation, the exclusion of the refunds would prejudicially force Greenberg to remain mute when lambasted about the moral culpability of his actions. Greenberg's counsel explained, "Greenberg did the right thing. As soon as he learned that there was a problem with any items he had sold, he tried to make it right. He has fully honored his contract, and now he is being denied the right to point out his honorable conduct." (*Id.*) Plaintiff's counsel responded, reiterating Koch's position that the refund offers were offers to compromise the claim, and properly excluded under Rule 408, adding that "Greenberg's 'after-the-fact' compromise offer does not tell us anything about the reprehensibility of his underlying misconduct." (*Id.*)

Later, prior to jury selection, and after carefully considering these arguments, the Court determined that while the refund offers were not relevant to Greenberg's mental state at the time of the alleged fraud, they were indeed indicative of the overall reprehensibility of his conduct, which is part of the necessary calculus a jury employs when evaluating claims for punitive damages.[7] Thus, the Court determined that, while not barred by Rule 408, as they were not

---

[7] Upon reconsideration of the motion *in limine* regarding the refund offers, the Court ruled as follows:

> Upon further review of the law and evidence, I have decided to permit the evidence of Mr. Greenberg's refund offers for certain limited purposes related to punitive damages.
>
> First, I have concluded these refund offers are best characterized as outside the scope of Rule 408. Mr. Greenberg's offers to refund the contract price did not affect the validity or amount that Mr. Koch's fraud

21

compromise offers in the traditional sense, the refunds were nevertheless prejudicial to Koch, and of limited probative value with respect to liability, but agreed with Greenberg as to their relevance to punitive damages.  (Tr. at 3:24-4:13.)  In the wake of this ruling, Koch raised concerns about the potential prejudice to Koch at trial, should the refunds be admitted, and suggested a bifurcated trial.  (*Id.* at 10:3-15.)  What followed was an extensive colloquy with the

---

claim or GBL claims. The offers did not include any conditions of release of liability.

Moreover, one such offer was sent after the mootness argument had been rejected by the court. After considering all the circumstances, I have concluded that the offers were not fundamentally efforts to compromise a claim, but rather offers of a specific remedy provided for in the terms of the auction contract.

Second, with respect to the balance of the factors under Federal Rule 403, I have considered that it is Mr. Greenberg rather than Mr. Koch who faces the greater danger of unfair prejudice by the exclusion of the offers specifically with respect to punitive damages.  If there were no punitive damages at issue in the case, I believe the analysis would be different, but punitive damages are very much involved in the case and implicate due process concerns, as the Supreme Court has held, and require consideration of factors such as the reprehensibility of defendant's behavior and degree of harm as well as other broad-based considerations, and requiring Mr. Greenberg to remain [mute] regarding his refund offers in the face of evidence and argument regarding his alleged wanton disregard for the law, moral reprehensibility, would unfairly prejudice and, therefore, I conclude that the probative value of such evidence on the limited issue of punitive damages is not substantially outweighed by the danger of unfair prejudice or other considerations under Rule 403.

That being said, defendant's counsel may not attempt to utilize these refund offers as evidence going to liability, principal liability, or the overall validity of Mr. Koch's claims or his right to be pursuing these claims in this Court. I will instruct the jury to disregard any such inference and I will also consider an appropriate limiting instruction delineating the purpose for which these refund offers may be used and I'll consider any submissions on that front.

(Tr. at 3:24-5:20.)

22

Court involving the potential mootness of the case without the punitive damages element, in light of Greenberg's offer of a full refund. (*See, e.g.*, *id.* at 10:16-17 ("THE COURT: If the punitive damages are out, isn't the case moot?").) At the conclusion of this discourse, the Court determined that bifurcation of trial between a liability phase and a punitive damages phase likely presented the optimal solution to both Plaintiff's and Defendant's concerns about any prejudicial effects of the refund offers.[8] Despite having moved for bifurcation in one of his original motions *in limine* (*see* Defendant's First Motion Limine, *To Bifurcate Determinations of the Availability and Amount of Punitive Damages To Bifurcate Determinations of the Availability and Amount of Punitive Damages*, Dkt. No. 383), Greenberg's counsel then strenuously objected to bifurcation as a potential solution, stating that after the Court had denied that motion they had "designed the case to deal with both issues . . . ." (Tr. at 23:19.) The Court nevertheless bifurcated the trial, excluding the refund offers during the liability phase, while permitting the refund offers to be admitted during the second (punitive damages) phase.[9] Despite Greenberg's repeated contention

---

[8] (*See id.* at 23:3-9 ("THE COURT: Okay. We're going to pick the jury, and I'm going to think about bifurcation in the back of my mind. And I'm going to think about whether the case is possibly moot. But as far as the refund offers, I've concluded that they meet the requirements of Rule 403 but only for punitive [damages], so for that reason the issue of bifurcation becomes a possibly good solution.").)

[9] In clarifying the ruling, the Court, prior to opening statements, noted as follows:

> Just to remind the parties of my ruling yesterday, I did rule that the refund offers are excluded under Rule 403 for purposes of liability but not for purposes of punitive damages. I want to note that that ruling is subject to revisiting if the plaintiff opens the door during liability arguments or evidence to reconsideration of that ruling with respect to the relevance of refund offers. I have decided to bifurcate the trial assuming that door is not open, so the first phase of the trial will be on liability, compensatory damages, and the second phase on punitive damages.

(Tr. at 48:12-21.)

23

**SA23**

that Koch's counsel had, at trial, opened the door to the refund offers and that New York law compelled the admission of the refunds (Dkt. No. 431; *see also* Tr. at 1780:3-1784:14), the Court maintained its original exclusion during the liability phase of the trial on the ground that Rule 403 warranted that result.  (Tr. at 1881:4-1882:18.)

The Court's ruling on the refund offers is in accordance with Rule 403 and was not unduly prejudicial to Greenberg.  Greenberg's argument that the refunds are relevant to his state of mind, as required for fraud, is untenable.  The fact that an individual shows remorse or is willing to "do the right thing" in accordance with business or societal practice after a wrong is discovered does not vitiate that individual's state of mind—whatever it may have been—at the time of the relevant acts.  That fact, coupled with the prejudice to Koch from evidence that could have painted him as unreasonable in pursuing the lawsuit, underscores the appropriateness of the Court's ultimate conclusion.  As for the relevance of the refunds to the GBL claims, the cases cited by Greenberg are distinguishable.[10]  Moreover, it was only after distinguishing those cases

---

[10] In *Faden Bayes Corp. v. Ford Motor Co.*, 259 A.D.2d 352 (1st Dep't 1999), the First Department affirmed the Supreme Court of New York County's dismissal of a plaintiff's GBL §§ 349 and 350 claims when the defendant had failed to include "Automatic Ride Control in the vehicle purchased by plaintiff," stating that "in view of the documentary evidence establishing defendant's voluntary disclosure of the circumstance that the vehicles in question were not equipped with Automatic Ride Control, and its refund of the $650 purchase price of the feature to plaintiff and the relatively small number of other affected customers, it is plain that defendant's practices are not deserving of sanction as "deceptive acts" or "false advertising" within the meaning of General Business Law §§ 349 and 350."  *Id.* at 352-53 (citations omitted). This case cannot be said to stand for the proposition that "Koch's refusal to accept any refunds, *is highly relevant as a matter of New York Law* to Koch's [GBL] claims . . . ."  (Dkt. No. 431 (emphasis in original).)

The other cases cited by Greenberg are similarly distinguishable.  For example, in *Baker v. Burlington Coat Factory Warehouse*, 175 Misc. 2d 951 (1998), the City Court of Yonkers held that a store's "no-refund" policy was a violation of GBL §§ 349 and 350, because it was misleading in light of consumers' "statutory right to a cash or credit card charge refund when clothing is defective and unwearable."  *Id.* at 956.  Moreover, the court held that "the defendant's

and determining that, even if they were to apply, Rule 403 warranted exclusion during the liability phase that the Court denied Greenberg's mid-trial request to reconsider its earlier determination.  (Tr. at 1881:4-1882:18.)

In any event, Greenberg was not prejudiced by the exclusion of the refund offers during the liability phase, and there is strong evidence of that fact in the form of the jury's verdict following the punitive damages phase, during which the refund offers were admitted.  Greenberg would have a stronger case for prejudice had the jury returned a verdict of $0 in punitive damages.  As noted, however, the jury returned a verdict of $12 million in punitive damages, in spite of Greenberg's counsel's emphasis on the refunds and Koch's subsequent refusal to accept them during the punitive damages phase.  Put another way, *despite* the refund offers, the jury found that Greenberg's conduct warranted millions of dollars in punitive damages; had the jury believed that the refunds reflected positively on Greenberg's state of mind, its verdict would have reflected that fact.  Accordingly, the bifurcation of trial and admission of the refunds solely during the punitive damages phase represented an appropriate solution in light of the relevant law and the balancing required by Rule 403.

---

refusal to give plaintiff a full cash refund in exchange for the [defective product] was itself misleading and deceptive."  *Id.* at 957.  Similarly, in *BNI New York, Ltd. v. DeSanto*, 177 Misc. 2d 9, 15 (1998) it was the defendant's refusal to refund payment that constituted the deceptive and misleading conduct that was violative of the GBL.  Here, the gravamen of Plaintiff's GBL claims was not that Defendant refused a refund when asked for one, but rather that he mislead would-be consumers, including Plaintiff, in the first instance.  *See also S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.*, 84 F.3d 629, 637 (2d Cir. 1996) (noting, in affirming the district court's dismissal of plaintiff's GBL claim, that the objectionable terms plaintiff claimed were misleading and added at the last minute during contract negotiations were divulged to plaintiff when plaintiff "was still free to decline to accept [Defendant's] terms and to receive a refund of its deposit money (as it did), and to seek more favorable terms with another lender.").

Second, Greenberg objects to the testimony of Maureen Downey and Jaime Cortes, arguing that the two witnesses provided improper character evidence that should not have been heard by the jury.  (Def.'s Mem. at 22.)  As for Downey's testimony, it was properly admitted, and Greenberg had a full and fair opportunity to cross-examine her at trial, with Greenberg's counsel eliciting (and not moving to strike) the testimony Greenberg now cites as objectionable. (Pl.'s Opp. at 21.)  Second, with regard to Cortes's testimony, on cross-examination, Greenberg's counsel questioned Cortes as to why he had previously called Greenberg an "asshole," highlighting potential bias and inconsistency between Cortes' statement at trial that he bore no ill-will towards Greenberg (Tr. 810:15-21; *see also id.* at 767:3-768:23.)  With respect to this inquiry, Greenberg's counsel also introduced evidence in the form of an email exchange in which Cortes stated to Koch's personal aide Brad Goldstein (referring to Greenberg):  "My info will help you guys bring this asshole down."  (*See id.* at 768:24-771:22; Trial Ex. 1048.)   Later, on redirect, and in accordance with Federal Rule of Evidence 613(b),[11] Koch's counsel questioned Cortes on the basis for his belief at the time of the email that Greenberg was an "asshole."  (Tr. 801:17-802:5.)  Upon objection from Greenberg's counsel, the Court stated that it would "briefly" allow some exposition of Cortes' belief.  (*Id.* at 802:18.)  After allowing Cortes to relay one incident, the Court sustained Greenberg's counsel's objections to all further such lines of questioning.  (*Id.* at 804:2-804:8.)   In any event, Koch's counsel mentioned the testimony only in passing during summation, as juxtaposition to Greenberg's own claim that

---

[11] Federal Rule of Evidence 613(b) provides, in pertinent part, that "[e]xtrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it . . . ."

Royal Wine representatives threatened his own life.  (*Id.* at 2270:2-11.)  Accordingly, the admission of this testimony does not warrant a new trial.

Finally, Greenberg objects to the testimony of Jamie Ritchie and Michael Egan, claiming that they provided undisclosed expert opinions in violation of Federal Rule of Civil Procedure 37(c).  Greenberg's contention is belied by the record.  Lay testimony may encompass those areas with which the witness has familiarity without subjecting that witness to the strictures of Federal Rule of Evidence 702, so long as that testimony is not based on "scientific, technical, or otherwise specialized knowledge."  Fed. R. Evid. 702(c).  Ritchie's testimony concerning the authenticity of Greenberg's wine was a reflection of his work at Sotheby's and familiarity with the wine auction business and thus was properly within the scope of Rule 701.  *See* Fed. R. Evid. 701, Advisory Committee Notes on Rules—2000 Amendment ("For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. . . .  Similarly, courts have permitted lay witnesses to testify that a substance appeared to be a narcotic, so long as a foundation of familiarity with the substance is established. . . .  Such testimony is not based on specialized knowledge within the scope of Rule 702, but rather is based upon a layperson's personal knowledge.  If, however, that witness were to describe how a narcotic was manufactured, or to describe the intricate workings of a narcotic distribution network, then the witness would have to qualify as an expert under Rule 702.").

As for one of Koch's experts, Michael Egan, Greenberg objects to Egan's testimony at trial about vertical branding on the corks of 17 of the 24 bottles of wine at issue, arguing that this testimony contradicted his expert report and deposition testimony.  As Koch notes, however, it is not as if Egan originally concluded the wine was authentic and later changed his mind on the eve

27

**SA27**

of trial.  (Pl.'s Opp. at 22.)  Instead, Egan stated that he had completed additional research since

the advent of the trial, which bolstered his prior conclusions that the wine was inauthentic.  (*Id.*)

It is well established that experts may "supplement, elaborate upon, explain and subject

[themselves] to cross-examination upon [their] report[s]."  *In re Methyl Tertiary Butyl Ether*

*(MTBE) Products Liab. Litig.*, 643 F. Supp. 2d 471, 482 (S.D.N.Y. 2009) (quotation and footnote

omitted).   Egan was subjected to vigorous cross-examination on these issues.  Moreover, even if

the testimony was improperly admitted, it did not prejudice Greenberg, whose counsel repeatedly

emphasized the fact that Egan had changed his opinion during the course of the trial.[12]  In

summation, Greenberg's counsel reiterated the point, stating:

---

[12] On cross-examination, Greenberg's counsel questioned Egan about the vertically branded cork issue, with part of the colloquy reading as follows:

> Q. You could see the branding on this cork, correct?
> A. Yes.
> Q. And you looked at it close enough to figure out that one of the digits on the vintage was missing, correct?
> A. Yes.
> Q. And you could see it was a vertical cork, correct?
> A. Yes, I could.
> Q. And when you saw it was a vertical cork, based upon the 20-plus years you have of looking at Chateau corks, particularly including Chateau Lafleur, it looked just fine to you; isn't that true?
> A. As I said before, I wasn't focusing on Lafleur corks. On these particular corks and seeing that it was becoming an issue in the case, I did do subsequent research including reference to photographs of old Chateau Lafleur corks, and I can see that the branding was -- should be horizontal for this period rather than vertical.
> Q. And when did you decide to do the subsequent work after you told me you had finished your work?
> A. Within the last few weeks.
> Q. The last few weeks. And what is it -- what is it, Mr. Egan, that all of a sudden that got into your head about this particular cork, which you had found to be just fine in the last few weeks? How did that happen?

Now, Mr. Egan. I will tell you, I took his deposition in New England. Thought he was a pretty straightforward guy. I thought that until he gave this testimony. I thought he was a decent, straightforward man, a competent but not brilliant expert. Real worklike guy. Not a Gil Schwarz, not in that class, but all right. And so what happens? Egan says: Oh, the trial started, I changed my opinion. Vertical corks are all wrong. I said: Well, gosh, you know, we're back there in Cape Cod, you said they were all correct. He didn't say – and this is really important. He didn't say: I was mistaken. 'Cause if he'd been mistaken, he could have said that. It was embarrassing. He said, "You know, I didn't focus on the cork." Remember that? "I didn't focus on the cork." And I really went after him. "I didn't focus on the cork."

(Tr. 2185:24-2186:12.)  In sum, Greenberg's counsel utilized any inconsistency between Egan's report and his trial testimony as an opportunity for both vigorous cross-examination and argument in summation. The admission of this testimony does not warrant a new trial.

## V.  Damages

Greenberg also argues that if the liability verdict is not set aside, then (1) the award of compensatory damages award should be reduced from $355,811 to $105,811 under § 15-108(a) of the New York General Obligations Law ("N.Y. GOL" or "GOL"), and (2) the punitive damages award must be eliminated or reduced to either $24,000, to match the exemplary damages awarded under the GBL, or one-half of the compensatory damages award. Each argument is addressed in turn.

### A.   N.Y. General Obligations Law Offset

Greenberg argues that without an offset of $250,000—the amount that Zachys paid to Koch in a previous settlement—Koch will receive an "impermissible double recovery." (Def.'s Mem. at 23.)  Section 15-108(a) of the N.Y. GOL provides that where a plaintiff enters into a release or covenant not to sue with "one of two or more persons liable or claimed to be liable in

tort for the same injury," the settlement "reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest."

As an initial matter, Koch argues that N.Y. GOL § 15-108(a) cannot be applied to reduce his fraud claim, because there was no fraud claim pending against Zachys when it settled (that claim had been dismissed).  However, "[n]othing in section 15-108 . . . requires that the two defendants be liable upon the same theory.  All that is required is that they be subject to liability for damages for the same injury."  *Roma v. Buffalo Gen. Hosp.*, 481 N.Y.S.2d 811, 813 (3d Dep't 1984).  Here, the fraud and GBL claims were simply alternative legal theories seeking compensation for the same wrongful conduct—as evidenced by the fact that Koch sought identical, not cumulative, damages under each claim asserted against Greenberg.

The Court also concludes that N.Y. GOL § 15-108 is potentially applicable to statutory GBL claims (and not just common law tort claims) notwithstanding its references to "tort" and "tortfeasor."  *See Mathis v. United Homes, LLC,* 607 F. Supp. 2d 411, 429-30 (E.D.N.Y. 2009); *Minpeco, S.A. v. Conticommodity Servs., Inc.,* 677 F. Supp. 151, 153 (S.D.N.Y. 1988).

The question, then, is whether Koch's settlement with Zachys involved "*the same injury*" as the claims on which Koch was awarded $355,811 at trial.  If the answer is yes, then Koch's claim against Greenberg is "reduce[d]" by the greatest of the following:  (1) "any amount stipulated by the release"; (2) "the amount of the consideration paid for it"; or (3) "the released tortfeasor's equitable share of the damages."[13]

---

[13] Koch's argument that Greenberg has forfeited his right to seek an offset under N.Y. GOL § 15-108 is unpersuasive.  The cases cited by Koch recognize that, even if a party has waived his

30

The "same injury" issue is complicated by the fact that the number and identity of the bottles of wine at issue have changed more than once throughout the course of this case. This is important: Greenberg insisted throughout trial that Koch prove his case "bottle by bottle"[14]— and that is how the case was tried. The verdict form required findings of liability as to *each* of the 24 specific bottles; and the compensatory damages sought and recovered at trial represented the total purchase price of those 24 bottles—no more and no less. Thus, the fact that the Zachys settlement and the Greenberg trial both generally involved "counterfeit wine bought from Greenberg at a 2005 Zachys auction" is insufficient to establish that they involve the "same injury."

Koch's original complaint in this case, filed in October 2007 against both Greenberg and Zachys, claimed that 19 bottles of wine were counterfeit: eight bottles purchased at a Zachys auction in October 2004 (which were *not* from Greenberg's cellar), and eleven bottles purchased at a Zachys auction in October 2005 (which were from Greenberg's cellar). Ruling on Zachys' motion to dismiss, Judge Jones dismissed the fraud claims but not the GBL claims against

---

right to seek an "equitable share" offset under the third prong of the statute, and even if he has not pleaded the statute as an affirmative defense, he may still obtain an offset under the "amount of consideration paid" prong. *See Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008) ("[Defendant's] offset under the statute was limited to the amount [Plaintiffs] received from the [settling] Defendants for their release . . . ."); *Whalen v. Kawasaki Motors Corp.*, 92 N.Y.2d 288, 298 (N.Y. 1998). As the New York Court of Appeals held in *Whalen*, a party may amend its pleading "at any time, even after trial," if the amendment does not prejudice the other party. *Id.* The Court finds no prejudice here and permits the amendment requested by Greenberg.

[14] (*See, e.g.*, FPTC Tr. at 133:24-25 ("I think peculiar knowledge is bottle by bottle."); Tr. at 2015:25-2016:3 ("We ought to be able to go through bottle by bottle ourselves. That's my real concern here. The representation was a bottle-by-bottle representation."); *id.* at 2152:9-10 ("This is a bottle-by-bottle case. This is not some global case about general conduct of people. You're going to hear instructions, I'm going to read to you one in a minute, that it's about 24 cases."); *see also* Dkt. No. 451 (bottle-by-bottle jury verdict form).)

Zachys. (Dkt. No. 33.) Koch then sought leave to file an amended complaint challenging 46 bottles of wine as counterfeit—from auctions in October 2004, December 2004, and October 2005. (Dkt. No. 89.) Magistrate Judge Freeman granted leave to amend as to 36 of the bottles, but denied leave to amend as to the 10 bottles purchased in the October 2004 auction on the ground that any GBL claims as to those purchases would be time-barred under the three-year statute of limitations applicable to GBL claims. (Dkt. No. 107.)

Zachys and Koch reached their settlement in January 2011. At that time, the operative complaint—filed in October 2010 and consistent with Magistrate Judge Freeman's order—challenged 36 bottles of wine (which Koch had purchased for a total of $621,559 at the December 2004 and October 2005 auctions). Under the settlement agreement, Koch gave Zachys a general release of all claims—including all claims in this case—in exchange for Zachys' payment of $250,000. However, the agreement recited that that payment "represent[ed]" the cost of the 10 bottles purchased at the *October 2004* auction ($143,459), plus interest and certain expenses. The agreement also stated that the settlement would not affect Koch's claims against Greenberg.

Koch argues that the settlement with Zachys involved an entirely different injury because it involved different bottles than those that were the subject of the Greenberg trial. However, the agreement's stipulation to that effect is not dispositive:

> Settling parties may not structure the apportionment to avoid a later setoff by a nonsettling defendant; to hold otherwise would permit them to circumvent the policy underlying section 15-108. . . . [T]he New York cases establish that the parties' settlement agreement, even when confirmed by a court order, does not bind a trial court in determining the proper allocation of settlement proceeds for purposes of setoff. That allocation must follow from a comparison by the trial court of the injuries of the settling plaintiffs.

32

**SA32**

*Andrulonis v. United States*, 924 F.2d 1210, *vacated and remanded on other grounds*, 502 U.S. 801 (1991), *reinstated*, 952 F.2d 652 (2d Cir. 1991).

It is utterly implausible that the settlement with Zachys did not involve, at least in part, the same claims and same injury as those arising from the 24 bottles at issue in the Greenberg trial. The release that Koch gave to Zachys covered *all* claims, not just those relating to the 10 bottles referenced in the agreement. Moreover, all claims as to those 10 bottles had been dismissed by the Court (the fraud claims for failure to state a claim, the GBL claims for untimeliness). It would ignore reality to conclude that the $250,000 that Zachys paid for the release was actually for the 10 bottles that had been dismissed, rather than for the 36 bottles as to which Koch had live claims pending against Zachys. *See Casey v. State of New York*, 119 A.D.2d 363, 368, 507 N.Y.S.2d 159, 163 (2d Dep't 1986) (rejecting parties' allocation of settlement proceeds where "$175,000 of the settlement could be allocated to a potentially nonexistent conscious pain and suffering cause of action").

It does not automatically follow, however, that a 100-percent reduction of the Zachys settlement amount is required by § 15-108. Under New York law, the trial court must "make an independent determination of what the proper apportionment of settlement proceeds should be, based on the monetary value of each cause of action." *Andrulonis*, 924 F.2d at 1225 (citing *Casey*, 119 A.D.2d at 367, 507 N.Y.S.2d at 163). As noted above, the causes of action in this case have evolved over time, as defined by the particular bottles of wine at issue (and the purchase price for each of them, reflecting the ultimate measure of compensatory damages in this case). Significantly here, Zachys settled with Koch for $250,000 at a time when 36 bottles were the subject of Koch's claims against both Greenberg and Zachys. Shortly before trial, Koch

33

**SA33**

limited his claims to a subset of 24 of those 36 bottles (that is, he dropped his claims as to 12 bottles).

Faced with analogous circumstances—*i.e.*, where a prior settlement covered overlapping but broader injuries—Judge Kiyo Matsumoto of the Eastern District of New York has applied a proportional reduction to the setoff amount under § 15-108. *See Barkley v. United Homes, LLC*, 848 F. Supp. 2d 248, 267 (E.D.N.Y. 2012), *aff'd*, 214 WL 305480 (2d Cir. 2014). This approach is appropriate here in light of the text and purposes of the statute.[15] Courts have recognized that "there is an element of speculation in attempting to apportion a settlement into relevant and irrelevant parts, especially where the latter are not before the Court." *Carter v. State of New York*, 139 Misc. 2d 423, 433 528 N.Y.S.2d 292 (Ct. Cl. 1988), *aff'd*, 154 A.D.2d 642 (2d Dep't 1989). Nevertheless, New York law calls for such an apportionment in these circumstances. *Id.*

The purchase price of the 36 bottles of wine at issue at the time of the Zachys settlement was $621,559. The purchase price of the 24 bottles at issue in the trial was $355,811. The latter is 57.245% of the former. When that same percentage is applied to the $250,000 paid by Zachys in the settlement, the result is $143,112. That number provides the best measure under § 15-108

---

[15] Greenberg argues that § 15-108 requires a dollar-for-dollar reduction even if the settlement *was* for the 10 bottles that were different from those at issue in the trial: so long as the *release* also covered the bottles at issue in the trial, he contends, the total "amount of consideration paid" for the release is "greate[r]" and therefore must be offset against Koch's damages. This argument is unpersuasive because it reads § 15-108's reference to "release" in isolation from its reference to "the same injury." The statute is implicated only insofar as the release is for "the same injury." Accordingly, if the earlier release was for a *broader* set of injuries than those at trial, the "amount of consideration paid" for the release of claims *for the same injury* will ordinarily be a subset of the total consideration paid for the earlier release, as determined by a proportional reduction. *See Barkley*, 848 F. Supp. 2d at 267. Put another way, absent such a proportional reduction in these circumstances, the setoff would mix apples and oranges.

of "the amount of the consideration paid for" the release of Zachys for the "same injury" as the claims that went to trial.

Accordingly, pursuant to N.Y. GOL § 15-108(a), Koch's compensatory damages award of $355,811 is reduced by $143,112, resulting in a modified compensatory damages award of $212,699.

### B.    Punitive Damages

Greenberg contends that his conduct does not merit an award of punitive damages, arguing that Koch, as a "sophisticated businessman and collector" declined to exercise his pre-sale inspection rights and declined multiple refund offers.  (Def.'s Rep. at 15.)  Greenberg also contends that the fact that his sale was only a single act, rather than behavior constituting repetitive, ongoing violations underscores the inappropriateness of punitive damages.  (*Id.* at 16.)

"It is not essential that the plaintiff allege a pattern of conduct directed at the public in general to assert a claim for punitive damages."  *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 813 F. Supp. 2d 489, 526 (S.D.N.Y. 2011) (citations omitted).  However, it is "necessary to allege fraud that is founded upon such moral indifference as to be 'aggravated by evil' or to be demonstrative of a criminal indifference to civil obligations."  *Rush v. Oppenheimer & Co., Inc.*, 596 F. Supp. 1529, 1532 (S.D.N.Y. 1984).  In sum, "[t]he conduct for which courts generally award punitive damages is that which is "close to criminality," being variously described as 'utter recklessness,' 'reckless and of a criminal nature,' 'wanton or malicious,' and 'gross and outrageous.'"  *Dubai Bank, Ltd., New York Branch v. Joshi*, No. 85 Civ. 5005 (MJL), 1989 WL 168088, at *4 (S.D.N.Y. Aug. 29, 1989) (citations omitted).

Here, it was permissible for the jury to find, based on all the evidence at trial, that Greenberg's conduct warranted an award of punitive damages.  *See, e.g.*, *Koch v. Rodenstock*,

35

No. 06 Civ. 6586 (BSJ) (DF), 2012 WL 5844187, at *11 (S.D.N.Y. May 9, 2012), *report and recommendation adopted*, No. 06 Civ. 06586 (BSJ) (DCF), 2012 WL 5845455 (S.D.N.Y. Nov. 19, 2012) ("In this case, Defendant's alleged actions satisfy all three requirements for punitive damages.  As discussed above, Plaintiff has alleged that Defendant made concerted efforts to forge indicia of authenticity with respect to the purported Thomas Jefferson wine, which he then offered for sale to the public.  He also allegedly made knowingly false statements about the wine to auction houses and brokers, with the intent that the statements be disseminated to the public.  Defendant's conduct was thus aimed at the public generally." (citations omitted)).

First, the jury was properly instructed on the egregiousness required for punitive damages, with the Court emphasizing that punitive damages were permitted only if the jury found by "clear, unequivocal, and convincing evidence that Mr. Greenberg's fraud was gross, involved high moral culpability, and was aimed at the general public," or "rose to such a level of wanton dishonesty as to imply a criminal indifference to his civil obligations."  (Court Ex. 8 at 1.)  Moreover, the Court repeatedly underscored the fact that punitive damages are not designed to compensate plaintiffs, but rather, constitute an "extraordinary penalty similar to criminal fines."  (*Id.* at 2.)  Here, it was within the range of reasonableness for the jury to find that punitive damages were warranted, as there was sufficient evidence from which it could conclude that Greenberg acted with wanton disregard for potential buyers' rights.  Moreover, even if a single incident is ordinarily insufficient to warrant punitive damages—a principle that the parties

dispute—there was evidence from which the jury could find that this auction was not the first time Greenberg had sold counterfeit wine.[16]

If the punitive damages award is not set aside, Greenberg requests a remittitur on the ground that $12 million in punitive damages is grossly excessive under the Due Process Clause of the United States Constitution. Greenberg proposes a remittitur of $24,000 (the amount of exemplary damages on the GBL § 349 claim) or one-half of the compensatory damages award. (Def.'s Mem. at 27.) In contrast, Koch argues that the $12 million punitive damages verdict is proper and should not be reduced. (Pl.'s Opp. at 25.)

It is axiomatic that excessive punitive damages awards implicate the due process rights of defendants. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996) ("Only when an award can fairly be categorized as "grossly excessive" in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment."). Under New York law, moreover, courts have the authority to review any damages award even in the absence of a constitutional violation. *See, e.g.*, *West v. Hogan*, 88 A.D.3d 1247, 1251 (4th Dep't 2011) (quoting *Nardelli v. Stamberg*, 44 N.Y. 2d 500, 504 (1978)); *Strader v. Ashley*, 61 A.D. 3d 1244, 1248 (3rd Dep't 2009); *cf. Browning-Ferris Inds. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278 (1989) ("In a diversity action, . . . the propriety of an award of punitive damages for the conduct in question . . . [is a] question[] of state law."); *Payne v. Jones*, 711 F.3d 85, 97 (2d Cir. 2012) (quoting *Perez v. Z Frank Oldsmobile, Inc.*, 223 F.2d 617, 625 (7th Cir. 2000)) ("Constitutional limits on punitive damages come into play only after the assessment has been tested against statutory and common-law principles. When a plaintiff seeks punitive

---

[16] (*See, e.g.*, Tr. at 175:22-23 ("John Kapon [of Acker Merrall] would take anything."); Tr. at 747:23-24 ("What they did to me, I'll do to them; what they did to me, I'll do to someone else."); Ex. 476 ("The good news is that there is no garbage. That has been sold.").)

37

**SA37**

damages in a federal case, it is unnecessary to look for limits in the Constitution." (alterations

omitted)). New York courts may not reduce a punitive damages award unless it "is so grossly

excessive as to show by its very exorbitancy that it was actuated by passion."[17] *West*, 88 A.D.3d

at 1251 (quoting *Nardelli*, 44 N.Y. 2d at 504); *see Payne*, 711 F.3d at 97 n.8 (citing *Gasperini v.*

*Ctr. For Humanities, Inc.*, 518 U.S. 415, 429–30 (1996)) ("[A] federal court in a case governed

by state law must apply the state law standard for appropriateness of remittitur."). When a jury

awards punitive damages under New York law, the reviewing court must consider whether the

punishment is "reasonably related to the harm done and the flagrancy of the conduct."

*Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 267 (S.D.N.Y. 1999) (Sotomayor, J.)

(quoting *Liberman v. Riverside Memorial Chapel, Inc.*, 225 A.D. 2d 283, 292 (1st Dep't 1996));

*Suffolk Sports Ctr., Inc. v. Belli Constr. Corp.*, 241 A.D. 2d 546, 547 (2nd Dep't 1997)). The

wealth of the defendant is also relevant, because a defendant's ability to pay impacts whether

damages are sufficient to function as a punishment and a deterrent. *Id.* (citing *McIntyre*

*v.Manhattan Ford, Lincoln-Mercury, Inc.*, 256 A.D. 2d 269, 271 (1st Dep't 1998). These factors

---

[17] New York law requires trial courts to enter an order of remittitur or additur in actions requiring an itemized verdict if a jury's award of money damages "deviates materially from what would be reasonable compensation." N.Y. C.P.L.R. § 5501(c); *see also Gasperini*, 518 U.S. at 425 (holding that § 5501(c) applies to trial courts). The "deviates materially" standard is stricter than the former "shock the conscience" test, which is still the test for remittitur under federal law. *Gasperini*, 518 U.S. at 425. There is conflicting persuasive authority discussing whether § 5501(c) applies to punitive damages. *Compare Payne*, 711 F.3d at 97 n.8 ("[I]t is hard to imagine that the New York legislature expected its courts to exercise this supervisory responsibility only as to compensatory damages, and not as to punitive damages."), *with Greenbaum*, 67 F. Supp. 2d at 266 (Sotomayor, J.) (observing that § 5501(c) discusses reasonable compensation, not punishment or deterrence; furthermore, § 5501(c) applies only to money judgments issued in actions requiring itemized verdicts under N.Y. C.P.L.R. § 4111, and § 4111 discusses itemized verdicts only for compensatory damages). The Court need not address this question because this action does not fall within the categories of cases requiring an itemized verdict under § 4111, and therefore, § 5501(c) does not apply.

help the Court determine whether the underlying test has been met:  whether an award is so exorbitant as to show that it was motivated by passion.  *Id.* at 268.

"Awards of punitive damages are by nature speculative, arbitrary approximations.  No objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct.  Nor is there any formula to determine the dollar amount needed to effectuate deterrence."  *Payne*, 711 F.3d at 93 (citations omitted).  But despite the unscientific nature of punitive damages calculations, courts have a responsibility "to ensure that such awards for intangibles be fair, reasonable, predictable, and proportionate."  *Id.* (citations omitted).  It should be noted that juries that award punitive damages, "[h]aving no objective standards to guide them, and understandably outraged by the bad conduct of the defendant, [] may be impelled to set punitive damages at any amount."  *Id.* at 93–94 (citation omitted).  In such cases, a Court may enter an order of remittitur, which sets aside the jury's award and orders a new trial unless the plaintiff agrees to accept a lesser amount specified by the court.  *Id.* at 94.

To determine the constitutionality of a jury's punitive damages award, courts consider three "guideposts" described by the Supreme Court in *Gore*, and reiterated in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003):  "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  *Id.* at 418 (citation omitted).  These guideposts mark the outer limits of a court's discretion to uphold a jury's award of punitive damages under the Due Process Clause, but they also inform the court's review of such awards for excessiveness that is short of constitutional excessiveness.  *See Payne*,

39

711 F.3d at 96–97, 101 n.13 (*Gore* guideposts apply to punitive award claimed to be excessive under federal and New York law, but not under the Constitution).  Using these factors, a court must make its own determination about the reasonableness of a jury's punitive damages award, as juries that render such awards may not have sufficient information to allow for a fair and tailored punishment.  *Id.* at 94; *accord id.* at 96 ("The courts, accordingly, bear the responsibility to ensure that judgments as to punitive damages conform, insofar as reasonably practicable, to those desiderata and are not excessive.").

In this case, the *Gore* guideposts indicate that the $12 million punitive damages award is excessive and cannot stand.  The Court need not reach the question whether the jury's award violates the Due Process Clause; the award is excessive under New York law, and the Court holds that an award of punitive damages greater than two times compensatory damages is so exorbitant that it is motivated by passion rather than reason.[18]  The following discussion is organized according to the *Gore* guideposts; relevant factors under New York law are paired with their analogous guideposts.

First, the Court considers the reprehensibility of the conduct at issue, examining whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419 (citation omitted).  This is the most important indication of the reasonableness of punitive damages; it should be assumed that the plaintiff is made whole by

---

[18] The Court notes that it would reach the same decision under the due process analysis, requiring remittitur in the same amount.

compensatory damages, and therefore, the further sanction of punitive damages is warranted only insofar as the reprehensibility of the defendant's conduct requires punishment or deterrence. *Id.* New York law calls for a similar inquiry into the "harm done and the flagrancy of the conduct." *Greenbaum*, 67 F. Supp.2d at 267. The reprehensibility and flagrancy of Greenburg's conduct indicate that some punitive award is appropriate in this case. To deceive for one's personal, pecuniary gain and exploit one's superior knowledge—the gravamen of the fraud here—reflects reprehensibility that warrants some sanction. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 494 (2008) ("Action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability, as of course does willful or malicious action, taken with a purpose to injure."); *see also Motorola Credit Corp. v. Uzan*, 509 F.3d 74, 85, 86 (2d Cir. 2007) (affirming district court's $1 billion punitive damages award in an Illinois fraud case, where that figure constituted approximately 20% of the defendants' net worth and the behavior was intentional and repetitive, but did not implicate the other reprehensibility factors of *State Farm*).

It is also true that Greenburg's conduct in this case can be characterized as flagrant. With its verdict, the jury found that Greenberg had brazenly committed 24 acts of fraud—that is, that he had made false statements or misleading omissions with respect to each of the 24 bottles at issue in the case, which he sold for up to tens of thousands of dollars each. Moreover, there was evidence from which a reasonable jury could infer that Greenberg had engaged in this sort of behavior before. (*See, e.g.*, Tr. at 747:23-24 ("What they did to me, I'll do to them; what they did to me, I'll do to someone else."); Ex. 476 ("The good news is that there is no garbage. That has been sold.").)

Greenberg again emphasizes the refund offers as indicia of his upstanding approach to business and lack of reprehensibility. (*See* Def.'s Mem. at 31 "Greenberg's immediate refund

41

**SA41**

offer to Koch is a further 'mitigating factor[]' that removes his conduct from the reprehensible type that courts seek to punish severely." (citations omitted).)  It is true that Greenberg's refund offers can be regarded as mitigating the reprehensibility of his overall conduct, and for that reason the Court admitted evidence of those offers in the punitive damages phase of the trial. However, the jury heard this argument and nevertheless awarded punitive damages, indicating that it viewed the refund offers otherwise.  While Greenberg is correct that the refund offers could be seen as his above-board attempt to "stand behind his wine,"[19] it is also possible to view those offers as the attempts of a fraudster, upon being caught, to remove the threat of litigation. Put another way, the refund offers, which could be construed as attempts to silence Koch with hush money rather than admirable business actions, do not necessarily vitiate the initial flagrancy involved in Greenburg's fraud.

While the flagrancy of Greenburg's fraud merits some award of punitive damages, the harm he caused is less compelling.  This harm was economic in nature and none of its targets— neither Koch nor other potential buyers at auction—were financially vulnerable.  Moreover, the tortious conduct did not evince an indifference to, or reckless disregard for, the health or safety of others, as Koch himself characterized the wine at issue as collectible artifacts rather than something that he would actually imbibe.  *Compare Silvanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241, 262–63 (S.D.N.Y. 2001) (upholding punitive damages less than three times compensatory damages where fraudulent conduct resulted in multiple plaintiffs becoming infected with Legionnaires' Disease; one plaintiff suffered debilitating brain injury).  And even

---

[19] (*See* Tr. at 2401:14-18 ("At this point Mr. Greenberg offers Mr. Koch all of his money back and more, as you will see. You heard Mr. Greenberg testify it was his practice always to stand behind the wine and to offer refunds to anyone who complained.  In fact, he does that in this letter.").)

in the realm of strictly economic harm, this fraud is not among the most reprehensible offenses. The fraud at issue did not implicate a person's home, *cf. Barkley v. Olympia Mortg. Co.*, __ Fed. App'x. __, 2014 WL 305480 (2d Cir. 2014) (upholding $60,000 in punitive damages awarded to each of six plaintiff homeowners for fraud resulting in plaintiffs purchasing seriously substandard homes), or even the profitability of a business, *cf. Motorola Credit Corp.*, 509 F.3d at 86 (affirming remittitur to $1 billion, which was half compensatory damages).  This dispute is about an extremely high-end luxury item.  Greenberg deceived a wealthy collector whose hobby involves expenditures that most people will never contemplate.

Turning to the second guidepost—"the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award"—Greenberg contends that the "33-to-1 ratio of the jury's punitive damages to its compensatory damages is patently unconstitutional." (Def.'s Mem. at 32.)  As noted, due process concerns figure prominently in determining the permissible amount of punitive damages, and the Supreme Court has indicated that "the relevant ratio [is] not more than 10 to 1."  *Gore*, 517 U.S. at 581 (footnote omitted).  The Supreme Court has also explained that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  *State Farm*, 538 U.S. at 425.  But the Court has consistently emphasized that there is no bright-line rule; each award must be based on the "facts and circumstances of the defendant's conduct and the harm to the plaintiff."  *Id.* ("We decline again to impose a bright-line ratio[,] . . . however, . . . we [have] concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. . . . While these ratios are not binding, . . . [s]ingle-digit multipliers are more likely to comport with due process." (citations omitted)).  New York courts also consider the relationship between punitive damages

43

and the harm done to determine whether a punitive award is so exorbitatnt that it must have been motivated by passion, rather than reason. *See Greenbaum*, 67 F. Supp. 2d at 267 (citing *Nardelli*, 44 N.Y. 2d at 504).

Here, the jury's $12 million award of punitive damages was over 33 times that of the compensatory award of $355,811 (and 56 times the reduced compensatory award of $212,699 following the setoff discussed above)—well beyond four times the amount of compensatory damages, which may be "close to the [constitutional] line," and even well beyond the presumptive constitutional limit of 10 times compensatory damages suggested in *State Farm*. 538 U.S. at 425. These ratios are not binding limits, but they do stake off the zone of the harshest possible punitive damages the Constitution will tolerate—a zone that should be reserved for the most egregious conduct. The fraud in this case did not result in death, serious physical injury, or even minor physical injury. The fraud did not risk any such injury. The fraud did not result in a restriction of liberty or an insult to Koch's human dignity by way of discrimination. The fraud did not cause an economic loss that interrupted Koch's life by interference with his housing, employment, or savings for retirement. And the fraud did not involve actually or potentially vulnerable victims. In the scheme of conduct that can be punished by damages in a civil case, this is not a fraud deserving of punishment that pushes the limits of the Due Process Clause.

The final guidepost requires the Court to examine comparable civil penalties and similar cases. As Greenberg notes, the maximum civil penalty for willful deceptiveness under the GBL is $1,000 per violation, which here was $24,000. Moreover, in a similar case, *Rodenstock*, Judge Jones, in adopting Magistrate Judge Freeman's recommendation, awarded punitive damages in an amount *equal* to compensatory damages, or a 1:1 ratio. *See* 2012 WL 5844187, at *12

44

**SA44**

("Although Plaintiff seeks an award of punitive damages in an amount that would be double his compensatory damages, this Court has reviewed relevant precedent, and concludes that an award equal to Plaintiff's compensatory damages—*i.e.,* $311,486.90—would be more appropriate in this case."). In doing so, Judge Freeman noted that while some similar cases had "awarded punitive damages as a multiple of actual damages, such cases have tended to involve fairly modest actual damages awards—generally not in the six- or seven-figure range." *Id.* (footnote omitted). It is true that this case bears some similarity to *Rodenstock*. However, that case involved a default judgment against an absent defendant, without a trial or other factfinding. It also involved a significant compensatory award that may have financially devastated the defendant. This is why New York precedent requires courts to consider a defendant's ability to pay when assessing the proper amount of punitive damages. *Greenbaum*, 67 F. Supp. 2d at 267 (citing *McIntyre*, 256 A.D. 2d at 271).

In this case, while a six-figure compensatory award is significant in the absolute sense, it is less so in the relative sense—particularly in the context of high-end wine auctions where a single bottle may sell for $20,000, and in light of the wealth of the inevitable participants in such auctions, including Greenberg. To deter individuals in this rarefied class, a punitive damages award less than or equal to the compensatory figure would likely have limited deterrent effect. And while the $1,000-per-violation cap of the GBL claims' exemplary provision provides a comparative measure, it is clear that in New York the GBL's treble damages provision does not proscribe an additional award of punitive damages. *See, e.g.*, *Wilner v. Allstate Ins. Co.*, 71 A.D.3d 155, 167 (2d Dep't 2010).

Having considered the *Gore* guideposts and relevant factors under New York law, the Court determines that punitive damages are appropriate, but that remittitur is legally required.

45

While Greenberg would have the Court believe that his fraud was minor and devoid of the reprehensibility meriting a punitive award, adopting that view would ultimately require the Court to reject the interpretation of the evidence adopted by the jury. The jury found that Greenburg had shamelessly defrauded customers with "garbage." Yet his conduct did not cause a particularly egregious harm: he was dealing in luxury goods marketed to a sophisticated and wealthy subset of the population. The harm was strictly economic, and the victims were far from vulnerable consumers. These facts merit a relatively low award of punitive damages. However, given Greenberg's wealth and the context of the high-end auctions at issue, a punitive damages award less than or equal to the compensatory amount in this case would be insufficient to punish Greenberg and deter other fraudsters considering following in his footsteps.

The Court ultimately concludes that punitive damages in an amount greater than two times compensatory damages would be so exorbitant as to be actuated by passion, and therefore excessive under New York law. Accordingly, the Court will remit the punitive damages award to $711,622 (twice the compensatory damages award of $355,811).[20] If Koch does not accept the reduced punitive damages award of $711,622, a new trial on punitive damages will be held. *See Vasbinder v. Scott*, 976 F.2d 118, 122 (2d Cir. 1992) ("[A] court may not simply reduce an award of punitive damages, but must offer the plaintiff the option of a new trial on that issue.").

---

[20] Although the compensatory damages award is being reduced to $212,699 as a result of Koch's settlement with Zachys by operation of NY GOL § 15-108, the Court still considers it appropriate to use the $355,811 figure as a measure of the harm for purposes of punitive damages. Punitive damages were awarded on the fraud claim, a claim that was pending only against Greenberg at the time of the Zachys settlement. It is also worth noting that the jury allocated 100% liability to Greenberg (and 0% to Zachys) on the GBL § 349 claim.

46

## VI.     Plaintiff's Motion for Attorney's Fees and Injunctive Relief

As a result of the jury's liability finding, Koch has moved for the following post-trial relief: (1) attorney's fees as a prevailing plaintiff under GBL §§ 349 and 350; (2) permanent injunctive relief against Greenberg; and (3) prejudgment interest on all compensatory damages; post-verdict/pre-judgment interest on all compensatory and punitive damages; and postjudgment interest on the entire award.

### A.     Attorney's Fees

Koch seeks an award of $7,865,872 in attorney's fees.  (Plaintiff's Post-Trial Motion for Injunctive Relief, Attorneys' Fees, and Pre- and Post- Judgment Interest ("Pl.'s Mem."), at 8.)  In response, Greenberg contends that "Koch's demand for nearly $8 million in attorneys' fees under the GBL is plainly excessive in light of the jury's compensatory damages award of only $355,811."  (Defendant's Memorandum of Law in Opposition to Koch's Post-Trial Motion, Dkt. No. 504 ("Pl.'s Opp.") at 15.

Sections 349(h) and 350-e of the GBL provide that the court "may award reasonable attorney's fees to a prevailing plaintiff."  As reflected in the statute's use of the word "may," the "fee award [under § 349] is left to the discretion of the trial court in all circumstances." *Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 54 (2d Cir. 1992); *see also Independent Living Aids, Inc. v. Maxi-Aids, Inc.*, 25 F. Supp. 2d 127, 131 (E.D.N.Y. 1998) (the "awarding of fees under these sections remains in the sole discretion of the court"); *Berkshire Fashions, Inc. v. Sara Lee Corp.* 729 F. Supp. 21, 23 (S.D.N.Y. 1990) ("no adequate showing has been made . . . that justice and equity require an award of attorneys' fees in this case").

47

**SA47**

After careful consideration, the Court declines to award attorney's fees in this case. Although Koch is certainly a "prevailing plaintiff" under GBL §§ 349(h) and 350-e, a fee award is not warranted here for a number of reasons.

First, the attorney's fees incurred in this case—by extraordinarily talented trial lawyers on both sides—bore no relationship to the amount of actual damages at issue. The legal teams in this case have aggressively fought a battle royale for six years, incurring millions of dollars in fees on each side.[21] Yet the compensatory damages ultimately sought and awarded were only $355,811. In terms of the attorney's fees incurred, the case was litigated in a manner more typical of a nine-figure case than a six-figure case.

Second, this is not a case in which the compensatory damages fail to "capture the extent of the plaintiff's success at trial," such as where "the intangible value of the rights vindicated [is] far greater than the actual physical injuries sustained." *Wilson v. Car Land Diagnostics Ctr., Inc.*, No. 99 Civ. 9570, 2001 WL 1491280, at *2 (S.D.N.Y. Nov. 26, 2001) (Lynch, J.). As Judge Lynch has noted, GBL §§ 349 and 350 protect consumer rights, which, in commercial cases, "are directly measured by the financial damages imposed." *Id.*

Third, the purposes of the GBL statute do not ultimately support an award of fees under the circumstances of this case. This was fundamentally a fraud case: the fraud claim was the focus of the trial; and the availability of punitive damages on the fraud claim prevented the case from being rendered moot by Greenberg's refund offers. (*See* Dkt. No. 37, at 5-12.) But it is

---

[21] The docket in this case reflects 507 docket entries and appearances filed by a total of 36 attorneys (many of whom have come and gone). As the docket shows, the parties have aggressively litigated this case, filing numerous discovery motions, sanctions motions, and dispositive motions. The parties filed 22 motions in limine prior to trial and numerous letter motions throughout the trial.

only the GBL claims, not the fraud claim, that provide for potential fee-shifting.  To be sure, this Court has held that Greenberg's conduct was sufficiently "consumer-oriented" to come within the scope of the GBL provisions.  (*See* Dkt. No. 335, at 14-15.)  At the same time, however, this case is not within the heartland of the types of cases animating the fee-shifting provisions of the GBL, for two reasons:  (1) it does not involve consumers who are "vulnerable" or "disadvantaged," and (2) it does not involve conduct with a "broad impact on consumers at large."  *Independent Living Aids, Inc. v. Maxi-Aids, Inc.*, 25 F. Supp. 2d 127, 132 (E.D.N.Y. 1998) ("In awarding fees, the Court also considers that the purpose of [GBL §§ 349 and 350] . . . was to combat 'fraud against consumers, particularly the disadvantaged.'"); *Devlin v. 645 First Ave. Manhattan Co.*, 229 A.D.2d 343, 344, 645 N.Y.S.2d 476, 478 (1st Dep't 1996) (GBL claim for attorney's fees "would not lie in this case because the requisite broad impact on consumers at large is not evident" where harm was limited to residents of a condominium).

Finally, it is relevant that Koch refused Greenberg's offers of a full refund for the bottles of wine at issue.  It was Koch's choice to decline the refund offers and bring this case to trial, in the hopes of sending a message and exposing what he perceived as Greenberg's wrongdoing.[22] In the wake of trial, Koch has now succeeded in doing exactly that.  The Court does not in any

---

[22] On cross-examination, Koch engaged in the following colloquy with Greenberg's counsel when discussing the refund offers:

> A. I could have [accepted the refund offers], but I sensed in his letters that he didn't accept any of the claims that we were claiming or any responsibility for selling fake wines.
>
> Q. You felt that he didn't confess to you?
>
> A. He didn't admit it.

(Tr. at 2429:15-19.)

49

way question or denigrate the intentions of Mr. Koch, who clearly feels strongly about this subject and is willing to expend significant resources on it.  But there is a real sense, reinforced by the amount of attorney's fees and Koch's rejection of the refund offers, in which this was a litigation of choice and of principle, rather than of necessity or monetary recompense.[23]

Accordingly, Koch's motion for attorney's fees under the GBL statute is denied.

## B.      Injunctive Relief

In addition to attorney's fees, Koch seeks injunctive relief against Greenberg, permanently enjoining Greenberg from the following: (1) engaging in deceptive acts or practices in selling his wines; (2) selling, offering, or consigning inauthentic wine; (3) selling, offering, or consigning wine without disclosing to buyers that he is the consigner of the wine; (4) selling, offering, or consigning wine without disclosing to buyers, auction houses, or retailers questions, doubts, or concerns expressed by others in the wine industry concerning the authenticity of the wine; (5) selling, offering, or consigning wine without disclosing to buyers, auction houses, and retailers that another auction house has previously rejected that wine for sale; (6) selling, offering, or consigning wine without first disclosing to buyers, auction houses, or retailers the provenance of the bottle being sold; (7) selling, offering, or consigning wine of a value at or above $500 without hiring an expert to inspect and authenticate the wine first; (8) engaging in false, deceptive, or misleading advertising; and (9) permitting an advertisement involving the

---

[23] Koch emphasizes that neither his wealth nor his sophistication bars an award of attorney's fees.  (Reply Memorandum of Law in Support of Plaintiff William I. Koch's Post-Trial Motion, Dkt. No. 507 ("Pl.'s Rep."), at 507.)  The Court agrees.  Moreover, the Court made clear over the course of this trial that any attempt by Greenberg to portray Koch as litigious would be foreclosed as inappropriate.  Nor does the fact that Koch is a knowledgeable buyer diminish his status as a victim of fraud.  Nevertheless, the Court finds it relevant to the attorney's fee analysis—and to a broader perspective on the litigation—that Koch could have been compensated years earlier for his injury and chose to spare no expense in this litigation, where the amount in controversy was miniscule in comparison to the attorney's fees involved.

50

sale of his wine to be published without disclosing that he is the consigner, any questions, doubts, or concerns raised by others in the wine industry about the authenticity of the wine, and the provenance of the wine.  (Pl.'s Mem. at 2.)

GBL §§ 349 and 350 allow private plaintiffs to bring actions to enjoin the unlawful practices proscribed by the statute.  In his Amended Complaint, Koch requested injunctive relief pursuant to the statute.  (Amended Complaint, Dkt. No. 285 ("Compl."), at ¶¶ 93, 100.)

### 1.    Legal Standard

The parties disagree as to the proper legal standard for injunctive relief under the GBL. According to Koch, "[t]o obtain an injunction under G.B.L. § 349, plaintiffs need only show that the defendants engaged in 'deceptive acts or practices,' as defined under the statute."  *Barkley v. United Homes, LLC*, 848 F. Supp. 2d 248, 274 (S.D.N.Y. 2012).  Accordingly, Koch contends, courts examining the propriety of injunctive relief under the GBL will not apply the "standard [] injunction test," and instead will "look to the 'statutory conditions for injunctive relief,' and may issue a preliminary injunction if those conditions are met."  *Id.* (quotations and citations omitted).  To be sure, the GBL, in part, "was written in order to give consumers 'the power to obtain injunctions against any and all deceptive and fraudulent practices.'"  *Jermyn v. Best Buy Stores, L.P.*, No. 08 Civ. 214 (CM), 2011 WL 2119725, at *4 (S.D.N.Y. May 24, 2011) (quoting *Oswego Laborers Local 214 Pension Fund v. Marine Midland Bank NA*, 85 N.Y.2d 20, 25 (1995)).  However, it is not clear from precedent whether a private plaintiff seeking a permanent injunction under the GBL must also satisfy the standard criteria employed by federal courts before granting a permanent injunction.  *See, e.g.*, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S.

388, 391 (2006) (citations omitted).[24]  And while the *Barkley* case suggests that these traditional

principles of equity have no place when examining the propriety of injunctions sought by private

plaintiffs pursuant to the GBL, other cases cited by Koch suggest that while government entities

need not meet the traditional equitable requirements in seeking injunctions, private plaintiffs are

ordinarily afforded no such dispensation.  *See, e.g.*, *SEC v. Management Dynamics, Inc.*, 515

F.2d 801, 808 (1975) ("Accordingly, appellants' contention on this point stands or falls with its

claim that preliminary injunctions cannot be granted at the SEC's behest unless a district court

finds irreparable injury or a balance of equities which favors the Commission.  The appellants'

crucial error on this score is their assumption that SEC enforcement actions seeking injunctions

are governed by criteria identical to those which apply in private injunction suits.").[25]  Moreover,

federal courts in other contexts, even where the injunctive relief sought is authorized by statute,

have declined to issue such equitable relief automatically upon a liability finding, instead

---

[24] In the *eBay* case, the Supreme Court explained:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

[25] *See also People ex rel. Spitzer v. Applied Card Sys., Inc.*, 27 A.D.3d 104, 805 N.Y.S.2d 175, 177 (2005) (holding that, in claim for injunction, "[a]s to the claims alleging deceptive business practices . . . under [GBL§ 349], the Attorney General was required to establish that respondents engaged 'in an act or practice that is deceptive or misleading in a material way and that [the consumer] has been injured by reason thereof'"); *People ex rel. Spitzer v. Gen. Elec. Co., Inc.*, 302 A.D.2d 314, 756 N.Y.S.2d 520, 523 (2003) (analyzing action for injunctive relief brought by the Attorney General without engaging in irreparable harm or *eBay* analysis).

choosing to engage in further inquiry. *See, e.g.*, *Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*, No. 08 Civ. 8718 (SHS), 2013 WL 1242374, at *2 (S.D.N.Y. Mar. 28, 2013) (noting that while "Section 34 of the Lanham Act specifically authorizes district courts to enter injunctive relief in false advertising cases," nevertheless "a permanent injunction will only issue if a plaintiff has met the U.S. Supreme Court's four-factor test spelled out in [*eBay*]"). In response, Koch notes that the GBL explicitly authorizes private plaintiffs to seek injunctive relief, and as such, exempts them from the *eBay* criteria. *See Management Dynamics*, 515 F.2d at 808 ("Unlike private actions, which are rooted wholly in the equity jurisdiction of the federal court, SEC suits for injunctions are 'creatures of statute.'").

To be sure, New York has clearly created a cause of action for citizens to act as private attorneys general in enforcing the consumer protection ideals embodied in the GBL. However, as seen with courts' approach to the Lanham Act, a statutory cause of action for injunctive relief does not automatically release a plaintiff from the burdens of *eBay*, nor can it strip the Court of its obligations in equity. *See, e.g.*, *Del Monte*, 2013 WL 1242374, at *2. Moreover, a strict application of the rule proposed by Plaintiff would engender an absurd result: permitting automatic injunctive relief, unlimited in scope, for any prevailing plaintiff on a GBL claim, no matter how small the violation. Even the court in *Barkley* seemingly contemplated some criteria for limiting or analyzing the proper scope of injunctive relief sought pursuant to the GBL, citing *United States v. Broccolo*, No. 06 Civ. 2812, 2006 WL 3690648 (S.D.N.Y. Dec. 13, 2006), which held that "[w]hen an injunction is expressly authorized by statute, the standard preliminary injunction test is not applied. Instead, the Court must look to the 'statutory conditions for injunctive relief,' and may issue a preliminary injunction if those conditions are met." *Id.* at *1. Here, however, there are no "statutory conditions for injunctive relief," but merely an

53

authorization for private plaintiffs to bring suits in equity and at law for violations of the GBL; accordingly, "traditional equitable considerations must be applied." *Id.* at \*2.  In employing this approach, other courts have recognized its consistency with Supreme Court precedent "strongly disfavor[ing]" a presumption of irreparable harm and, consequently, the automatic legitimacy of injunctive relief upon a finding of liability.  *See, e.g.*, *Kane v. Chobani, Inc.*, No. 12 Civ. 02425, 2013 WL 3776172, at \*7 (N.D. Cal. July 15, 2013) ("The Court distills from these cases, that presumptions and categorical rules regarding irreparable harm are strongly disfavored, and that a preliminary injunction should generally only issue upon a finding of a likelihood of irreparable harm.  To the extent that presumptions are permissible, they may only be employed upon a showing that Congress clearly intended for a presumption to apply." (citations omitted)).

Here, a private litigant seeks permanent injunctive relief pursuant to the GBL.  While the GBL provides a statutory basis for him to do so, as discussed above, this statutory right of action does not vitiate the need to satisfy the factors outlined in *eBay*.  Koch's status as a private attorney general will not relieve him of the traditional burdens of a plaintiff in equity.  *See, e.g.*, *Verzani v. Costco Wholesale Corp.*, 387 Fed. App'x 50, 51-53 (2d Cir. 2010).  Were the GBL to include specific statutory conditions under which an injunction is properly granted, the statutory framework would prevail.  *See, e.g.*, *Broccolo*, 2006 WL 3690648, at \*1-2.  In light of the Supreme Court's teachings on presumptions of equitable relief, it cannot be that a prevailing plaintiff under the GBL will automatically receive a permanent injunction, unlimited in scope so long as that plaintiff had the foresight to pray for injunctive relief in its original complaint.  *See Verizon Directories Corp. v. Yellow Book USA, Inc.*, 338 F. Supp. 2d 422, 429-30 (E.D.N.Y. 2004) (denying final injunction in Lanham Act and GBL case).

### 2.    Application of Law to Facts

The Court examines Koch's proposed permanent injunction under the four factors delineated in *eBay*, finding that such an injunction is unwarranted in this case.[26]  First, Koch has not suffered irreparable injury.  His injury was fully reparable by compensation for the counterfeit bottles.  And while Koch asserts that the 24 bottles at trial were not the full extent of the counterfeits consigned by Greenberg, such a contention is beyond the injury proven at trial and thus not properly the subject of a permanent injunction.  Moreover, Koch could have received a full refund for these bottles, and still others, had he accepted Greenberg's refund offers in the years prior.

Second, the remedies available at law for the injury suffered here—monetary damages, both compensatory and exemplary—are adequate to make Koch whole.  Here, Koch has received the value of the counterfeit wine consigned by Greenberg, as well as $24,000 in statutory damages under the GBL.  Nor will Koch continuously suffer as a result of Greenberg's violations, as he has been paid in full.

Third, in considering the balance of the hardships between Koch and Greenberg, it is clear that the terms of the injunction would require Greenberg to make disclosures not required of other consigners in the wine industry, due to his actions associated with the 2005 Zachys auction that was the sole subject of this case.  That result is unwarranted.  Koch has made efforts

---

[26] Independently, even if *eBay* were not the appropriate metric, under traditional principles of equity, the injunction sought by Koch could not stand, as it is overbroad and excessive in light of the litigation.   For example, while Koch seeks to enjoin Greenberg from "permitting an advertisement involving the sale of his wine to be published without disclosing . . . questions, doubts, or concerns raised by others in the wine industry about the authenticity of the wine," there is no discussion of what might constitute such "doubts" or "concerns."  *See Mgmt. Dynamics*, 515 F.2d at 807-08 (even when awarding an injunction authorized by statute, which "obviates" the need for a finding of "irreparable injury," a court must "implicitly" examine "those considerations of fairness that have been the traditional concern of equity courts").

to change the auction practices in the industry that permit this type of deceit to occur.  However, it does not follow from the jury's finding that Greenberg engaged in GBL violations that he must now be the symbol for changed norms within the wine industry.  An injunction permanently compelling Greenberg to speak about "questions, doubts, or concerns" regarding his wine, and indefinitely requiring him to hire his own expert to authenticate wine before consigning it, regardless of the auction house's own requirements, is beyond the pale.  Finally, the Court concludes that the overall public interest would not be served by the injunction sought by Koch.

While it is true that federal courts have "broad power to restrain acts which are of the same type or class as unlawful acts which [have been] found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past," *NLRB v. Express Pub. Co.*, 312 U.S. 425, 435 (1941), the Court is satisfied that this costly litigation, intense public scrutiny, and a punitive damages award are sufficient to dissuade Greenberg from engaging in deceptive acts or practices in the future.

Accordingly, Koch's request for a permanent injunction is denied.

## C.       Interest

Finally, Koch seeks (1) pre-judgment interest on his compensatory damages, pursuant to New York CPLR § 5001; (2) post-verdict and pre-judgment interest on his compensatory damages and punitive damages pursuant to CPLR § 5002; and (3) post-judgment interest pursuant to 28 U.S.C. § 1961.

### 1.       Pre-Judgment Interest on Compensatory Damages

Section 5001 provides that mandatory pre-judgment interest "shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property . . . ."

56

CPLR § 5001(a).  Pre-judgment interest, which is fixed at the statutory rate of 9%, *id.* § 5004,

accrues from the "earliest ascertainable date the cause of action existed," *id.* at § 5001(b).  Both

parties agree that pre-judgment interest should accrue from no later than February 15, 2006, the

date on which Koch received shipment of the 24 wines at issue in this lawsuit.  However, they

disagree as to the endpoint of the interest accrual, with Koch contending that it should accrue

until the date that judgment is entered by the Court and Greenberg asserting that his refund offers

affect the accrual period's length.

Under New York law, "one of the principal purposes of allowing prejudgment interest is

to compensate the plaintiff for its inability to use the money."  *Quintel Corp., N.V. v. Citibank,

N.A.*, 606 F. Supp. 898, 914-15 (S.D.N.Y. 1985).  Accordingly, where putative plaintiffs receive,

but refuse, a tender offer of the money at issue in the eventual suit, courts have recognized that

defendants "should not be penalized for [such a plaintiff's] refusal of the tender."  *Id.* at 915; *see*

*also Rivera v. Cincinnati Inc.*, No. 92 Civ. 4345 (SHS), 1998 WL 898128 (S.D.N.Y. Dec. 23,

1998) ("The accrual of interest is halted by either tendering a deposit to the clerk of court in an

amount sufficient to satisfy the claim or by tendering unconditional payment to the plaintiff."

(citations omitted)); *Feldman v. Brodsky*, 12 A.D.2d 347, 350, 211 N.Y.S.2d 56, 59 (1961), *aff'd*,

11 N.Y.2d 692, 180 N.E.2d 915 (1962) ("One [way in which a judgment holder may be estopped

from enforcing statutory prejudgment interest] is by a tender from the judgment debtor which

does not result in a satisfaction of the judgment because the judgment creditor refuses it[.]").

This interpretation of the law stems from familiar equitable considerations rooted in estoppel.

*See Knab Bros., Inc. v. Town of Lewiston*, 58 A.D.2d 1016, 397 N.Y.S.2d 45 (4th Dep't 1977)

("Concededly, the right to interest may be lost on equitable principles of estoppel, such as a

refusal by a creditor to accept a tender." (citations omitted)).  In order, however, "to be valid as a

defense against the accrual of interest running against the debtor, a tender must be shown to be absolute and free from all conditions." *Id.* (citation omitted); *see also Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 770 F. Supp. 1014, 1021 (E.D. Pa. 1991) (applying NY law, noting that a tender must be free of conditions to act as an estoppels against prejudgment interest); *Malson Ltd. v. Liberty Mut. Fire Ins. Co.*, No. 84 Civ. 1717 (CMM), 1986 WL 2963, at *1 (S.D.N.Y. Mar. 3, 1986) (same). Thus, a tender conditioned on, for example, release of a lawsuit's claims, would not act as a bar to prejudgment interest.

Here, Greenberg's position throughout this litigation has been that the refund offers were not settlement offers in the traditional sense, as they were not explicitly conditioned on a release of the claims in the litigation. As discussed above, the Court eventually agreed with this view, and thus held that the offers did not fall within the traditional strictures of Federal Rule of Evidence 408. While Koch's position has been that the offers were settlement offers, and thus conditional, Koch also argued (successfully) that a payment of compensatory damages would not moot this case, given the request for punitive damages. Accordingly, an acceptance of these refund tenders would neither have explicitly, nor implicitly, barred Koch's ability to bring the claims central to this lawsuit; and as such, the refund offers cannot reasonably be construed as conditional. Therefore, with respect to seven of the bottles ultimately included in the jury's verdict,[27] the pre-judgment interest shall accrue from February 15, 2006 through November 27, 2007, the date of Greenberg's first refund offer. With respect to the remaining 17 bottles, the

---

[27] The following bottles were the subject of Greenberg's initial refund offer: (1) the 1921 Chateau Lafleur (Trial Ex. 206); (2) the three 1945 Chateau Lafleur (Trial Exs. 207, 229, 230); (3) the 1928 Chateau Latour (Trial Ex. 200); (3) the 1921 Chateau Petrus (Trial Ex. 225); and (4) the 1928 Chateau Petrus (Trial Ex. 216).

58

pre-judgment interest shall accrue from February 15, 2006 through November 29, 2010, the date of Greenberg's second refund offer.

### 2. Post-Verdict, Pre-Judgment Interest on Award

Koch also seeks statutory pre-judgment interest, pursuant to CPLR § 5002 on the entire award, from the date the jury entered the verdicts to the date of the final judgment of the Court. CPLR § 5002 provides that "[i]nterest shall be recovered upon the total sum awarded, including interest to verdict, report or decision, in any action, from the date the verdict was rendered or the report or decision was made to the date of entry of final judgment." Again, the interest rate is the statutory percentage of 9%, and includes pre-judgment interest to date on the verdict amount. *Del Monte*, 2013 WL 1242374, at *10 ("In other words, pursuant to section 5001, the Court will add 9% interest from the date the damages were incurred to the date of verdict; pursuant to section 5002, the Clerk of Court will add to the judgment 9% interest from the date of verdict to the date of judgment on the sum of (1) the contract damages and (2) the section 5001 interest."). As § 5002 directs that the post-verdict, pre-judgment interest include the interest to verdict (the § 5001 interest discussed above), here, Koch will receive 9% interest on the relevant amounts, which will accrue from the date of the liability verdict (April 11, 2013), until the date the Court enters a final judgment. Under the plain language of § 5002, Koch is also entitled to post-verdict, pre-judgment interest on his punitive damages award, from the date of that verdict (April 12, 2013), until the date the Court enters its final judgment. The pre-judgment interest on Koch's punitive damages award will accrue on the remitted amount of $711,622, rather than on the full amount of $12,000,000. *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 56 (2d Cir. 1998).

### 3.      Post-Judgment Interest on Award

Title 28 U.S.C. § 1961 entitles prevailing plaintiffs to post-judgment interest "on any money judgment in a civil case recovered in a district court." *Id.* at § 1961(a). This interest rate is calculated from the date of judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding [] the date of the judgment," up "to the date of payment . . . ." *Id.* at § 1961(a)-(b). "Postjudgment interest is designed to compensate the plaintiff for the delay it suffers from the time damages are reduced to an enforceable judgment to the time the defendant pays the judgment." *Andrulonis v. United States*, 26 F.3d 1224, 1230 (2d Cir. 1994). The postjudgment amount upon which the interest accrues includes compensatory damages, punitive damages, and fee awards. *See Becerril v. E. Bronx NAACP Child Dev. Ctr.*, No. 08 Civ.10283 (PAC) (KNF), 2009 WL 2611950, at *11 (S.D.N.Y. Aug. 18, 2009), *report and recommendation adopted sub nom. Becerril v. Ease Bronx NAACP Child Develpoment Ctr.*, No. 08 CIV. 10283 (PAC) (KNF), 2009 WL 2972992 (S.D.N.Y. Sept. 17, 2009); *accord Foley v. City of Lowell, Mass.*, 948 F.2d 10, 21-22 (1st Cir. 1991) ("[W]e hold that, once a money judgment is obtained in a federal district court, interest thereon is obligatory under 28 U.S.C. § 1961 without regard to the elements of which that judgment is composed, even if attorneys' fees are included." (footnote omitted)).

## VII.   Conclusion

For the foregoing reasons, it is hereby ORDERED that:

1.      Defendant's motion for judgment as a matter of law, or, in the alternative, for a new trial, is GRANTED in part and DENIED in part, as follows:

**SA60**

(a)     the compensatory damages award is reduced pursuant to New York General Obligations Law § 15-108 from $355,811 to $212,699 as a result of Plaintiff's prior settlement with Zachys;

(b)     the punitive damages award of $12 million is remitted to $711,622; if Plaintiff does not accept the remitted punitive damages amount, a new trial on punitive damages will be held;

(c)     in all other respects, Defendant's motion for judgment as a matter of law or for a new trial is DENIED;

2.     Plaintiff's motion for attorney's fees, injunctive relief, and interest is GRANTED in part and DENIED in part, as follows:

(a)     Plaintiff's request for attorney's fees is DENIED;

(b)     Plaintiff's request for injunctive relief is DENIED;

(c)     Plaintiff request for pre- and post-judgment interest is GRANTED.

3.     Plaintiff shall inform the Court by letter, on or before April 25, 2014, whether he accepts the remitted amount of punitive damages.  If he does so, an appropriate order directing entry of final judgment will be issued.

The Clerk of Court is directed to close the motions at docket entry numbers 495 and 497.

SO ORDERED.

Dated: March 31, 2014
       New York, New York

_____
          J. PAUL OETKEN
       United States District Judge

61

**SA61**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

WILLIAM I. KOCH,

Plaintiff ,

-against-

ERIC GREENBERG,

Defendant.

---------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/9/14

07 **CIVIL** 9600 (JPO)

**JUDGMENT**

Whereas the above-entitled action having been assigned to the Honorable J. Paul Oetken, United States District Judge, and the matter having been brought to trial on March 27, 2013, and at the conclusion of Phase I of the trial, on April 11, 2013, the jury having returned a verdict in favor of Plaintiff on all three claims, awarding Plaintiff compensatory damages in the amount of $355,811.00, and an additional $24,000.00 in statutory damages on one of Plaintiff's GBL claims ($1,000.00 per bottle), and at the conclusion of Phase II of the trial, on April 12, 2013, the jury having reached a verdict in favor of Plaintiff, awarding Plaintiff $12,000,000.00 in punitive damages; and

Whereas, Defendant having moved for judgment as a matter of law, or, in the alternative, for a new trial (Doc. # 495) on June 21, 2013; and Plaintiff having moved for attorney fees, injunctive relief, and interest (Doc. # 497) on June 24, 2014; and the Court, having rendered its Opinion and Order (Doc. # 508) on March 31, 2013, granting in part Defendant's motion and reducing the compensatory damages award from $355,811.00 to $212,699.00, and denying in part Defendant's motion in all other respects; and granting Plaintiff's request for pre- and post-judgment interest, and denying Plaintiff's request for attorney's fees and Plaintiff's request for injunctive relief; and

1

**SA62**

Whereas Plaintiff having accepted the remittitur of the jury's punitive damages award (Doc.# 509) on April 25, 2014, and the Court thereafter, having rendered its Order (Doc. # 510) on April 29, 2014, and its Order (Doc. # 511) on May 2, 2014, directing the Clerk of Court to enter judgment in accordance with the Court's March 31, 2014 order, it is,

**ORDERED, ADJUDGED AND DECREED**: That for the reasons stated in the Court's Order (Doc. # 511) dated May 2, 2014, and in accordance with the Court's Opinion and Order dated March 31, 2014 (Doc. # 508), judgment is entered in favor of Plaintiff as against Defendant, as follows: (1) $212,699.00 in compensatory damages, plus (2) $711,622.00 in punitive damages, plus (3) 9% prejudgment interest on $117,017.00 from February 15, 2006 through November 27, 2007 in the amount of $18,754.78, plus (4) 9% prejudgment interest on $238,794.00 from February 15, 2006 through November 29, 2010 in the amount of $102,923.49, plus (5) 9% postverdict, prejudgment interest on items (1) through (4) from April 12, 2013 through the date of final judgment, in the amount of $101,103.71; for a total judgment in the amount of $1,147,102.98, plus postjudgment interest.

**DATED:** New York, New York

_May 9_ , 2014

**So Ordered:**

J. PAUL OETKEN
United States District Judge

**RUBY J. KRAJICK**

_____
**Clerk of Court**

BY: _____
**Deputy Clerk**

2

**SA63**

# STATUTORY ADDENDUM

N.Y. Gen. Bus. Law § 349 provides:

## § 349.  Deceptive acts and practices unlawful

(a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

(b) Whenever the attorney general shall believe from evidence satisfactory to him that any person, firm, corporation or association or agent or employee thereof has engaged in or is about to engage in any of the acts or practices stated to be unlawful he may bring an action in the name and on behalf of the people of the state of New York to enjoin such unlawful acts or practices and to obtain restitution of any moneys or property obtained directly or indirectly by any such unlawful acts or practices.  In such action preliminary relief may be granted under article sixty-three of the civil practice law and rules.

(c) Before any violation of this section is sought to be enjoined, the attorney general shall be required to give the person against whom such proceeding is contemplated notice by certified mail and an opportunity to show in writing within five business days after receipt of notice why proceedings should not be instituted against him, unless the attorney general shall find, in any case in which he seeks preliminary relief, that to give such notice and opportunity is not in the public interest.

(d) In any such action it shall be a complete defense that the act or practice is, or if in interstate commerce would be, subject to and complies with the rules and regulations of, and the statutes administered by, the federal trade commission or any official department, division, commission or agency of the United States as such rules, regulations or statutes are interpreted by the federal trade commission or such department, division, commission or agency or the federal courts.

(e) Nothing in this section shall apply to any television or radio broadcasting station or to any publisher or printer of a newspaper, magazine or other form of printed advertising, who broadcasts, publishes, or prints the advertisement.

(f) In connection with any proposed proceeding under this section, the attorney general is authorized to take proof and make a determination of the

relevant facts, and to issue subpoenas in accordance with the civil practice law and rules.

(g) This section shall apply to all deceptive acts or practices declared to be unlawful, whether or not subject to any other law of this state, and shall not supersede, amend or repeal any other law of this state under which the attorney general is authorized to take any action or conduct any inquiry.

(h) In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

(j) Notwithstanding any law to the contrary, all monies recovered or obtained under this article by a state agency or state official or employee acting in their official capacity shall be subject to subdivision eleven of section four of the state finance law.

N.Y. Gen. Bus. Law § 350 provides:

## § 350.  False advertising unlawful

False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.