# 14-1712-cv

## United States Court of Appeals
### for the
## Second Circuit

WILLIAM I. KOCH, an individual,

*Plaintiff-Counter-Defendant-Appellee,*

– v. –

ERIC GREENBERG, an individual,

*Defendant-Counter-Claimant-Appellant,*

ZACHYS WINE & LIQUOR STORE, INC., a New York corporation,
ZACHYS WINE ACTIONS INC., a New York corporation,

*Defendants,*

MR. JUSTIN CHRISTOPH, MR. JOHN KAPON,

*Intervenors.*



ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-COUNTER-DEFENDANT-APPELLEE

HUESTON HENNIGAN LLP
*Attorneys for Plaintiff-Counter-
Defendant-Appellee*
523 West Sixth Street, Suite 400
Los Angeles, California 90014
(213) 788-4340

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................... i

TABLE OF AUTHORITIES .............................................................................iv

STATEMENT OF JURISDICTION ............................................................... 1

QUESTIONS PRESENTED FOR REVIEW................................................. 1

STATEMENT OF THE CASE ......................................................................... 1

    **I.** Greenberg's Discovers He Has Counterfeit Wine. ................................ 3

    **II.** Greenberg Confirms He Has Counterfeit Wine.................................... 5

    **III.** Greenberg Seeks To Recover the Value of His Counterfeit
           Wine From Royal................................................................................. 6

    **IV.** Greenberg Develops Special Expertise Identifying Counterfeit
           Wine. ...................................................................................................... 7

    **V.** Greenberg Attempts To Sell Counterfeit Wine.................................. 10

           **A.** Christie's ...................................................................................... 11

           **B.** Rudy Kurniawan ......................................................................... 11

           **C.** Acker Merrall................................................................................ 12

           **D.** Chicago Wine Company .............................................................. 13

    **VI.** Greenberg's Intentionally Sells Counterfeit Wine At The
           October 2005 Zachys Auction. ....................................................... 14

SUMMARY OF THE ARGUMENT............................................................. 25

ARGUMENT....................................................................................................... 27

    **I.** Greenberg's Appeal Is Procedurally Barred By His Failure To
          Specify the Basis for His Preverdict Rule 50 Motions..................... 27

           **A.** Standard of Review................................................................... 27

**B.** Governing Law................................................................. 28

    1.  A Postverdict Motion for JMOL is Constrained by the Specific Issues Raised in a Preverdict Motion................. 28

    2.  Greenberg's Appeal Fails Due to His Failure to Comply with Rule 50. ...................................................... 29

    3.  Greenberg Cannot Demonstrate "Manifest Injustice" Excusing His Failure to Comply with Rule 50. ................................................................................ 31

**II.**  Greenberg's Rule 50(b) Motion Fails on the Merits........................... 33

  **A.**  Standard of Review.................................................... 33

  **B.**  Koch Reasonably Relied on Greenberg's Misrepresentations.................................................... 34

    1.  Whether A Defendant Has "Peculiar Knowledge" Is A Jury Question. ................................................... 35

    2.  The Jury Reasonably Concluded That Greenberg Had Peculiar Knowledge. .................................... 38

    3.  The District Court Did Not "Misunderstand" Peculiar Knowledge. .......................................... 42

  **C.**  The Jury Reasonably Found That Greenberg Misrepresented and Fraudulently Concealed Material Information. ................................................................ 43

    1.  Greenberg Cannot Evade Liability Simply Because He Made His Misrepresentations Through Zachys. .............................................................. 43

    2.  The Jury Reasonably Concluded that Greenberg Indirectly Made Representations of Fact And Opinion That Were Both False and Actionable. ................................. 47

  **D.**  The Jury Reasonably Found That Greenberg Fraudulently Concealed Facts From Koch........................ 51

1. Greenberg Possessed Superior Knowledge....................... 51

2. Greenberg Made Partial Statements. ............................... 53

**E.** The Jury Properly Found That Greenberg's Sale of Counterfeit Wine Violated of New York GBL. ............................... 54

1. The Jury Reasonably Found That Greenberg's Sale of Counterfeit Wine Was Misleading. .................................... 55

2. Greenberg's Sale of Counterfeit Wine Was Consumer-Oriented. ............................................................... 57

**III.** Greenberg's Intentional and Egregious Misconduct Warrants Punitive Damages. ........................................................................ 59

**A.** Standard of Review.................................................................. 59

**B.** Governing Law........................................................................ 60

**C.** The Jury Reasonably Concluded that Greenberg's Fraudulent Scheme Warranted Punitive Damages........................... 62

CONCLUSION ............................................................................................... 66

CERTIFICATION OF COMPLIANCE ....................................................... 68

# TABLE OF AUTHORITIES

**Cases**

*Abu Dhabi Comm. Bank v. Morgan Stanley and Co.*, No. 08 Civ. 7508
(SAS), 2013 WL 664176 (Feb. 25, 2013 S.D.N.Y.) .............................. 36

*ACA Galleries Inc. v. Kinney*, 928 F. Supp.2d 699 (S.D.N.Y. 2013).............. 40

*Against Gravity Apparel, Inc. v. Quarterdeck Corp.*, 699
N.Y.S.2d 368 (1st Dep't 1999)........................................................ 56

*Aldrich v. Thomson McKinnon Sec. Inc.*, 756 F.2d 243 (2d Cir. 1985) .......... 61

*Anderson v. Bessemer City*, 470 U.S. 564 (1985) .................................... 34

*Barrett v. U.S. Banknote Corp.*, 806 F. Supp. 1094 (S.D.N.Y. 1992).............. 61

*Baskin v. Hawley*, 807 F.2d 1120 (2d Cir. 1986) ........................... 28, 32

*Black v. Chittenden*, 69 N.Y.2d 665 (1986)........................................ 37

*Blank v. Baronowski*, 959 F. Supp. 172 (S.D.N.Y. 1997) ................................ 61

*Blue Cross and Blue Shield v. Philip Morris, Inc.*, 178 F.Supp.2d
198 (E.D.N.Y. 2001) ...................................................................... 59

*Bracey v. Bd. Of Educ.*, 368 F.3d 108 (2d Cir. 2004) ........................... 29

*Brass v. Am. Film Techs., Inc.*, 987 F.2d 142 (2d Cir. 1993) ......................... 51

*Broadnax v. City of New Haven*, 415 F.3d 265 (2d Cir. 2005) ....................... 31

*Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90 (1985) ........................................ 35

*Country World Inc. v. Imperial Frozen Foods Co.*, 186 A.D.2d 781 (1992)... 36

*Cristallina S.A. v. Christie, Manson & Woods Int'l, Inc.*, 502 N.Y.S.2d
165 (App. Div. 1st Dep't 1986)........................................................ 46

*Cruz v. Local Union No. 3*, 34 F.3d 1148 (2d Cir. 1994)...................... 29

*Dallas Aerospace, Inc. v. CIS Air Corp.*, No. 00 Civ. 1657, 2002 WL
31453789 (S.D.N.Y. Oct. 31, 2002)....................................................... 41

*Danann Realty Corp. v. Harris*, 5 N.Y.2d 317 (1959) ................................ 35, 36

*DIMON Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359 (S.D.N.Y. 1999) ................. 38

*Donovan v. Aeolian*, 270 N.Y. 267 (1936) ....................................... 52, 54

*Dygert v. Leonard*, 138 A.D.2d 793 (1988) ........................................... 36

*Flaks v. Koegel*, 504 F.2d 702 (2d Cir. 1974) ...................................... 61

*Foxley v. Sotheby's*, 893 F.Supp. 1224 (1995) .................................... 40

*Galdieri-Ambrosini v. Nat'l Realty & Development Corp.*, 136 F.3d 276 (2d Cir. 1998) ................................................................ 28

*Gasperini v. Center. For Humanities, Inc.*, 518 U.S. 415(1996) ......... 59

*Goshen v. Mut. Life Ins. Co.*, 98 N.Y.2d 314 (2002) ........................... 54

*Greene v. Mercantile Trust Co.*, 60 Misc. 189 (N.Y. Sup. Ct. 1908) .............. 44

*Holmes v. United States*, 85 F.3d 956 (2d Cir. 1996) .......................... 29

In *Mandarin Trad'g Ltd. v. Wildenstein,* 16 N.Y.3d 173 (2011) ..................... 52

In *Minpeco S.A. v. Conticommodity Servs., Inc.,* 552 F. Supp. 332 (S.D.N.Y. 1982) ........................................................... 52

*In re Johns-Manville Corp.*, 759 F.3d 206 (2d Cir. 2014) ......................... 32

*Junius Const. Corp. v. Cohen,* 257 N.Y. 393 (1931) .......................... 53

*Koch v. Acker, Merrall & Condit, Co.*, 18 N.Y.3d 940 (2012) ...... 54, 55, 56, 58

*Koch v. Greenberg*, 14 F. Supp. 3d 247 (S.D.N.Y. 2014) ................................ 3

*Kramer v. Showa Denko KK*, 929 F. Supp. 733 (S.D.N.Y. 1996 ..................... 64

*Laborers' v. Marine Mid. Bank*, 85 N.Y.2d 20 (1995) .......................... 55

*LeBlanc-Sternberg v. Fletcher*, 57 F.3d 412 (2d Cir. 1995) ................. 34

*Lennon v. Miller*, 66 F.3d 416 (2d Cir. 1995) ................................. 57

*Liberman v. Riverside Mem. Chapel*, 225 A.D.2d 293 (1st Dep't 1996) ......... 60

*Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012) ................................ 28, 34

*Magnaleasing Inc. v. Staten Island Mall*, 428 F. Supp. 1039 (S.D.N.Y. 1977) ................................................................................................... 47

*McPherson v. Husbands*, 864 N.Y.S.2d 444 (App. Div. 2d Dep't 2008) ........ 40

*Meriwether v. Coughlin*, 879 F.2d 1037 (2d Cir. 1989 ......................... 30

*Moore v. Microsoft Corp.*, 741 N.Y.S.2d 91 (2d Dep't 2002 ................. 56

*Morris v. Flaig*, 511 F. Supp. 2d 282 (E.D.N.Y. 2007) ......................... 63

*Most v. Monti*, 456 N.Y.S.2d 427 (App. Div. 2d Dep't 1982) ........................ 41

*Moustakis v. Christie's, Inc.*, 892 N.Y.S.2d 83 (App. Div. 1st Dep't 2009).... 66

*Muller-Paisner v. TIAA*, 289 F. App'x 461 (2d Cir. 2008) ............................... 51

*Nardelli v. Stamberg*, 44 N.Y.2d 500 (1978) ...................................................... 60

*Nigro v. Lee*, 882 N.Y.S. 2d 346 (App. Div. 3d Dep't 2009) ........................... 41

*Ostano Commerzanstalt v. Telewide Sys., Inc.*, 794 F.2d 763 (2d Cir. 1986) ................................................................................................... 44

*Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254 (2d Cir. 2011) .............. 32, 33

*Payne v. Jones*, 711 F.3d 85 (2d. Cir. 2013) ...................................................... 60

*Petraccione v. Simmons*, 106 A.D.2d 776 (1984) ............................................ 36

*Piesco v. Ed Koch*, 12 F.3d 332 (2d Cir. 1993) ................................................ 28

*Randi A.J. v. Long Island Surgi-Center*, 46 A.D.3d 74 (2d Dep't 2007) ................................................................................................... 60

*Ross v. Louise Wise Services, Inc.*, 8 N.Y.3d 478 (N.Y. 2007) ........................ 66

*S.E.C. v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013) ............................................ 28

*S.Q.K.F.C. Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629 (2d Cir. 1996) ................................................................................................... 54

*Samuels v. Air Transport Local 504*, 992 F.2d 12 (2d Cir. 1993) .............. 31, 32

*Sanders v. New York City Hum. Res. Admin.*, 361 F.3d 749 (2d Cir. 2004) ........................................................................ 34

*Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256 (2d Cir. 1995).......... 54

*See Wechsler v. Hoffman-LaRoche, Inc.*, 198 Misc. 540 (Sup. Ct, Bronx Cty. 1950) ...................................................................... 46

*SIPC v. BDO Seidman, LLP,* 746 N.E.2d 1042 (N.Y. 2001) ......................... 46

*Sir Speedy, Inc. v. L&P Graphics, Inc.*, 957 F.2d 1033 (2d Cir. 1992).............. 3

*St. Patrick's Home v. Laticrete Int'l, Inc.*, 696 N.Y.S.2d 117 (1st Dep't 1999) .................................................................... 59

*Stampf v. Long Island R. Co.*, 761 F.3d 192 (2d Cir. 2014) ................ 34

*Steinberg v. Guild*, 258 N.Y.S.2d 670 (App. Div. 1st Dep't 1965)................. 53

*Steinhardt Grp. Inc. v. Citicorp.* 272 A.D.2d 255 (2000)................................ 36

*Tahini Investments, Ltd. v. Bobrowsky*, 99 A.D.2d 489 (1984)....................... 37

*Tahini Invs. v. Bobrowsky*, 99 A.D.2d 489 (1984) ........................................ 36

*Tindle v. Birkett*, 171 N.Y. 520 (1902) ....................................................... 44

*Todd v. Pearl Woods, Inc.*, 20 A.D.2d 911 (1964) ....................................... 36

*Tolbert v. Queens College*, 242 F.3d 58 (2d Cir. 2001)........................... 30

*Tribune Printing Co. v. 263 Ninth Ave. Realty, Inc.*, 57 N.Y.2d 1038 (1982)................................................................... 47

*Turkish v. Kasenetz*, 27 F.3d 23 (2d Cir. 1994)................................... 35

*Union Carbide Corp. v. Montell N.V.*, 9 F. Supp. 2d 405 (S.D.N.Y. 1996) .... 47

*United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) ................................ 32, 33

*UST Private Equity Investors Fund, Inc. v. Salomon Smith Barney*, 733 N.Y.S.2d 385 (App. Div. 1st Dep't 2001)............................... 41

*Walker v. Sheldon*, 10 N.Y.2d 401 (1961)....................................... 60

*Warner Theatre Assocs. v. Metro. Life Ins. Co.*, 149 F.3d 134 (2d Cir. 1998) ............................................................................................ 35

*Whitney v. Citibank, N.A.*, 782 F.2d 1106 (2d Cir. 1986) ........................... 61, 62

*Young v. Keith*, 112 A.D.2d 625 (3d Dep't 1985) ............................................ 51

*Yuzwak v. Dygert*, 534 N.Y.S.2d 35 (App. Div. 4th Dep't 1988) .................... 65

## Statutes

28 U.S.C. § 1291 ................................................................................................ 1

N.Y. Gen. Bus. Law § 349 .......................................................................... 2, 40

N.Y. Gen. Bus. Law § 350 ............................................................................... 40

Rest. (2d) of Torts § 531 .................................................................................. 38

Rest. (2d) of Torts § 533 .................................................................................. 38

## Rules

Fed. R. Civ. P. 50 ............................................................................................ 26

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## QUESTIONS PRESENTED FOR REVIEW

1. Does a defendant who failed to make a preverdict Rule 50(a) motion with the requisite specificity forfeit the right to seek appellate review of the District Court's denial of his motion?

2. Viewing all evidence in Koch's favor, did Koch present sufficient evidence for a reasonable jury to conclude that:

    a. Koch reasonably relied on Greenberg's misrepresentations;

    b. Greenberg misrepresented and fraudulently concealed material information about the counterfeit wine he sold; and

    c. Greenberg's conduct was consumer-oriented and materially misleading within the scope of New York's General Business Law?

3. Is there sufficient evidence to support the jury's imposition of punitive damages under New York law?

## STATEMENT OF THE CASE

At an October 2005 auction in New York City, Greenberg consigned and sold several thousand bottles of wine in a single-seller

auction. Greenberg earned around $7 million in proceeds. Tr. 321:25-322:10; Ex. 450. In that auction, Greenberg sold Koch at least 24 bottles of counterfeit wine, purported to be from exceedingly rare vintages with a combined value of about $355,811. Tr. 1216:18-24.

On April 11, 2013, after a three-week trial, the jury unanimously found that Greenberg committed fraud through affirmative misrepresentations and fraudulent concealment, and violated New York's General Business Law (GBL). Dkt 451 (Verdict Form) at 2, 4, & 7. The jury awarded Koch $355,811 in compensatory damages plus $24,000 in statutory damages under GBL § 349. *Id.* at 6, 9.

The next day, after hearing additional evidence and argument, the jury found "by clear, unequivocal, and convincing evidence" that Greenberg's conduct "was not merely intentional, but rather, evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations," warranting the imposition of $12 million in punitive damages. Jury Charge: Phase II; Dkt. 452 (Verdict Form).

On March 31, 2014, the District Court denied Greenberg's motions for judgment as a matter of law and for a new trial, remitted the punitive damages award to two times the compensatory damages award, otherwise affirmed the jury verdict in all respects, and entered

judgment for Koch in the amount of $1,147,102.98, including interest. *Koch v. Greenberg*, 14 F. Supp. 3d 247, 273 (S.D.N.Y. 2014).  Greenberg brings this appeal from the District Court's denial of his motion for judgment as a matter of law, challenging the sufficiency of the evidence supporting the jury's findings of liability and the imposition of punitive damages.

The facts are presented in the light most favorable to Koch— drawing all reasonable inferences and making all credibility assessments in Koch's favor.  *Sir Speedy, Inc. v. L&P Graphics, Inc.*, 957 F.2d 1033, 1039 (2d Cir. 1992).

## I. <u>GREENBERG'S DISCOVERS HE HAS COUNTERFEIT WINE.</u>

Greenberg amassed great wealth during the late 1990s, and also amassed a large collection of fine and rare wine.  Tr. 314:14-315:8.  In January 2000, he began buying wine from Royal Wine Merchants ("Royal"), a New York-based wine retailer.  Tr. 524:25-10.  By April 2002, Greenberg had purchased more than $2 million worth of wine from Royal.  Tr. 525:17-19.  He had also developed close friendships with Royal's owner, Jeff Sokolin.  Having accumulated over 50,000 bottles of wine, Greenberg formed a "wine sale company" called Innovation Wines, of which he was the principal, specifically to manage his business of buying and selling wine.  Tr. 317:23-18:11

As part of his wine business, in April 2002, Greenberg approached the auction house Sotheby's to sell part of his collection at auction. Sotheby's worldwide head of wine auctions, Serena Sutcliffe, and Sotheby's Senior Vice President, Jamie Ritchie, visited Greenberg's cellar to see his collection. Tr. 152:14-25.

During that visit, Sutcliffe and Ritchie informed Greenberg that he had counterfeit wines due to "counterfeit labels" and "discrepancies between the labels and vintage on the cork." Tr. 154:20-25. Sutcliffe and Ritchie showed Greenberg specific counterfeit bottles with these discrepancies. Tr. 155:7-18. Sotheby's informed Greenberg it would not sell certain of his wines without performing more research and possibly authenticating the wines at the chateaux they purportedly came from. Tr. 156:10-157:22. Ritchie explained that because Greenberg had acquired rare wines from Royal, this was particular reason for concern, as Royal had a reputation for selling inauthentic wine. "Whenever Royal was a source," Ritchie testified, "you have heightened awareness for counterfeit wines." Tr. 151:4-22.

When informed of these counterfeit wines, Greenberg was "angry." Tr. 383:4-11. Greenberg told Ritchie "if he did have counterfeit wines, he could always sell them through [a different auction house] Acker

Merrall, who would take anything." Tr. 176:2-25. Sotheby's never auctioned Greenberg's wine. Tr. 176:10-11.

## II. GREENBERG CONFIRMS HE HAS COUNTERFEIT WINE.

Following Sotheby's devastating visit, Greenberg launched an extensive investigation into the contents of his cellar. He hired a wine expert, William Edgerton, to examine more than 100 bottles of wine. Edgerton's findings—delivered to Greenberg—were clear: Edgerton concluded that nearly 60% of the bottles sampled were definitely counterfeit, and suspected that another 9 bottles were probably counterfeit. Ex. 73. Of the 69 bottles Greenberg identified as coming from Royal, most were "definitely counterfeit." Ex. 73; Tr. 1848:14-23.

Edgerton identified each bottle he inspected by affixing a sticker with a unique identifying number. He affixed the number 41 to a bottle of purported 1928 Chateau Latour that was "definitely counterfeit." Ex. 73. Greenberg then sold this very same bottle of 1928 Chateau Latour—sticker number 41 and all—to Koch at the October 2005 auction. Tr. 1707:16-1708:25. Greenberg knew it was counterfeit.

Greenberg also prepared a document he called the "Royal Wine Fake Summary Notes." Ex. 107. This document listed the "wines believed to be fake and sold to Eric Greenberg," and stated that Greenberg along with two sommeliers Greenberg retained conducted a

"bottle by bottle" investigation of his cellar and consulted "outside experts, domains [*i.e.* producers of wine], and importers . . . on the authenticity, labeling and corks of various wines." Ex. 107. In this document, Greenberg identifies many of the wines he later sold to Koch as "counterfeit." *See infra* at pp. 20-23.

### III. <u>GREENBERG SEEKS TO RECOVER THE VALUE OF HIS COUNTERFEIT WINE FROM ROYAL.</u>

Greenberg was furious with Royal for selling him counterfeit wine. Greenberg contacted Royal's owner, Sokolin, to threaten his life and freedom. Tr. 343:25-44:5.

Greenberg also had an attorney prepare a draft complaint against Royal, and Sokolin. Ex. 332. The complaint was delivered to Royal, but never filed. Tr. 378. It stated that Royal sold Greenberg "more than $2 million of wine, of which all or substantially all is fake." Ex. 332. Greenberg also delivered to Royal a list of wines he had concluded was counterfeit. Ex. 300. Greenberg eventually settled his dispute with Royal. The settlement provided that Greenberg would return only $360,000 worth of wine, far less than the $2 million he had concluded to be counterfeit. Tr. 399:17-19; Exs. 357, 358, 360. The evidence at trial showed that among the bottles Greenberg concluded were counterfeit, but which he did not return to Royal as part of the settlement, were several of the bottles at issue in this case. Ex. 1102; Tr. 669:21-70:19;

671:23-72:8; 673:6:74:4; 676:18-77:18; 678:7-12; *see generally infra* at pp. 20-23.

Greenberg also filed insurance claims with two insurance companies seeking recovery for fraud.  Ex. 331; Tr. 433:18-20. Greenberg told the insurance companies that Sotheby's informed him of the counterfeit wines in his collection, and that he knew at least $1.6 million of wine he had purchased from Royal was fake.  Ex. 331 (Greenberg "likened it to buying a fake Picasso painting"); Ex. 291.

In 2004, shortly after Greenberg settled with Royal, Greenberg's cellar manager, Cortes, asked if could have a couple of the counterfeit wines as "a trophy of all the hard work" he did in investigating the cellar.  Greenberg responded:  "[A]bsolutely not.  I purchased that wine, what they did to me I'll do to them; what they did to me, I'll do to someone else." Tr. 757:7-24.

## IV. <u>GREENBERG DEVELOPS SPECIAL EXPERTISE IDENTIFYING COUNTERFEIT WINE.</u>

In the course of investigating his wine, Greenberg developed special expertise in spotting fakes.  For instance, he developed a painstaking process to authenticate a cork: cut the capsule with a razor blade, clean the neck with solvent and razor blade, and use "[h]igh intensity halogen and incandescent lights" and "two types of magnifying

glass."  Ex. 107; *see also* Ex. 343 ("[I] personally took high intensity light to every cork").

Based on his expertise and his personal inspections, Greenberg often identified particular bottles he owned as counterfeit, and even specific features of individual bottles that supported his conclusion. *See, e.g.*, Ex. 78 ("Label is printed by a fake mechanism"; "The year and monopole flag on top was scissor cut and not die stamped"; "The Dating on the cork is inconsistent and darkness in print of rest of cork.  Looks amateur."; "The 1985 on the cork is in the wrong font"; "these are so fake, you have no idea …"); Ex. 388 ( "the [19]49 Latour you just shipped is fake … The cork is not properly marked, the bottle itself is suspect, and label is taped with cellophane tape, making it obvious …"); Ex. 310 ("The cork [on purported 1929 Chateau Cheval Blanc] is not appropriately marked"; "no vintage date … illegible domaine markings … different from 21s and 47s."); Ex. 354 (purported 1945 Chateau Petrus "has no legible cork dating"; "I am not comfortable with the two [19]50 lafleur, so I will return them"; purported "[19]61 evangile … corks have a vertical orientation to the print and dating" suggesting they are counterfeit; "I found a number … of [19]87 jayer CP bottles I bought from you that are counterfeit");

Greenberg told wine authenticator Maureen Downey that he "had…become an expert by himself" in identifying counterfeit wines. Tr. 836.

Greenberg also learned of particular wine sellers who sold counterfeit wines, such as Royal and Bordeaux Wine Locators. In 2004, Greenberg claimed that Bordeaux Wine Locators was "the worst counterfeiting operation in the world." Ex. 388. Nonetheless, at least ten of the 24 bottles at issue in this case that Greenberg sold to Koch came to Greenberg from Bordeaux Wine Locators. *See infra* at pp. 20-23.

Greenberg also learned how to identify counterfeit wines from other auction houses, such as Acker. When Greenberg attempted to sell wines through Acker in 2004, Acker's president Kapon rejected Greenberg's counterfeits and identified to Greenberg the features showing their inauthenticity. *See* Ex. 389 (identifying photocopied labels, too young color, and other issues). Kapon explained to Greenberg that for Greenberg's magnums of purported 1940s and 50s Chateau Lafleur, "there is one fundamental problem: the corks all have the vertically, ovally chateau lafleur brand on the cork, which they only start using post '66. . . . So I cannot offer those Lafleurs in good conscience." Ex. 389. Greenberg, already familiar with the issue of

vertically branded corks, responded that Chateau Petrus had also changed to vertically branded corks in 1966. Ex. 390; Tr. 1714. Despite knowing that vertically branded corks evidenced inauthenticity, Greenberg thereafter sold Koch 12 magnums of counterfeit pre-1966 Lafleur with vertically branded corks, and six magnums of counterfeit pre-1966 Petrus with vertically branded corks.

Kapon also identified a uniquely yellow "photocopied label" on Greenberg's bottle of purported 1945 Chateau Lafite, informing Greenberg that this was an obvious sign of inauthenticity. Ex. 389; Tr. 457:9-17. Greenberg's own counsel argued that this yellow color made the wine obviously counterfeit. Tr. 104:11-15. Greenberg nevertheless sold this yellow-labeled bottle of 1945 Chateau Lafite to Koch at the October 2005 Zachys auction. Ex. 222; Tr. 1322:2-6.

## V. <u>GREENBERG ATTEMPTS TO SELL COUNTERFEIT WINE.</u>

After learning in April 2002 that his collection was a minefield of counterfeit wine—and after confirming this with his own investigation—Greenberg continued to attempt to sell the collection. Between 2002 and the October 2005 auction at issue in this case, Greenberg attempted to sell counterfeit wine or discussed selling counterfeit wine through multiple outlets. These efforts confirm Greenberg's statements to Ritchie and Cortes that he intended to sell

counterfeit wine to unsuspecting collectors. Koch was one of those unsuspecting collectors.

## A. CHRISTIE'S

In late 2002, Greenberg entered negotiations with another auction house, Christie's. When Christie's sent Greenberg a proposed consignment agreement that contained a representation that Greenberg "has no reason to believe that any lot of property is not authentic or is counterfeit," Greenberg balked. He wrote back: "I cannot agree" and "We must discuss terms in the contract . . . including warranties." Exs. 68, 309; Tr. 307:14-311:10. Christie's never sold Greenberg's wine.

## B. RUDY KURNIAWAN

Undeterred by his failures with Sotheby's and Christie's, Greenberg still intended to unload his counterfeit wines. In 2003, Greenberg discovered that he had purchased counterfeit wine from an individual named Rudy Kurniawan. Tr. 239:17-24; Tr. 243:4-21. Greenberg was "livid" and threatened Kurniawan with a lawsuit for punitive damages. Tr. 240:3-24; Ex. 78. But then Greenberg saw an opportunity. Despite knowing that Kurniawan dealt in counterfeits, Greenberg continued to do business with him for years, apparently seeing Kurniawan as an outlet for his counterfeit wine. Tr. 237:12-14; 247:18-23. In 2004, Kurniawan offered to sell some of Greenberg's

counterfeit or questionable wine.  He wrote: "I can…try to move those 'suspects' bordeaux for u."  Greenberg responded: "I AM PUTTING IT ON AUCTION."  Ex. 380.

Greenberg continued to do business with Kurniawan even after this.  Tr. 258:23-25.  By 2005, he and Kurniawan were buying and selling so much wine from one another that Greenberg considered Kurniawan his "partner."  Ex. 419.  Greenberg's "partner" Kurniawan is currently in federal prison, serving a ten-year sentence following his fraud conviction for the sale of counterfeit wine.

### C. ACKER MERRALL

As set forth above, Greenberg again tried to put his counterfeit wine on auction in 2004 through auction house Acker.  Although Greenberg had told Sotheby's that Acker "would take anything," Tr. 176:2-25, Kapon refused to accept for auction bottles he concluded were likely counterfeit, which caused Greenberg to go ballistic. Ex. 386.

Kapon described the problems he saw in Greenberg's wines, including improper corks, photocopied labels, and improper vertical branding.  *See* Ex. 386; 389.  Kapon explained that it was Greenberg who was "the one insistent on [selling] the mag[num]s, and if I was confident about them after inspecting them, there would not be this big deal."  *Id.*  Kapon told Greenberg that he did "not want to sell wines

that I have doubts over." Ex. 389. Kapon pleaded with Greenberg: "So please do not bully me into offering these wines." *Id.* Despite Greenberg's threats, Kapon ultimately did not sell many of Greenberg's counterfeit wines in 2004. The evidence showed that Greenberg instead sold those counterfeit wines (which Kapon had identified as counterfeit) at the Zachys auction, including bottles at issue in this case.

### D. CHICAGO WINE COMPANY

Although some auction houses rebuffed Greenberg's attempts, Greenberg did sell counterfeits through Chicago Wine Company. In February 2005, an owner of the CWC, Simon Lambert, emailed Greenberg that a customer who had bought magnums of 1921 and 1929 Petrus from Greenberg had discovered that the magnums contained problematic corks. Ex. 413. Lambert told Greenberg that the wines needed to be returned and should not have been sold in the first place. *Id.* [1] Greenberg was ultimately forced to accept return of these magnums of Petrus. Evidence at trial showed that one of these

---

[1] Greenberg's claim that his "belief in the authenticity" of these returned magnums "was disputed at trial," Brief of Appellant ("Br.") 14, is legally irrelevant. The jury was entitled to discredit Greenberg's trial testimony. This Court draws all reasonable inferences and makes all credibility assessments in Koch's favor. *Sir Speedy, Inc. v. L&P Graphics, Inc.*, 957 F.2d 1033, 1039 (2d Cir. 1992).

returned magnums of Petrus was sold to Koch at the Zachys auction. *See infra* at pp. 20-23.

## VI. <u>GREENBERG'S INTENTIONALLY SELLS COUNTERFEIT WINE AT THE OCTOBER 2005 ZACHYS AUCTION.</u>

Greenberg learned from his experiences at Sotheby's, Christie's and Acker. He knew that for an auction house to sell his collection, he could not disclose damning information about the collection, especially that many wines came from Royal or had been rejected or returned by others. He put the lessons he had learned to practice in negotiating the sale at issue in this case: the October 2005 auction at Zachys.

First, Greenberg knew that word of the counterfeits in his collection had spread. He had been told that his "collection needs to stay more low-key due to too many whispers in the dark." Ex. 329. Greenberg therefore insisted that he remain anonymous in the October 2005 auction. Tr. 441:16-42:4. Sure enough, the auction catalog does not identify Greenberg as the consigner. Ex. 449.

Second, Greenberg knew he needed to be "actively involved in deciding which wines were going to be sold" so that the auction house did not exclude his counterfeits. Tr. 649:25-650:3. Greenberg therefore either "personally pulled" the bottles to sell at auction or else instructed his staff to "always … grab the shittiest bottles" when packing wines for auction. Ex. 528; Tr. 758:6-25.

Third, Greenberg knew that he had to keep certain material, negative information secret from Zachys.  As multiple witnesses familiar with wine auctions testified at trial, this refusal to volunteer information went against auction rules, practice and custom, which provides that a consignor inform the auction house of any doubts about authenticity.  Tr. 231:2-9 (Ritchie); 1491:5-10 (Egan); 840:15-20 (Downey).  Jeff Zacharia, owner of Zachys, testified that he wanted and expected Greenberg to disclose all known issues regarding specific bottles or types of wine.  Tr. 1706:14-25.  Yet Greenberg did not tell Zachys about any of the red flags he was aware of regarding the bottles selected for sale.  For example, Greenberg did not tell Zacharia:

- Sotheby's had identified particular counterfeit wines to Greenberg and had refused to sell those wines. Tr. 151-55.

- Edgerton had inspected more than 100 bottles of Greenberg's wine and concluded that most (including bottle number 41) were "definitely counterfeit." Tr. 1707:5-1708:25

- Greenberg knew that Chateau Petrus and Chateau Lafleur did not begin using vertical cork branding until 1966, which meant that bottles with vertical cork branding that purported to be of pre-1966 vintages were counterfeit.  Nevertheless, Greenberg consigned

many bottles of purported pre-1966 Lafleur and Petrus with vertical branding.  Tr. 1709:16-1714:23; Ex. 389.

- Greenberg knew the yellow label of the bottle of 1945 Lafite at issue in this case, Ex. 222, was an obvious sign of inauthenticity. Tr. 1715:5-24.

- Some of the wines Greenberg was consigning came from Royal, a known purveyor of counterfeit wines. Tr. 1720:14-1722:16.

- Greenberg had prepared the Royal Fake Wine Summary Notes, identifying specific Royal-sourced wines he had determined were counterfeit.  Tr. 1722:23-1723:3.

- Only a fraction of the Royal wines that Greenberg determined to be fake were returned to Royal and he kept many counterfeit bottles from Royal, which retained bottles had the same producers and vintages at issue in this case.  Tr. 1724:2-1728:25.

- Bordeaux Wine Locators was the worst counterfeit wine operation in the world but Greenberg was consigning wines he had acquired from Bordeaux Wine Locators.  Ex. 388.

Greenberg not only kept these facts hidden from Zachys—and thus hidden from auctions customers, including Koch—but he also affirmatively lied about the sources of some wines.  In response to Zacharia's request for information regarding the provenance, or origin,

of certain rare bottles Greenberg wished to consign, Greenberg did not reveal that his source was Royal. Ex. 98. Instead, he falsely wrote back that "The only thing I can tell you about the older Bordeaux is that they were purchased from eddie gelsman at wine library or dave Sokolin at d Sokolin in southampten [sic]." *Id.* Greenberg knew that some of these wines came from Royal and possibly Kurniawan, but he failed to disclose that.[2] Ex. 1102. Nor was this the only time Greenberg lied about the provenance of his wines. After the October 2005 auction, when questions were raised about certain of the wines Greenberg sold, Greenberg falsely wrote "many [of his wines] came out of Europe, in many cases from English royalty." Ex. 530.

Finally, Greenberg exerted editorial authority over the auction catalog. Although Greenberg denied that he exerted such authority, Tr. 641-42, numerous emails contradict his testimony, revealing his heavy involvement in drafting and editing the representations made in the auction catalog. Greenberg demanded that Zachys call his sale a "best of the best collection" that was "assembled by me [Greenberg] with painstaking effort." Ex. 435. He also demanded that Zachys remove references to how much wine Greenberg had already sold. *Id.* Other

---

[2] D Sokolin is a different, unrelated wine company than Royal, although the principals share a last name.

edits reveal how sensitive Greenberg was to convincing buyers that Greenberg's wines were authentic and reputable. To Zachys' proposed language that "[d]oubters may be reassured," Greenberg wrote back that the sentence "WHY BEG THE QUESTION OF DOUBTERS?" *Id.*

Greenberg insisted on constant oversight.[3] *Id.* ("I WANT TO REVIEW NEXT DRAFT AS WELL"); Ex. 439 (Greenberg to Zacharia: "We need to resolve all of this before we go to press with the catalog"); Ex. 524 (Zacharia to Greenberg: "Please look this over and give me your thoughts or an okay"); Ex. 526; Ex. 528 (Greenberg to Zacharia: "As an overall note, we still have much to do," "I absolutely do not like the flow of the 'other' wines", "No way", "Absolutely not [arranging wines in the catalog] by vintage").

The final catalog reflected Greenberg's extensive edits. Among other things, the catalog repeated Greenberg's misrepresentations that his "Right Bank magnums"—such as the magnums of Chateau Petrus, Cheval Blanc, L'Eglise Client, and Lafleur that are at issue here—were "sourced on the continent," meaning Europe. Ex. 101; *see also* Ex. 98. Greenberg knew these magnums were not sourced from Europe but from notorious sources of counterfeit wine, such as Royal and Bordeaux

---

[3] Greenberg, again ignoring the standard of review, states that "the parties disputed at trial whether Greenberg approved the final draft." Br. 20. The jury could reasonably conclude that he did.

Wine Locators.  The catalog further represented, as Greenberg specifically requested, that it was "a best of the best collection" amassed by the consigner alone.  *Id.*  In fact, Greenberg knew his collection was riddled with counterfeits.

At the October 2005 auction, Greenberg sold Koch numerous bottles of wine, including the 24 counterfeit wines at issue for $355,811.  Ex. 100.  Koch relied on Greenberg's representations, as repeated in 2005 auction catalog and on the bottles themselves, that the 24 wines at issue were genuine.  If Koch had known any of the facts Greenberg alone knew about his cellar, Koch would not have purchased the wines.  *E.g.*, Tr. 973-74.

Emboldened by his successful sale of counterfeit wines at the 2005 Zachys auction, Greenberg returned to Christie's in 2006, seeking to sell even more of his collection.  Greenberg boasted to Christie's: "[t]he good news is that there is no garbage.  That has been sold."  Ex. 476.

## VII. THERE IS OVERWHELMING EVIDENCE OF GREENBERG'S PECULIAR KNOWLEDGE.

The evidence that Greenberg knew each of the 24 wines at issue was counterfeit when he sold them at the October 2005 auction is overwhelming.  Selected examples are summarized below:

| Exhibit No. | Purported Description | Selected Examples of Greenberg's Peculiar Knowledge That The Bottles Were Counterfeit[4] |
|---|---|---|
| **223, 224** | 1921 Cheval Blanc (Magnum) | • Sourced from Royal. Ex. 1102 (Greenberg acquired 4 of the 6 wines of this type in his cellar from Royal).<br><br>• Acker rejected these wines from auction because of their photocopied labels and lack of branding on the cork. Ex. 389. |
| **222** | 1945 Lafite (Magnum) | • Acker rejected this wine from auction because of its yellow photocopied label. Ex. 389.<br><br>• This wine contains a Bordeaux Wine Locators sticker. Ex. 388 (2004 Greenberg: "Bordeaux Wine Locators is the worst counterfeiting operation in the world.").<br><br>• Sourced from Royal. Ex. 1102. |
| **205** | 1921 Lafleur (Magnum) | • Vertically branded cork that Greenberg knew meant the wine was counterfeit. Ex. 389 (2004 Kapon email to Greenberg: "one fundamental problem: the corks all have the vertically, ovally chateau lafleur brand on the cork, which they only start using post '66.") |

---

[4] The facts below are based on the evidence presented at trial, drawing all reasonable inferences in Koch's favor.

| 206 | 1921 Lafleur (Magnum) | • Vertically branded cork. Ex. 389. Acker rejected from auction because of cork. |
|---|---|---|
| **207, 229, & 230** | 1945 Lafleur (Magnum) | • Vertically branded corks. Ex. 389. Acker rejected from auction because of corks.<br><br>• Sourced from Royal. Ex. 1102 (Greenberg acquired 12 of the 16 wines of this type in his cellar from Royal) |
| **208, 209** | 1949 Lafleur (Magnum) | • Vertically branded corks. Ex. 389. Acker rejected from auction because of corks. |

| 210, 211, 212, 213, & 214 | 1950 Lafleur (Magnum) | <ul><li>Vertically branded corks. Ex. 389. Acker rejected from auction because of corks.</li><li>These wines each contain a Bordeaux Wine Locators sticker. Ex. 388.</li><li>Sourced from Royal. Ex. 1102 (Greenberg acquired 7 of the 24 wines of this type in his cellar from Royal).</li><li>Greenberg identified three of these wines as counterfeit in his Royal Wine Fake Summary Notes. *Compare* Ex. 107 (notes) to Ex. 106 (Greenberg's expert's report).</li><li>Greenberg identified three wines of this type and description as counterfeit, Ex. 62; but did not return any wines of this type and description as part of his settlement with Royal. Ex. 80.</li></ul> |
|---|---|---|
| 201 | 1864 Latour (Bottle) | <ul><li>Sourced from Royal. Ex. 1102 (Greenberg acquired 3 of the 4 wines of this type in his cellar from Royal).</li><li>Greenberg identified this wine as counterfeit in his Royal Wine Fake Summary Notes.</li><li>Greenberg identified wine of this type and description as counterfeit, Ex. 62; but did not return any wines of this type and description as part of his settlement with Royal. Ex. 80.</li></ul> |

| 200 & 227 | 1928 Latour (Bottle) | • Edgerton inspected Exhibit 200 and determined it to be "definitely counterfeit." Ex. 73 (Edgerton Sticker No. 41, "definitely counterfeit").<br><br>• Sourced from Royal. Exs. 73 & 1102.<br><br>• Greenberg identified these wines as counterfeit in his Royal Wine Fake Summary Notes.<br><br>• Greenberg identified these wines (plus one other wine of this type and description) as counterfeit, Ex. 62; but did not return these wine as part of his settlement with Royal. Ex. 80. |
|---|---|---|
| 225 | 1921 Petrus (Magnum) | • This wine was returned as inauthentic by a customer of Chicago Wine Company. Ex. 413.<br><br>• Sourced from Royal. Ex. 1102 (Greenberg acquired 5 of the 11 wines of this type in his cellar from Royal).<br><br>• Greenberg identified this wine as counterfeit in his Royal Wine Fake Summary Notes.<br><br>• Greenberg identified two wines of this type and description as counterfeit, Ex. 62; but did not return any wines of this type and description as part of his settlement with Royal. Ex. 80. |

| 215 & 216 | 1928 Petrus (Magnum) | • Vertically branded corks. Ex. 391 (2004 Greenberg: "Petrus changed cork [to vertically branded] in [19]66"). |
|---|---|---|
| | | • Sourced from Royal. Ex. 1102 (Greenberg acquired 2 of the 6 wines of this type in his cellar from Royal). |
| | | • Greenberg identified one of these wines as counterfeit in his Royal Wine Fake Summary Notes. |
| | | • Greenberg identified a wine of this type and description as counterfeit, Ex. 62; but did not return any wines of this type and description as part of his settlement with Royal. Ex. 80. |
| 217, 218 & 228 | 1950 Petrus (Magnum) | • Vertically branded corks. Ex. 391. |
| | | • Sourced from Royal. Ex. 1102 (Greenberg acquired 5 of the 11 wines of this type in his cellar from Royal). |
| | | • Greenberg identified two of these wine as counterfeit in his Royal Wine Fake Summary Notes. |
| | | • Greenberg identified two wines of this type and description as counterfeit, Ex. 62; but did not return any wines of this type and description as part of his settlement with Royal. Ex. 80. |
| | | • Exhibits 217 and 228 each contain a Bordeaux Wine Locators sticker. Ex. 388. |

**SUMMARY OF THE ARGUMENT**

I.      By failing to make a preverdict motion for judgment as a matter of law with the requisite specificity, Greenberg forfeited his claims on appeal.  If a defendant fails to make a sufficiently specific Rule 50(a) motion, this Court will overturn a jury verdict and issue JMOL only if necessary to avoid "manifest injustice," a standard Greenberg cannot meet.

II.      Greenberg's claims fail on the merits.

A.      Greenberg argues that Koch's reliance was unjustified because of an 'as-is' disclaimer in Zachys catalog and because Koch did not inspect the wines before auction.  The evidence supports the jury's conclusion that Koch reasonably relied on Greenberg's fraudulent misrepresentations.  The catalog's disclaimers cannot protect Greenberg, because the evidence shows that Greenberg had peculiar knowledge of facts regarding the inauthenticity of his wine that were unavailable to Koch.  Furthermore, it is the province of the jury to determine what inspection, if any, a reasonable purchaser would conduct prior to purchase.  The jury could reasonably conclude based on the evidence that pre-purchase inspections (1) would have been inordinately expensive and time-consuming, (2) would not have

revealed the information Greenberg alone knew, and (3) were exceptionally rare in the wine auction industry.

B.     Greenberg argues that he did not make any misrepresentations, because Zachys technically printed the auction catalog and sold the wines.  But the evidence supports the jury's conclusion that Greenberg—and not Zachys—misrepresented and concealed information regarding his counterfeit wine.  Greenberg had extensive control over the auction catalog.  Greenberg's own emails revealed that he knew and intended that Zachys would include his misrepresentations in the catalog that would be sent to consumers such as Koch.

C.     Greenberg argues that he did not owe Koch any duty to disclose facts because he did not personally know Koch.  But the evidence shows that Greenberg had a duty to disclose because (a) he had superior knowledge that the wines were counterfeit and knew that anyone buying the wines was acting on the mistaken belief they were genuine and (b) he made partial disclosures about some sources of the wines, requiring that he make full disclosure regarding other sources.

D.     Greenberg argues that he did not violate the GBL.  But the jury reasonably concluded that Greenberg's sale of counterfeit wine was both misleading and consumer-oriented, and therefore violated the

GBL. New York courts have squarely rejected Greenberg's claims that contractual disclaimers or the plaintiff's wealth can immunize a defendant from GBL liability.

III.   The evidence supports the jury's conclusion that Greenberg's wrongdoing warrants substantial punitive damages. The evidence shows that Greenberg intentionally auctioned wine he knew to be counterfeit and engaged in a pattern of deception and obfuscation without regard for Koch or other consumers. New York law permits punitive damages in cases such as this, where the evidence demonstrated "willful fraud" involving "a high degree of moral culpability." Even under Greenberg's misguided and overly restrictive interpretation of New York law, overwhelming evidence justifies the jury's award of punitive damages.

## ARGUMENT

### I.  GREENBERG'S APPEAL IS PROCEDURALLY BARRED BY HIS FAILURE TO SPECIFY THE BASIS FOR HIS PREVERDICT RULE 50 MOTIONS.

#### A.  STANDARD OF REVIEW

"As to any issue on which proper Rule 50 motions were not made, JMOL may not properly be granted by the district court, or upheld on appeal, or ordered by the appellate court unless that action is required to prevent manifest injustice." *Lore v. City of Syracuse*, 670 F.3d 127,

153 (2d Cir. 2012); *Galdieri-Ambrosini v. Nat'l Realty & Development Corp.*, 136 F.3d 276, 287 (2d Cir. 1998).

## B. Governing Law

### 1. A Postverdict Motion for JMOL is Constrained by the Specific Issues Raised in a Preverdict Motion.

A defendant's Rule 50 motion at the close of evidence "must be made with *specificity*," so as "to give the [plaintiff] a fair opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury." *Piesco v. Ed Koch*, 12 F.3d 332, 340 (2d Cir. 1993) (emphasis added); *see also S.E.C. v. Razmilovic*, 738 F.3d 14, 30 (2d Cir. 2013) ("[W]hen a party moves for [judgment as a matter of law] in a jury trial, it must do so—with specificity as to the alleged evidentiary deficiency—*before* the case is submitted to the jury." (emphasis added)); *Baskin v. Hawley*, 807 F.2d 1120, 1134 (2d Cir. 1986). "To ensure that that opportunity is a 'fair' one . . . Rule 50(a) also provides that '[t]he motion *must specify* the judgment sought and *the law and facts that entitle the movant to the judgment.*'" *Lore v. City of Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012) (quoting Fed. R. Civ. P. 50(a)(2) (emphasis added in *Lore*)). This specificity requirement demands "the JMOL motion must at least identify the specific element that the defendant contends is insufficiently supported." *Galdieri-Ambrosini*, 136 F.3d at 286.

"[T]he specificity requirement is obligatory,'" *id.* (quoting *Holmes v. United States*, 85 F.3d 956, 962 (2d Cir. 1996), and "may not be waived by the parties or excused by the district court." *Bracey v. Bd. Of Educ.*, 368 F.3d 108, 117 (2d Cir. 2004) (citing *Cruz v. Local Union No. 3*, 34 F.3d 1148, 1155 (2d Cir. 1994)).

### 2. GREENBERG'S APPEAL FAILS DUE TO HIS FAILURE TO COMPLY WITH RULE 50.

At the close of evidence of both the liability and punitive phases of trial, Greenberg's counsel failed to specify *any* element or issue for which Greenberg contends "there was insufficient evidence to permit the jury to find in favor of [Koch]." *Piesco*, 12 F.3d at 341. The entirety of Greenberg's pre-verdict Rule 50 motion before the liability verdict consists of seven lines of trial transcript:

> **Ms. Salisbury [Counsel for Greenberg]:** "Your Honor, we would like to move for judgment as a matter of law pursuant to Rule 50. What we would like is to have the motion deemed made now with briefing to be filed in due course."
> **The Court:** "That's fine. I'll reserve on that, subject to any briefing."
> **Ms. Salisbury:** "Thank you."

Tr. 2109:14-20. Greenberg's counsel made a similarly insufficient motion at the close of the punitive damages phase on the last day of trial:

**Mr. Coles [Counsel for Greenberg]:** "Your Honor, on the Rule 50 and subject to further briefing, we would like to move for judgment as a matter of law on the punitive damages claims for the legal reasons that we articulated this morning[5] and on the ground that based on the evidence, no reasonable jury would have a legally sufficient basis to find for Mr. Koch on punitive damages."

**The Court:** "Your motion is noted, and I'll reserve on that."

**Mr. Kaba [Counsel for Koch]:** "Your Honor, to make it clear, plaintiff obviously reserves all objections procedurally and substantively to that objection."

**The Court:** "Yes. Are we ready for closings?"

Tr. 2473:25-2474:10.[6]

It was not until two months later—after the jury found Greenberg liable on all counts and returned an eight-figure punitive damage award—that Greenberg identified *any* of the issues he asks this Court to review on appeal. *See* Dkt. No. 495. This post hoc argument, however, "was not a renewal of any argument made in [Greenberg's] Rule 50(a) motion, and its assertion postverdict plainly did not give [Koch] the requisite opportunity to cure any perceived deficiency." *Lore*, 670 F.3d at 153. Having failed to timely identify the grounds of his

---

[5] The "reasons" Greenberg incorporates by this reference consist only of his inaccurate claim that, prior to submitting the question to the jury, Koch had to elect to pursue either treble damages under the GBL or punitive damages for common law fraud. Tr. 2374-82.

[6] Courts cannot overlook a failure to comply with Rule 50's requirements and are powerless to extend the time to file a proper motion. *See Meriwether v. Coughlin*, 879 F.2d 1037, 1041 (2d Cir. 1989); *Tolbert v. Queens College*, 242 F.3d 58, 77 (2d Cir. 2001).

preverdict motion, Greenberg could not succeed in his postverdict motion,[7] "[b]ecause the [postverdict] Rule 50(b) motion is only a renewal of the preverdict motion [that] can be granted *only on grounds advanced in the preverdict motion.*"  Fed. R. Civ. P. 50 Advisory Committee Note (2006) (emphasis added).  For the same reasons, Greenberg cannot argue on appeal that the evidence was insufficient as a matter of law.

### 3. GREENBERG CANNOT DEMONSTRATE "MANIFEST INJUSTICE" EXCUSING HIS FAILURE TO COMPLY WITH RULE 50.

When a party fails to make a preverdict Rule 50 motion with the requisite specificity, as Greenberg did, a postverdict request for JMOL may be granted only where necessary "to prevent manifest injustice."  *Lore*, 670 F.3d at 153; *Broadnax v. City of New Haven*, 415 F.3d 265, 268 (2d Cir. 2005) (same); *see also Samuels v. Air Transport Local 504*, 992 F.2d 12, 15 (2d Cir. 1993) ("Relief from the specificity requirement is available only to avoid manifest injustice to the moving party.").  There can be no grounds for such injustice when there is trial evidence supporting the plaintiff's claims.  *See Baskin v. Hawley*, 807 F.2d 1120,

---

[7] Although Koch briefed these arguments in the postverdict request for JMOL, Koch Opp. at 1-3, the District Court ruled in Koch's favor on the merits of Greenberg's motion, without addressing whether Greenberg had waived or forfeited his claims by failing to make a proper Rule 50(a) motion.

1130 (2d Cir. 1986) (holding "trial evidence permits no such conclusion of injustice"); *Samuels*, 992 F.2d at 17  ("No manifest injustice to the union occurred because this evidence was sufficient to require the trial court to submit the case to the jury.").

The manifest injustice standard is "deferential to district courts and provide[s] relief only in the proverbial 'rare case.'" *United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009) (noting standard is comparable to "shocks-the conscience" and "substantive unreasonableness" standards).  The burden has been described as requiring the movant to demonstrate that "the jury's verdict is wholly without legal support." *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 271 (2d Cir. 2011).  In civil cases, this Court does not consider a judgment manifestly unjust if the defaulting party's arguments could have been properly made to the District Court and the party "proffer[s] no reason for their failure" to comply with the proper procedure.  *In re Johns-Manville Corp.*, 759 F.3d 206, 219 (2d Cir. 2014).

Greenberg cannot demonstrate that the denial of his defective motion for JMOL would amount to "manifest injustice." The District Court found that the jury's verdict "was permissible based on the

evidence." SA 14 (fraud verdict); *id.* at 15-17 (GBL verdict); *id.* at 35 (punitive damages verdict). This finding is in accord with the District Court's previous conclusions about the viability of Koch's claims. *See* Dkt. No. 37 (denying Greenberg's motion to dismiss); Dkt No. 335 (denying Greenberg's motion for summary judgment).[8] Greenberg cannot meet the onerous burden of showing manifest injustice "because the jury's verdict was not wholly without support." *Patsy's Italian Rest.*, 658 F.3d at 271) (holding evidence of misrepresentation precluded showing of manifest injustice in fraud case). Given the abundant evidence of Greenberg's culpability, this is not that "rare case" that warrants setting aside the jury's verdict. *Rigas*, 583 F.3d 108, 123.

## II. GREENBERG'S RULE 50(B) MOTION FAILS ON THE MERITS.

### A. STANDARD OF REVIEW

A Rule 50(b) motion for judgment as a matter of law following a jury verdict may be granted "[o]nly if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against

---

[8] Greenberg's pretrial dispositive motions were denied by retired District Judge Barbara Jones.

[the moving party]." *LeBlanc-Sternberg v. Fletcher*, 57 F.3d 412, 429 (2d Cir. 1995); *Stampf v. Long Island R. Co.*, 761 F.3d 192, 197 (2d Cir. 2014). "[A] jury is entitled to believe part and disbelieve part of the testimony of any given witness . . . and its assessments of witness credibility and its choices between competing factual inferences are not to be second-guessed." *Lore*, 670 F.3d at 150 (citing *Anderson v. Bessemer City*, 470 U.S. 564 (1985)). The question of the sufficiency of the evidence (viewed in light most favorable to Koch) to sustain the verdict is reviewed de novo. *Sanders v. New York City Hum. Res. Admin.*, 361 F.3d 749 (2d Cir. 2004).

## B. KOCH REASONABLY RELIED ON GREENBERG'S MISREPRESENTATIONS.

Greenberg raises three challenges to the jury's liability verdict. First, Greenberg contends that he cannot be liable for fraud because a disclaimer in an auction catalog stated that the items were sold "as is." Br. 32-42. Second, Greenberg alleges there was insufficient evidence that he made any misrepresentation or owed Koch a duty to disclose. Br. 43-52. Finally, Greenberg claims that there was insufficient evidence for the jury to conclude that his conduct was materially misleading or consumer oriented in violation of the GBL. Br. 52-58. None of these challenges can prevail.

In New York, a defendant generally cannot avoid liability for fraud by means of a contractual limitation. *See Turkish v. Kasenetz*, 27 F.3d 23, 27-28 (2d Cir. 1994) ("It is well settled that parties cannot use contractual limitation of liability clauses to shield themselves from liability for their own fraudulent conduct."). As an exception to this rule, a specific disclaimer may preclude a buyer from relying upon disclaimed representations, but only where "the facts represented are not matters peculiarly within the [defendant's] knowledge." *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 322 (1959).[9] "A specific disclaimer will not undermine another party's allegation of reasonable reliance on the misrepresentations" if "the allegedly misrepresented facts are peculiarly within the misrepresenting party's knowledge." *Warner Theatre Assocs. v. Metro. Life Ins. Co.*, 149 F.3d 134, 136 (2d Cir. 1998).

### 1. WHETHER A DEFENDANT HAS "PECULIAR KNOWLEDGE" IS A JURY QUESTION.

The question of whether facts are "peculiarly within the misrepresenting party's knowledge" is a factual question left to the jury. *Country World Inc. v. Imperial Frozen Foods Co.*, 186 A.D.2d 781, 782

---

[9] Even a specific disclaimer may be insufficient to preclude reliance if the disclaimer is buried in a "generalized boilerplate exclusion" or was not negotiated between the parties. *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 95 (1985). Here, the general, boilerplate "as is" disclaimer in the auction catalog, was buried on page 240 of a 270 page catalog and was not negotiated between Koch and Greenberg. Ex. 101.0240.

(1992) (citing *Dygert v. Leonard*, 138 A.D.2d 793 (1988); *Petraccione v. Simmons*, 106 A.D.2d 776 (1984); *Tahini Invs. v. Bobrowsky*, 99 A.D.2d 489 (1984)); *see also Steinhardt Grp. Inc. v. Citicorp.* 272 A.D.2d 255, 257 (2000) ("[T]here are factual issues as to whether defendants acted with superior knowledge…").  The jury is tasked with determining whether the plaintiff could reasonably be expected to have uncovered the material facts known by the defendant—whether the facts were discoverable through "the exercise of ordinary intelligence."  *Danann Realty*, 5 N.Y.2d at 322; *see Abu Dhabi Comm. Bank v. Morgan Stanley and Co.*, No. 08 Civ. 7508 (SAS), 2013 WL 664176, *1 (Feb. 25, 2013 S.D.N.Y.) ("[T]he preliminary determination of whether plaintiffs *could have* discovered the fraud (the 'peculiar knowledge question') is a factual question for the jury." (emphasis in original)).

In applying the peculiar knowledge analysis, courts do not impose any *per se* requirement that the plaintiff perform an inspection.  *Todd v. Pearl Woods, Inc.*, 20 A.D.2d 911 (1964) ("where, as here alleged, the facts were peculiarly within the knowledge of the defendants and were willfully misrepresented, the failure of the plaintiffs to ascertain the truth by inspecting the public records is not fatal to their action [for fraud]").  Rather, the jury must determine what amount of inspection, if any, is reasonable.

The case of *Tahini Investments, Ltd. v. Bobrowsky*, 99 A.D.2d 489 (1984), is instructive. The *Tahini* plaintiff purchased land the defendant represented as having been previously used as a horse farm. When the plaintiff discovered buried drums of industrial waste, suggesting the land had actually been a dumping site, the defendant asserted that a contractual disclaimer precluded the plaintiff's reliance on the horse farm representation. The Appellate Division disagreed and reversed the grant of summary judgment, holding that "[t]he material issues of whether defendant knew of the existence of the dumping site and whether plaintiff could have ascertained the site's presence *with reasonable diligence*, present questions of fact which may not be resolved on motion papers." *Id.* (emphasis added).

*Tahini* reaffirms that the relevant question is not one of whether the plaintiff could have possibly discovered the true facts—without regard to expense or ease—but rather, is one of *reasonableness*, a quintessential jury question. *See also Danann Realty*, 5 N.Y.2d at 322 (exception applies where plaintiff does not have "the means available to him of knowing, *by the exercise of ordinary intelligence*, the truth, or the real quality of the subject of the representation" (emphasis added)); *Black v. Chittenden*, 69 N.Y.2d 665, 669 (1986) (seller of bowling alley had peculiar knowledge where alley's defects were "not detectable to the

untrained eye"); *DIMON Inc. v. Folium, Inc.,* 48 F. Supp. 2d 359, 369 (S.D.N.Y. 1999) (seller had peculiar knowledge notwithstanding that buyer was "extremely sophisticated part[y]" with "access to the resources and specialized skills necessary to conduct a quite thorough review" of records underlying fraud).

### 2. THE JURY REASONABLY CONCLUDED THAT GREENBERG HAD PECULIAR KNOWLEDGE.

Greenberg's argues that his knowledge was not "peculiar" to him, because Koch did not inspect the wines before sale, and such inspection would have revealed that the wines were inauthentic. But the jury reasonably rejected that argument. The evidence showed that:

- Koch was not trained in detecting counterfeits. Tr. 959:12-22; *Black*, 69 N.Y.2d at 669 (peculiar knowledge existed where defects were "not detectable to the untrained eye");

- Greenberg, by contrast, was a wine businessman versed in identifying counterfeit wine;

- Pre-auction inspections were rare in the industry, and were considered too costly and time-consuming (Tr. 1073:13-19, 1300:1-5, 1298:25-1299:17 (Wine expert, Michael Egan, testifying that buyers "very rarely" inspect wines), 148:12-150:4 (Sotheby's Senior Vice President, Jamie Ritchie, testifying that "it is rare that buyers inspect prior to auction," as they "trust the information in the

catalogs"), 616:2-6 (Greenberg admitting even he "didn't physically inspect" before purchasing wines at auction)); and

- Inspecting the bottles Koch purchased at the October 2005 auction would have taken an expert more than 1,100 hours—an impossible chore in the two weeks between Koch's receipt of the catalog and the auction. Tr. 1073:13-19; 1300:1-5.

Meanwhile, the jury could also conclude that Greenberg knew material information no amount of inspection would reveal (*see* Tr. 2228-34 (summarizing facts Greenberg was told by others that Koch could not have known)):

- Greenberg alone knew that certain of the wines had been rejected by auction houses as counterfeit (Sotheby's, Acker);

- Greenberg alone knew that certain of the wines had been returned to him as counterfeit (Chicago Wine Company);

- Greenberg alone knew that certain wines came from notorious sources of counterfeit wine, such as Royal, Kurniawan, and Bordeaux Wine Locators. Exs. 78, 107, 31, 316, 317, 318, 353, 354, 388; *See, e.g.,*

- Greenberg alone knew that he had determined certain of the wines were counterfeit;

- Greenberg alone knew that his expert had determined certain wines were counterfeit; and

- Greenberg alone knew that he *intended* to sell counterfeit wine, and had told three people as much.

Thus, Koch's "reasonable diligence" would not have uncovered Greenberg's fraud. *Country World Inc.*, 186 A.D.2d at 782; *Todd*, 20 A.D.2d 911 (jury could excuse failure to investigate when defendant "willfully misrepresented" facts only within defendant's knowledge).

The cases Greenberg cites do not subvert the jury's finding as they are inapposite. *See ACA Galleries Inc. v. Kinney*, 928 F. Supp.2d 699, 703 (S.D.N.Y. 2013) (plaintiff gallery was "in the business of buying and selling art," evidence suggests that pre-purchase inspection was standard in art industry, and plaintiff's inspector sent email confirming availability to inspect before sale); *Foxley v. Sotheby's*, 893 F.Supp. 1224, 1230-32 (1995) (defendant auction house made no representation regarding provenance of painting at issue, plaintiff never received letter he allegedly relied upon, and "fraud claim [wa]s barred by the statute of limitations"); *McPherson v. Husbands*, 864 N.Y.S.2d 444, 445-46 (App. Div. 2d Dep't 2008) (defendant seller did nothing to "thwart[]" discovery of termites before sale, plaintiff home buyer personally observed termite damage before sale, and even retained termite company; plaintiff's

fraud and other claims remained against termite company that failed to eradicate termites); *UST Private Equity Investors Fund, Inc. v. Salomon Smith Barney*, 733 N.Y.S.2d 385, 386 (App. Div. 1st Dep't 2001) (in stock sale, where plaintiff investors failed to obtain documents from purchased corporation as part of due diligence, defendant broker had neither the documents nor superior access to them).

In particular, and unlike here, pre-sale inspections in the cases Greenberg cites were cheap, easy, commonplace in the relevant industry, and would certainly have disclosed the alleged misrepresentation. *See Dallas Aerospace, Inc. v. CIS Air Corp.,* No. 00 Civ. 1657, 2002 WL 31453789, at *6 (S.D.N.Y. Oct. 31, 2002) (plaintiff aircraft buyer "could have obtained an 'Engine Event History' report for a nominal fee," unlike situation where plaintiff "would face high costs"); *Nigro v. Lee*, 882 N.Y.S. 2d 346 (App. Div. 3d Dep't 2009) (unlike wine authenticity, history and condition of car were cheap and easy to investigate via "vehicle history report" or mechanic's inspection); *Most v. Monti*, 456 N.Y.S.2d 427, 428 (App. Div. 2d Dep't 1982) (alleged "verbal assurance[]" that health club was fully assessed for tax purposes was cheap and easy to look up in public records).

### 3. THE DISTRICT COURT DID NOT "MISUNDERSTAND" PECULIAR KNOWLEDGE.

Greenberg incorrectly claims that the District Court misunderstood "peculiar knowledge". Greenberg can cite no authority that "peculiar knowledge" is limited to "external indicia of the wine's authenticity." Br. 39. Nor is it true that "Koch never contended that evaluating authenticity involved anything other than visual inspection." Br. 39. To the contrary, for example, provenance (the source of the wine at issue) is an important factor in assessing a wine's authenticity. Greenberg alone knew the provenance of his wines (*i.e.*, from where he purchased the wines), and this information is not detectable by visual inspection. Greenberg knew that provenance is important in evaluating authenticity based on his own experience with fakes. *See, e.g.*, Ex. 310; Ex. 98 (falsely representing provenance to Zachys because "[w]ines from the nineteenth century will not fetch top dollar, in fact will be much harder to sell without provenance"). Koch could not have determined— as Greenberg knew—that the wines Greenberg sold came from notorious sources of counterfeit wine, such as Royal and Bordeaux Wine Locators. *E.g.*, Exs 62, 107, 266, 283, 291, 306, 331, 332, 388.

In claiming that the District Court made "inconsistent holdings" in determining that there was evidence sufficient to find that Greenberg had peculiar knowledge but Zachys did not, Greenberg ignores the

evidence.  Br. 39-40.  Greenberg and Zachys did not possess equal knowledge.  To the contrary, the evidence shows that Greenberg withheld his superior knowledge from *both* Zachys and Koch.  *See supra* at pp. 15-17.  The District Court therefore concluded that Zachys "was at the same comparative disadvantage as [Koch]." Dkt. 33 at 9.

### C. The Jury Reasonably Found That Greenberg Misrepresented and Fraudulently Concealed Material Information.

#### 1. Greenberg Cannot Evade Liability Simply Because He Made His Misrepresentations Through Zachys.

"One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act . . . in reliance upon the misrepresentation." Rest. (2d) of Torts § 531.  The Restatement explains:

> The maker of a fraudulent misrepresentation is subject to liability . . . to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.

*Id.* § 533.  One making a fraudulent misrepresentation "with notice in the circumstances of its making that the person to whom it was made would communicate it to third parties subjects the person making the misrepresentation to liability to the third party."  *Ostano*

*Commerzanstalt v. Telewide Sys., Inc.*, 794 F.2d 763, 766 (2d Cir. 1986); *Greene v. Mercantile Trust Co.*, 60 Misc. 189, 193 (N.Y. Sup. Ct. 1908) ("It is not necessary that these representations should be made to the plaintiff personally."); *see also Tindle v. Birkett*, 171 N.Y. 520 (1902) (defendant that knowingly misrepresents its credit-worthiness to intermediary-agency with intent that misrepresentations be communicated to third-party-sellers is liable to such sellers). If the misrepresentation is actually communicated to the plaintiff, it is an "unremarkable principle" that the defendant may be liable for misrepresentations communicated by a third party.

Greenberg argues that he can evade liability because he made his misrepresentations through an intermediary: Zachys. Br. 43-46. But the jury reasonably rejected Greenberg's implausible claim that Zachys alone was responsible for the catalog, or that Zachys "served as the expert exercising independent and final judgment" regarding the auction and catalog. Br. 44. The evidence shows that Greenberg personally selected the bottles for auction and affirmed their authenticity in so doing. Ex. 528; Tr. 758:6-25. Numerous emails show that Greenberg collaborated with and oversaw Zachys in drafting and preparing the catalog with its extensive representations regarding the authenticity and desirability of the wines being sold, even directing

which language was acceptable and which was not. *See* Exs. 435 (Greenberg to Zacharia: "PLEASE SEE COMMENTS WITHIN AND BELOW TEXT. I WANT TO REVIEW NEXT DRAFT [introduction] AS WELL."), 439, 524, 526, 528.

Greenberg knew and intended that Zachys would communicate his misrepresentations to consumers such as Koch, as illustrated by Greenberg's edits to and comments regarding the catalog's glowing introduction. Ex. 435. And Greenberg knew that each bottle of wine he auctioned included a label representing the bottle as authentic (*i.e.*, the labels did not say that the bottles were "purported to be" of a certain vintage and producer, instead the labels reflected that the bottles were in fact of that vintage and producer). Thus, Greenberg misstates the evidence when he claims "the undisputed evidence was that Zachys, not Greenberg controlled anything the Catalog said about authenticity." Br. 45.[10]

That Zachys participated in passing on Greenberg's misrepresentations does not excuse Greenberg of liability. *See Wechsler*

---

[10] At Greenberg's request, the jury was asked to apportion fault between Greenberg and Zachys in connection with the GBL claims. The jury concluded that Greenberg was "100%" at fault for the violations of GBL § 349 and "75%" at fault for the violations of § 350. The jury thus expressly rejected Greenberg's claim that Zachys is the only one that made misrepresentations.

*v. Hoffman-LaRoche, Inc.*, 198 Misc. 540 (Sup. Ct, Bronx Cty. 1950) (defendant drug manufacturer liable in fraud to patient's estate where manufacturer misrepresented drug's fatal propensities to prescribing doctor, who then passed misrepresentations on to patient).  Moreover, Greenberg refused to disclose material information and lied to Zachys about the sources of his wines.  Ex. 98; *see also supra* at pp. 15-17.

Greenberg's reliance on *SIPC v. BDO Seidman, LLP,* 746 N.E.2d 1042 (N.Y. 2001) and *Cristallina S.A. v. Christie, Manson & Woods Int'l, Inc.*, 502 N.Y.S.2d 165 (App. Div. 1st Dep't 1986) is misplaced.  In *SIPC*, the New York Court of Appeals held as an "inescapable conclusion" that the third-party regulatory agency "had a significant role in choosing what information it wanted to receive [from the defendant] and, in addition, what it deemed worthy of communicating [to the plaintiff]." 95 N.Y.2d at 710.  By contrast, Zachys received little of the information it wanted to receive from Greenberg, and Greenberg exerted editorial control over the communications that Zachys sent to consumers, including Koch.  Exs. 435, 439, 524, 526, 528; Tr. 231:2-9; 1491:5-10; 840:15-20; 1706:14-25.  Likewise, *Cristallina*, a breach of contract action, stands for the unremarkable fact that an auction house owes a duty to the consignor not to underprice the consignor's goods.  117 A.D.2d 284, 293.  *Cristallina* does not suggest that a consignor is

insulated from liability if—after lying to the auction house—the auction house fails to detect the lie. Yet that is what Greenberg argues here. Greenberg withheld information and lied to Zachys. Zachys' failure to detect such deceit cannot insulate Greenberg from liability to Koch.

### 2. THE JURY REASONABLY CONCLUDED THAT GREENBERG INDIRECTLY MADE REPRESENTATIONS OF FACT AND OPINION THAT WERE BOTH FALSE AND ACTIONABLE.

Greenberg next argues that the representations he made through Zachys are not actionable. Br. 46.

"[A]n expression of opinion may be actionable if it is not sincerely held." *Union Carbide Corp. v. Montell N.V.*, 9 F. Supp. 2d 405, 409 (S.D.N.Y. 1996); *Tribune Printing Co. v. 263 Ninth Ave. Realty, Inc.*, 57 N.Y.2d 1038, 1041 (1982) (statements that "falsely represent the declarant's state of mind" are actionable as "the state of his mind is a fact"); *Magnaleasing Inc. v. Staten Island Mall*, 428 F. Supp. 1039, 1042-43 (S.D.N.Y. 1977) ("It has long been the law of New York that an expression of opinion may constitute actionable fraud."); *see, e.g., Black*, 69 N.Y.2d at 668-69 (misrepresentation that bowling lane was in "good repair and operating condition" was actionable opinion).

In selling counterfeit wines, Greenberg made many misrepresentations of both fact and opinion, any of which could sustain the jury's liability findings.

First, in selecting the bottles to include in the auction, Greenberg represented to Zachys that he was consigning wines from specific chateaus and specific vintages. Ex 71; Tr. 590:17-591-7 (Greenberg prepared list of wines with vintages that he submitted to Zachys for inclusion in auction). Greenberg knew that if he represented to Zachys that a magnum he was consigning was a 1945 Chateau Lafite Rothschild, then the auction catalog would list the lot as "Chateau Lafite Rothschild 1945." That is precisely what occurred here. Ex. 101 at 51 (lot 394). The fact that this interaction took place between Greenberg and Zachys, and not with Koch directly is of no consequence. Rest. (2d) of Torts § 533; *Ostano Commerzanstalt*, 794 F.2d at 766. Greenberg knew that this representation would be repeated to "a class of persons"—wine auction customers such as Koch—"whom he intend[ed] or ha[d] reason to expect [would] act . . . in reliance upon the misrepresentation." Rest. (2d) of Torts § 531. Greenberg also knew this representation to be false. Tr. 467:24-468:6 (Greenberg conceded Koch purchased magnum of purported 1945 Lafite, which was previously rejected by Kapon).

Greenberg's allegation that the catalog "specifically disclaims authenticity" is factually wrong and legally irrelevant. Br. 46. The catalog made the representation, for example, that Lot 409 consisted of

three bottles of "Chateau Latour 1928." Koch purchased Lot 409, believing he "was getting Latour 1928." Tr. 943:18-944:4. In truth, at least one of the bottles was not produced by Chateau Latour and was not produced in 1928. *See, e.g.,* Ex. 200 (bottle with Edgerton sticker "41"); Ex 73 (concluding bottle "41" was "definitely counterfeit"); Tr. 1348:11-22; 1349:14-1350:11. Each of the 24 bottles was the subject of similar misrepresentations by Greenberg, as all the experts, including Greenberg's, concluded that not one of the bottles should have been offered for sale as a genuine wine. Tr. 1994:10-12.

Second, Greenberg misrepresented the provenance of his counterfeit wines. For example, Greenberg represented that "all" the Right Bank magnums[11] had been "sourced on the continent"—*i.e.* the wines came from Europe and not from, for instance, Royal. Tr. 1735:6-1736:2. This is plainly false. Such misrepresentations were material as the provenance of wine influences the wine's value. Tr. 937:16-938:5 (provenance critical to Koch in purchasing wine); Ex 430 (email from Zacharia to Greenberg's cellar master: a key to "get top dollar for his old wines is getting the provenance."). Greenberg himself considered

---

[11] The Right Bank is a Bordeaux region that is home to several prominent chateaus, including Chateau Petrus, Chateau Lafleur, and Chateau Cheval Blanc. *See, e.g.,* Tr. 1929:5-10.

provenance crucial, as he had stated that he thought any bottle originating from certain sources was counterfeit.  Ex. 310.

Third, even the statements that Greenberg calls puffery are actionable under New York law because of the evidence that these opinions were not sincerely held.  Ex. 435.  For instance, Greenberg misrepresented the sources of his older Bordeaux, claiming it was untraceable or from unobjectionable sources, when in fact he knew that much of these wines came from Royal, a notorious purveyor of fakes. Ex. 98.  Greenberg also misrepresented that he was a "collector" of wine.  *Compare* Exs. 101 & 435, *with* Tr. 316-19.  Greenberg now argues that he was merely "a collector who, like Koch, auctioned some of his wine."  Br. 48.  The evidence shows the opposite, that Greenberg was CEO and founder of a wine business, Innovation Wines, and he viewed wines as "like a stock or a bond."  Tr. 316-19. Greenberg had sold tens of millions of dollars worth of wines, making him one of the largest wine sellers in the world.  Tr. 324-25.

Greenberg concedes false statements of opinion can "constitute actionable fraud where a present intent to deceive exists."  Motion at 3. The jury found "a present intent to deceive" here.  Greenberg told people before the October 2005 auction that he intended to sell his counterfeit wine.  Tr. 175:10-25 (Ritchie); Tr. 757:7-758:2 (Cortes); Ex.

380 (Kurniawan).  Then, after the sale, Greenberg told another auction house that the "garbage" had "been sold."  Ex. 476.

**D.  THE JURY REASONABLY FOUND THAT GREENBERG FRAUDULENTLY CONCEALED FACTS FROM KOCH.**

The evidence also supports the jury's finding that Greenberg is liable for fraudulent concealment. *Young v. Keith*, 112 A.D.2d 625, 627 (3d Dep't 1985) ("Concealment with intent to defraud of facts which one is duty-bound in honesty to disclose is of the same legal effect and significance as affirmative misrepresentations of fact").  A defendant-seller has a duty to disclose (1) "where [he or she] possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge" or (2) "where [he or she] has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth."  *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).  Greenberg had a duty to disclose the truth about his wine under either theory.

**1. GREENBERG POSSESSED SUPERIOR KNOWLEDGE.**

Greenberg had superior knowledge not "readily available" to Koch, *Brass*, 987 F.2d at 150, nor "made obvious by the disclosed facts." *Muller-Paisner v. TIAA*, 289 F. App'x 461, 465 (2d Cir. 2008).

Greenberg also knew Koch was acting based on a mistaken belief that the wine was authentic. *Brass*, 987 F.2d at 150. Greenberg argues he did not personally know Koch, but that's irrelevant. Br. 48. Greenberg knew that no one wanted to buy counterfeit wine, and that anyone buying it must be acting on the mistaken belief it was genuine. Such conduct has been held to be sufficient to trigger a duty to disclose. In *Donovan v. Aeolian*, 270 N.Y. 267, 271 (1936), the New York Court of Appeals held that a defendant piano-retailer had a duty to disclose that the showroom piano plaintiff purchased was used—even though defendant had made no affirmative misrepresentations. Merely by placing the piano in the showroom, defendant "induced" plaintiff into believing it was new. *Id.* In *Minpeco S.A. v. Conticommodity Servs., Inc.,* 552 F. Supp. 332, 336-38 (S.D.N.Y. 1982), the defendants allegedly conspired to manipulate the silver market. The "trading defendants" who bought up silver futures—but did not deal directly with plaintiff silver trader—could nevertheless be liable to plaintiff under a "superior knowledge" theory of fraudulent concealment.

The other cases Greenberg relies upon are inapposite. In *Mandarin Trad'g Ltd. v. Wildenstein,* 16 N.Y.3d 173 (2011), the defendant made representations (a valuation of a painting) in an appraisal letter addressed to a third party without any indication that

defendant contemplated the letter would be used in furtherance of a sale. *Id* at 177. Here, of course, Greenberg intended that his misleading statements in the catalog would be communicated to potential consumers such as Koch. *E.g.*, Ex. 435. *Remington Rand* is inapplicable for similar reasons. 68 F.3d 1478 (2d Cir. 1995). *Steinberg v. Guild*, 258 N.Y.S.2d 670, 671 (App. Div. 1st Dep't 1965) was resolved by summary opinion that does not even identify which theory of fraudulent concealment was at issue.

### 2. GREENBERG MADE PARTIAL STATEMENTS.

Greenberg assumed a duty to disclose true facts by making partial statements regarding the source of his wine. *Id.* Greenberg incorrectly claims that he made no disclosure at all. Br. 51. But Greenberg represented that the bottles being consigned were authentic. He represented that his "older Bordeaux" came from legitimate sources, without disclosing that many of his older Bordeaux actually came from Royal or Bordeaux Wine Locators (both of whom Greenberg believed trafficked in counterfeit wines). Ex. 98. After disclosing some of his alleged sources, Greenberg "could not fairly stop halfway, listing those [facts] that were unimportant and keeping silent as to the other[s]." *Junius Const. Corp. v. Cohen,* 257 N.Y. 393, 400 (1931). Likewise, by placing his wines in glossy catalogs with glowing rhetoric, Greenberg

induced buyers to believe that Greenberg did not suspect them to be counterfeit. *Donovan*, 270 N.Y. at 271 (defendant piano maker's placement of used piano in showroom "induced" plaintiff to believe it was new, triggering defendant's duty to disclose true facts).

### E. THE JURY PROPERLY FOUND THAT GREENBERG'S SALE OF COUNTERFEIT WINE VIOLATED OF NEW YORK GBL.

A claim under GBL §§ 349 and 350 requires a plaintiff to prove "that a defendant engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Koch v. Acker, Merrall & Condit, Co.*, 18 N.Y.3d 940, 941 (2012). These consumer-protection causes of action were enacted to "ensure an honest marketplace." *Goshen v. Mut. Life Ins. Co.*, 98 N.Y.2d 314, 321 (2002). To give full effect to the statute, the GBL's "consumer-oriented" requirement is broadly interpreted, and satisfied by "conduct that *potentially* affects similarly situated consumers." *S.Q.K.F.C. Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 636 (2d Cir. 1996) (emphasis added).

The statute's sweeping protection applies equally to individual and corporate plaintiffs, rich and poor alike. *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 262 (2d Cir. 1995) (wealthy corporate plaintiff entitled to recover for defendant's violation of GBL § 349).

Claims under the GBL do not require proof of scienter, *Oswego Laborers' v. Marine Mid. Bank*, 85 N.Y.2d 20, 26 (1995), or of justifiable reliance, *Acker, Merrall & Condit Co.*, 18 N.Y.3d at 941. The New York Court of Appeals squarely rejected the notion that an as-is disclaimer in a catalog could bar recovery under the GBL. *Id.* ("disclaimers set forth in defendant's catalogs do not . . . bar claims for deceptive trade practices").

**1. THE JURY REASONABLY FOUND THAT GREENBERG'S SALE OF COUNTERFEIT WINE WAS MISLEADING.**

First, Greenberg again argues he did not make any false or incomplete statements. As detailed above, the jury reasonably concluded that Greenberg misrepresented the nature of his counterfeit wine by, at least, (1) identifying it as something it was not; (2) lying about its provenance; and (3) making statements of opinion he knew to be false. *See supra* Part II.C.2. While Greenberg cites *Gomez-Jimenez*, 956 N.Y.S.2d 54 (1st Dep't 2012), for the proposition that "simply publishing truthful information" is not materially misleading, the jury rightly concluded that his conduct was far more deceptive than speaking half-truths. *E.g.*, Ex 101; Tr. 1735:6-1736:2 (making misrepresentations about the sources of his wines).

Second, Greenberg relies on inapposite and outdated cases from intermediate state courts to claim that action catalogs disclaimers could

defeat his liability under the GBL. Br. 54 (citing *Moore v. Microsoft Corp.*, 741 N.Y.S.2d 91 (2d Dep't 2002; *Against Gravity Apparel, Inc. v. Quarterdeck Corp.*, 699 N.Y.S.2d 368 (1st Dep't 1999)). In 2012, before the trial in this case, the New York Court of Appeals in *Koch v. Acker, Merrall*, squarely held that "disclaimers set forth in defendant's catalogs do not . . . bar claims for deceptive trade practices." 18 N.Y.3d at 941. While Greenberg acknowledges the Court of Appeals' ruling in a footnote,[12] he posits a meritless theory that this Court can usurp the jury's function and consider the disclaimer and hold as a matter of law that "[t]he totality of evidence presented at trial . . . establishes the consignment was not materially misleading." Br. 54 n. 14. Unsurprisingly, Greenberg offers no legal authority to support this theory.

Third, Greenberg again ignores the role of the jury in asking this Court to hold as a matter of law that Koch "could *reasonably* have obtained the relevant information regarding the wine's authenticity." Br. 54 (emphasis added). As discussed above with respect to Greenberg's peculiar knowledge, the evidence supports the jury finding that information about the wine's authenticity was not reasonably

---

[12] The "disclaimer" cases Greenberg relies on come from New York's intermediate appellate courts and pre-date the New York Court of Appeals' ruling in *Koch v. Acker, Merrall*.

obtainable. *See supra* Part II.B.2. Moreover, because reliance is not an element of a GBL claim, it is of no consequence whether Koch could or could not have obtained the information about the counterfeit wines that Greenberg was concealing.

Greenberg claims that "[u]nder th[e] circumstances, a *reasonable* auction-goer would not be mislead about Greenberg's wines." Br. 55 (emphasis added). But "[d]isputes over reasonableness are . . . fact questions for juries." *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995). In this case, the jury considered the facts and found in favor of Koch.

### 2. GREENBERG'S SALE OF COUNTERFEIT WINE WAS CONSUMER-ORIENTED.

Greenberg's arguments that his October 2005 auction, in which he sold 17,000 bottles of wine for around $9 million, was not "consumer-oriented" conduct are similarly unavailing. The GBL's "consumer-oriented" requirement is broadly interpreted. As Greenberg concedes, the question here is whether his conduct could have "'*potentially* affect[ed] similarly situated consumers.'" Br. 55. The evidence demonstrates the answer is "yes." The deceptive catalog Greenberg drafted with Zachys was disseminated to over 2,000 potential buyers. Tr. 640; Ex. 96.0064. Many people attended the auction in person. Tr. 1900:23-1901:4 (auction conducted in a "full room. There must have been 60 or 80 people" attending in person). Others purchased wines or

placed bids by telephone.  Ex. 101 at 235.  Undoubtedly, a jury could find that Koch was not the only potential victim of Greenberg's deceptive sale.[13]

Greenberg argues that the GBL cannot apply because wine is not a consumer good.  Br. 56.  Not only is there no support for his claim, but the New York Court of Appeals has rejected this argument by sustaining GBL claims arising out of the purchase of allegedly counterfeit bottles of wine.  *Acker, Merrall & Condit Co.*, 18 N.Y.3d at 940-41 (Under GBL "a plaintiff must allege that a defendant has engaged in . . . consumer-oriented conduct . . . .  Here, plaintiff sufficiently pleaded such causes of action").

Next, Greenberg argues that "[i]f anyone engaged in consumer-oriented activity, it was Zachys, not Greenberg."  Br. 57.  The jury expressly disagreed, specifically finding that Greenberg was "100%" at fault for engaging in the materially deceptive practices under section 349 and was "75%" at fault for violations of section 350 for false advertising in the auction catalog.  Dkt. No. 451 at 13.  As detailed

---

[13] In fact, other customers from the same auction also complained that the wine they purchased was counterfeit.  The District Court excluded documents containing these reports on the grounds of hearsay. In doing so, the court stated that it viewed "the auction here is the type of thing" that meets the consumer-oriented element.  Tr. 2054:11-2060:11.

above, such apportionment was wholly reasonable in light of the evidence. *See*, *e.g.,* Ex. 435. Given the jury's rejection of Greenberg's claim that Zachys was an intermediary responsible for cleansing his misconduct, Greenberg's reliance on *St. Patrick's Home v. Laticrete Int'l, Inc.*, 696 N.Y.S.2d 117 (1st Dep't 1999) is misplaced.

Finally, Greenberg claims that because his deceptive conduct involved rare wine auctions, only wealthy people were likely targeted. But "too rich to be a victim" is not a theory under the GBL. *Securitron Magnalock Corp.*, 65 F.3d at 262 (wealthy corporate plaintiff can recover for violation of 349).[14] Neither the amount paid nor the wealth of the victim can preclude liability under the GBL as a matter of law.

## III. <u>GREENBERG'S INTENTIONAL AND EGREGIOUS MISCONDUCT WARRANTS PUNITIVE DAMAGES.</u>

### A. STANDARD OF REVIEW

New York courts will not disturb a jury verdict for punitive damages unless the verdict is "utterly irrational."[15] *Liberman v.*

---

[14] Contrary to Greenberg's claim, GBL cases do not uniformly involve small damage amounts. *Securitron*, 65 F.3d at 262; *see also Blue Cross and Blue Shield v. Philip Morris, Inc.*, 178 F.Supp.2d 198 (E.D.N.Y. 2001) (upholding $17 million damages verdict under GBL § 349), rev'd on other grounds, 393 F.3d 312 (2d Cir. 2004).

[15] "For rights that are state created, state law [of the forum state] governs the amount properly awarded as punitive damages" in diversity jurisdiction cases. *Gasperini v. Center. For Humanities, Inc.*, 518 U.S. 415 (1996).

*Riverside Mem. Chapel*, 225 A.D.2d 293, 289 (1st Dep't 1996); *see also*

*Nardelli v. Stamberg*, 44 N.Y.2d 500, 503 (1978). This Court is

"required to view all evidence in the light most favorable to sustaining

the jury's verdict," and is not "free to substitute its own fact findings or

credibility determinations for those of the jury." *Payne v. Jones*, 711

F.3d 85, 98 n.10 (2d. Cir. 2013).

## B. GOVERNING LAW

New York law authorizes punitive damages for a wide array of

misconduct. "[I]t is not the form of the action that gives the right to the

jury to give the punitory damages, but the moral culpability of the

defendant." *Walker v. Sheldon*, 10 N.Y.2d 401, 404-05 (1961) (internal

quotation marks omitted).[16] The award of such damages is properly

"left to the jury in their sound discretion . . . to amplify the damages

(actually caused) by way of punishment and example." *Id.*

In *Walker*, the New York Court of Appeals observed that punitive

damages are especially appropriate in actions for fraud because:

> [T]hose who deliberately and cooly engage in a far-
> flung fraudulent scheme, systematically conducted for
> profit, are very much more likely to pause and

_____

[16] Indeed, punitive damages are not limited to only intentional or bad faith conduct, but are available for willfully or wantonly negligent or reckless conduct. *Randi A.J. v. Long Island Surgi-Center*, 46 A.D.3d 74, 80-81 (2d Dep't 2007) (quoting *Home Ins. Co. v. Am. Home Prods. Corp.*, 75 N.Y.2d 196, 204 (1990)).

> consider the consequences if they have to pay more than the actual loss suffered by an individual plaintiff. An occasional award of compensatory damages against such parties would have little deterrent effect.

10 N.Y.2d at 406.

The *Walker* court held that punitive damages are available "where the fraud, aimed at the public generally, is gross and involves high moral culpability." *Walker*, 10 N.Y.2d at 405; *accord Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1118 (2d Cir. 1986) (authorizing punitive damages in cases of "gross, wanton or willful fraud . . . as to involve a high degree of moral culpability, making it appropriate to deter the defendants from engaging in similar conduct in the future and to induce the victim to take action against the wrongdoer"); *Aldrich v. Thomson McKinnon Sec. Inc.*, 756 F.2d 243 (2d Cir. 1985); *Flaks v. Koegel*, 504 F.2d 702 (2d Cir. 1974).

Other courts have not adhered to *Walker's* "aimed at the public generally" requirement, holding that punitive damages are proper wherever "the wrong is aggravated by recklessness or willfulness, whether or not directed against the public generally." *Barrett v. U.S. Banknote Corp.*, 806 F. Supp. 1094, 1101 (S.D.N.Y. 1992); *see also Blank v. Baronowski*, 959 F. Supp. 172, 179 (S.D.N.Y. 1997) ("Under New York law, punitive damages are allowable in tort cases involving claims for

fraud … even if there is no harm aimed at the general public …" and listing cases).  Contrary to Greenberg's arguments, Koch need not prove that the defendant's misconduct is repetitive;[17] punitive damages "have been awarded for a single act of wrongdoing."  *Whitney*, 782 F.2d at 1118.  The proper test is "whether the conduct is sufficiently willful and egregious to indicate a need for something more than compensatory relief."  *Whitney*, 782 F.2d at 1118.

## C.  THE JURY REASONABLY CONCLUDED THAT GREENBERG'S FRAUDULENT SCHEME WARRANTED PUNITIVE DAMAGES.

After being properly instructed, the jury concluded that Greenberg committed willful fraud.[18]  Greenberg nevertheless asks this Court to overturn the jury's factual findings to conclude that Greenberg's

---

[17] Evidence in this case, however, showed that Greenberg's conduct was repetitive.  *See, e.g.,* Tr. 846:12-50:5 (Downey testifying that Zachys rejected Greenberg wines in 2003, but Downey then "saw those same bottles being offered for sale through another auction house.").

[18] On appeal, Greenberg relies on his own testimony to claim that he did not intentionally sell counterfeit wine.  For example, Greenberg cites his trial testimony to claim that it was "undisputed" that he did not intend to sell the "smoking gun" bottle of 1928 Latour (the bottle Edgerton labeled with a "41" sticker and told Greenberg was "definitely counterfeit").  *See, e.g.,* Br. 24 n.10.  This fact was very much disputed.  The jury was free to discredit any or all of this testimony in light of the significant other evidence that Greenberg intended to sell his fake wine.  *Lore*, 670 F.3d at 150.

conduct "was neither reprehensible nor aimed at the public." Br. 58.[19] The evidence supports the jury's verdict, and this Court should affirm the punitive damages award.

Greenberg admits that "the disputed evidence could be viewed as suggesting a desire to sell fake wine in the future." Br. 62. This admission is fatal. It means—viewing this "disputed evidence" in the light most favorable to Koch, as this Court must—the evidence shows that Greenberg willfully and intentionally sold fake wine. *Randi A.J.*, 46 A.D.3d at 80-81.

Evidence of Greenberg's willfulness is overwhelming. Greenberg told at least three different people that he intended to sell his counterfeit wine. He told Ritchie: "if he did have any counterfeit wines in his collection, he could sell them through Acker Merrall because John Kapon would take anything." Tr. 175:10-25. He told Cortes: "what [Royal] did to me, I'll do to someone else." Tr. 757:7-24. He told

---

[19] As discussed *supra*, Greenberg failed to preserve his challenge to the sufficiency of the evidence warranting punitive damages. *Tolbert*, 242 F.3d at 77 (defendants' failure to specify basis for Rule 50(a) challenge to punitive damages award barred appellate review); *see also Morris v. Flaig*, 511 F. Supp. 2d 282, 298 (E.D.N.Y. 2007).

Kurniawan, regarding his "suspects" Bordeaux[20] wine: "I AM PUTTING IT ON AUCTION." Ex. 380. Greenberg also repeatedly attempted to sell his counterfeit wine to the public. After discovering his cellar was plagued by counterfeits, he approached multiple auction houses (Christie's, Acker) and wine vendors (Chicago Wine Company, Kurniawan) to unload fake wine. *See also supra* at pp. 20-23.

Drawing all inferences in favor of the verdict, these facts prove that Greenberg was morally culpable, the touchstone of the punitive damages analysis. *Walker*, 10 N.Y.2d at 405; *Aldrich*, 756 F.2d at 248. When caught, he tried to refund his ill-gotten gains and continue on his fraudulent way. Tr. 2401-10, 2428-29, 2445-47, 2480. Punitive damages were therefore necessary to deter Greenberg from continuing to sell his counterfeit wines. *Aldrich*, 756 F.2d at 248. Moreover, Greenberg's moral culpability is a quintessential factual question for the jury that should not be disturbed. *See Kramer v. Showa Denko KK*, 929 F. Supp. 733, 741 (S.D.N.Y. 1996 ("punitive damages claim … requir[es] a judge or jury to resolve the parties' differing versions of the truth at trial.").

---

[20] Every wine in this case is a purported Bordeaux wine (i.e., each bottle or magnum purportedly came from the Bordeaux region of France).

Greenberg claims he relied on Zachys to inspect, select, and market wines. Br. 60. But the jury could reject this self-serving testimony in favor of the evidence showing that Greenberg was an expert on wine authentication in his own right, did not rely on Zachys, and actively deceived Zachys. Tr. 1707:5-1728:25; *see also* Tr. 231:2-9 (Ritchie testifying to expectation that consigners disclose material facts to auction houses); 1491:5-10; 840:15-20.[21] Greenberg knew his cellar was riddled with fakes; he "personally pulled" bottles for the auction, Ex. 528; he misrepresented to Zachys and Koch the authenticity and provenance of his wines; and he exercised editorial control over the marketing for his auction.

In his appeal, Greenberg relies on inapposite cases in which the plaintiffs presented no evidence of willful or egregious conduct. Br. 60-62 (citing *Yuzwak v. Dygert*, 534 N.Y.S.2d 35 (App. Div. 4th Dep't 1988)

---

[21] The testimony of Ritchie, Egan, and Downey on this point alone demonstrates that Greenberg's conduct "constitute[d] a gross deviation from the standard of conduct that a reasonable person would observe in the situation." Br. 60 (quoting *MTBE*, 725 F.3d at 127-28). Even under Greenberg's unduly narrow interpretation of the punitive damages standard, there is no basis to overturn the jury's award, as the facts support a finding that Greenberg acted in a manner "close to criminality," Br. 60. Although, as explained *supra*, New York law authorizes punitive damages in a broader swath of cases than Greenberg admits, the overwhelming evidence of Greenberg's knowledge, intent, and conduct precludes the Court from discarding the jury's decision.

(no evidence suggested that the *Yuzwak* defendant had sold the horse as part of a "deliberate[]" or "systematic[]" "fraudulent scheme for profit"); *Ross v. Louise Wise Services, Inc.*, 8 N.Y.3d 478, 485 (N.Y. 2007) (defendant adoption agency's policy not to disclose psychiatric history of an adopted child's biological family was based on widely accepted (though later discredited) professional advice from psychiatrists and social workers); *Moustakis v. Christie's, Inc.*, 892 N.Y.S.2d 83 (App. Div. 1st Dep't 2009) (punitive damages were inappropriate not because they arose "from a private contract," as Greenberg suggests in his brief, but because the plaintiff pled no tortious conduct "apart from the contractual obligations").

## CONCLUSION

The District Court's judgment should be affirmed in all respects.

Dated:  February 17, 2015

Respectfully submitted,

*/s/ Moez M. Kaba*

JOHN C. HUESTON
MOEZ M. KABA
PADRAIC W. FORAN
C. MITCHELL HENDY
HUESTON HENNIGAN LLP
523 W. Sixth Street, Suite 400
Los Angeles, CA 90014
(213) 788-4340
*Counsel for Appellee William I. Koch*

# CERTIFICATION OF COMPLIANCE

I certify that this Brief of Appellee complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,665 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief was prepared using a proportionally spaced, 14 point font.

Dated:  February 17, 2015

/s/ *Moez M. Kaba*
Moez M. Kaba